# Exhibit A

**Appendix XII-B1**



## CIVIL CASE INFORMATION STATEMENT
### (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY |
| --- |
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
| --- | --- | --- |
| Julie LaVan | (856) 235-4079 | Burlington |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
| --- | --- |
| LaVan Law | |

| OFFICE ADDRESS | DOCUMENT TYPE |
| --- | --- |
| 11 East Main Street 2nd Floor Moorestown, NJ 08057 | JURY DEMAND  ■ YES  ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
| --- | --- |
| Michael Leese, Ashley Leese, A. Leese, a minor, I. Leese, a minor, A. K. Leese, a minor, Plaintiffs | Leese, et al. v. Lockheed, et al. |

| CASE TYPE NUMBER (See reverse side for listing) | IS THIS A PROFESSIONAL MALPRACTICE CASE?  ☐ YES  ■ NO |
| --- | --- |
| 605 | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING?  ☐ Yes  ■ No | IF YES, LIST DOCKET NUMBERS |
| --- | --- |

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)?  ☐ Yes  ■ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)  ☐ NONE  ☐ UNKNOWN |
| --- | --- |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?  ■ Yes  ☐ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE  ■ FRIEND/NEIGHBOR  ☐ OTHER (explain) ☐ FAMILIAL  ☐ BUSINESS |
| --- | --- |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?  ■ YES  ☐ No |
| --- |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?  ☐ YES  ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
| --- | --- |
| WILL AN INTERPRETER BE NEEDED?  ☐ YES  ■ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE: *Julie A. LaVan*

| | |
|---|---|
| Attorney(s) | LaVan Law |
| Office Address | 11 East Main Street |
| | 2nd Floor |
| Town, State, Zip Code | Moorestown, NJ 08057 |
| Telephone Number | 856-235-4079 |
| Attorney(s) for Plaintiff | Julie A. LaVan, Esq |

Michael Leese, Ashley Leese, A. Leese, a minor,

I. Leese, a minor, and A. K. Leese, a minor

      Plaintiff(s)

    Vs.

Lockheed Martin, and Orleans Homebuilders, Inc.

      Defendant(s)

# Superior Court of New Jersey

Burlington     ◆ COUNTY

Civil       DIVISION

Docket No:

# CIVIL ACTION
# SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

    The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

    If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

    If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

                                  Jennifer M. Perez,
                                  Acting Clerk of the Superior Court

DATED:   7/24

Name of Defendant to Be Served:     Lockheed Martin

Address of Defendant to Be Served:     199 Borton Landing Road

NOTE: The Case Information Statement is available at www.njcourts.com.

# Directory of Superior Court Deputy Clerk's Offices
## County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(800) 496-4570

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl.,  Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records,  Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn:  Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(908) 475-2010

LaVan Law
Julie A. LaVan, Esq.
11 East Main Street, 2nd Floor
Moorestown, NJ 08057
856-235-4079 (Phone)
856-235-4018 (Fax)
Attorney for Plaintiffs

SUPERIOR COURT OF NEW JERSEY

Michael Leese, Ashley Leese,
A. Leese, a minor,
I. Leese, a minor, and
A. K. Leese, a minor

              Plaintiffs,

        v.

Lockheed Martin, and its wholly-owned
or controlled subsidiaries,
Orleans Home Builders, Inc., and its
wholly-owned or controlled subsidiaries

              Defendants.

LAW DIVISION
CIVIL PART
BURLINGTON COUNTY

Docket No. L-2487-11

Civil Action
**COMPLAINT AND JURY DEMAND**

      Plaintiffs Michael and Ashley Leese and their minor children, A. Leese, I. Leese, and A. K. Leese ("Plaintiffs"), by way of complaint against the above-named defendants ("Defendants"), aver as follows:

## Statement of the Case

1.     The Plaintiffs bring this civil action pursuant to the Spill Compensation and Control Act ("the Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -20, the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. 6921 *et seq.*, and the common law, for reimbursement of the costs and damages they have incurred, and will incur, as a result of the discharge of pollutants and hazardous substances

1

affecting the Plaintiffs' residence at 5 Victoria Ct., Moorestown, NJ 08057 (hereinafter "the Property").

2.      Plaintiffs request relief in the form of:

a.      Injunctive relief, ordering Defendant Lockheed Martin, under the supervision of the New Jersey Department of Environmental Protection, to properly and fully remediate the Property and the groundwater beneath the Property in accordance with all relevant New Jersey and federal environmental laws;

b.      Monetary damages in an amount to be determined at trial, representing Plaintiffs' physical injuries, pecuniary losses, including loss of property value, and emotional distress;

c.      And all appropriate legal fees and costs in pursuing this action.

## PARTIES AND VENUE

3.      Plaintiffs are persons residing at 5 Victoria Ct., Moorestown, NJ 08057.

4.      Defendant Lockheed Martin ("Lockheed") is an aerospace and defense corporation with its headquarters in Bethesda, Maryland, and conducting business in the State of New Jersey.

5.      Defendant Orleans Homebuilders ("Orleans") is a homebuilding corporation incorporated in Pennsylvania and conducting business in the State of New Jersey through its subsidiary A.P. Orleans, Inc. of New Jersey.

6.      Venue is appropriate because the injury occurred in Burlington County, New Jersey and Defendants conduct business therein.

2

## GENERAL ALLEGATIONS

7.     Defendant Lockheed is the owner and operator of a facility on Borton Landing Road in Moorestown, NJ (hereinafter the "Site").

8.     On June 7, 2003, Plaintiffs purchased 5 Victoria Court (the "Property") from Defendant Orleans.  The Agreement of Sale is attached hereto as Exhibit "A" and is incorporated herein by reference.

9.     Plaintiffs' home is across the street, in very close proximity to Defendant Lockheed's Borton Landing Road facility.

10.     Contained in the Agreement of Sale was a disclosure of environmental issues at the Property.  The "Executive Summary" section of the agreement includes a preliminary assessment by Environmental Resolutions, Inc. ("ERI").  See "Executive Summary" within Exhibit "A," Agreement of Sale.

11.     The summary warned of historic pesticide usage and ground water contamination with trichloroethylene (TCE).  See "Executive Summary" within Exhibit "A," Agreement of Sale.

12.     The summary, citing the New Jersey Department of Environmental Protection (hereinafter "NJDEP"), named Lockheed as the responsible party for the TCE contamination and stated that remediation was ongoing.

13.     The summary contained no mention of tetrachloroethylene (PCE), which was found on the Property in subsequent tests.  TCE is a derivative of PCE.  See "Executive Summary" within Exhibit "A," Agreement of Sale.

14.     The summary concluded:

Due to the utilization of public water and sewer and the depth of the ground water table on the Wexford at Moorestown site [the development in which the Property

3

is located] the risk of contact with the contaminants, if any is remote.  Inasmuch as the problem was caused from an off-site property (Lockheed Martin), a letter of No Further Action is expected to be issued from NJDEP pertaining to the Wexford at Moorestown site concerning this issue.

See "Executive Summary" within Exhibit "A," Agreement of Sale.

15.     However, in September 2008, the NJDEP informally requested that Defendant Lockheed conduct vapor intrusion testing at residential properties across from the Site.  A letter from Defendant Lockheed to Plaintiffs dated January 12, 2009 is attached hereto as Exhibit "B" and is incorporated herein by reference; a letter from Defendant Lockheed to Plaintiffs dated March 10, 2009 is attached hereto as Exhibit "C" and is incorporated herein by reference.

16.     Defendant Lockheed conducted subslab soil vapor testing at the Plaintiffs' property in December 2008.  See Exhibit "B," Letter from Defendant Lockheed to Plaintiffs dated January 12, 2009.

17.     Defendant Lockheed's vapor intrusion testing revealed sampling results in excess of NJDEP screening levels for tetrachloroethylene (PCE) in both subslab and indoor air samples.  See Exhibit "B," Letter from Defendant Lockheed to Plaintiffs dated January 12, 2009; Exhibit "C," Letter from Defendant Lockheed to Plaintiffs dated March 10, 2009.

18.     Defendant Lockheed installed a monitoring system and the Site continues to test above the legal level for both PCE and TCE.

19.     The Property is in the path of the groundwater flow, and located within a calculated plume of the Site.

20.     TCE and PCE are both known carcinogens.

21.     Both chemicals were found on Defendant Lockheed's property and on Plaintiffs' property.

4

22.     Plaintiffs A. Leese, A. K. Leese, and I. Leese have suffered health effects that are related to the contamination of their home by PCE and TCE.

23.     Plaintiff A. Leese refused to eat as a baby, which is a sign of chemical exposure. As a result, A. Leese fell off the growth charts for height and weight and is currently below the 10th percentile for height and weight for her age.

24.     Plaintiff I. Leese also refused to eat as an infant, and has suffered the same effects as A. Leese. She is also below the 10th percentile for height and weight for her age.

25.     Plaintiff A. K. Leese has developmental issues as a result of this chemical exposure. He was tested and entered the New Jersey early intervention program for a year as a two year old. Plaintiffs have incurred expenses for special classes and programs to rehabilitate A. K. Leese.

26.     Both PCE and TCE are known carcinogens and will continue to cause health issues for Plaintiffs in the future.

27.     As a result of their health issues and the stress of living on a contaminated property, Plaintiffs have suffered severe emotional distress.

**FIRST COUNT**
**Spill Act**
*Against Defendant Lockheed Martin*

28.     Plaintiffs repeat each allegation of paragraph nos. 1 though 27 above as though fully set out in its entirety herein.

29.     Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b-1.

30.     Except as otherwise provided in N.J.S.A. 58:10-23.11g12, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance that

5

is discharged, shall be jointly and severally liable, without regard to fault, for all cleanup and removal costs, no matter by whom they are incurred. N.J.S.A. 58:10-23.11g.c.(1).

31. Except as otherwise exempted under N.J.S.A. 58:10-23.11g12, the discharge of a hazardous substance is a violation of the Spill Act, for which any person who is the discharger of, or is in any way responsible for, is strictly liable, jointly and severally, without regard to fault. N.J.S.A. 58:10-23.11g.c.(1).

32. Plaintiffs have incurred and will continue to incur costs as a result of the discharge of hazardous substances onto their property.

33. Plaintiffs may certify, for payment, valid claims made against the Spill Fund concerning the Site, and may approve other appropriations for the site.

34. Plaintiffs also have incurred, and will continue to incur, costs and damages, including lost property value and reasonable assessment costs.

35. Plaintiffs have incurred, and will incur, "cleanup and removal costs" for the Property within the meaning of N.J.S.A. 58:10-23.11b.

36. Defendant Lockheed is, or is the successor-in-interest to, the dischargers of hazardous substances at the Borton Landing Road facility, and is liable, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost value and reasonable assessment costs that Plaintiffs have incurred, and will incur, to assess, mitigate, restore, or replace damage to their property. N.J.S.A. 58:10-23.11g.c.(1).

37. Defendant Lockheed is, or is the successor-in-interest to, the owners of the Borton Landing Road facility at the time hazardous substances were discharged there and, thus, are persons responsible for the discharged hazardous substances, and are liable, jointly and severally,

6

without regard to fault, for all cleanup and removal costs and damages, including lost value and reasonable assessment costs. N.J.S.A. 58:10-23.11g.c.(1).

38.    Plaintiffs are "persons" within the meaning of N.J.S.A. 2A:35A-4.

39.    Plaintiffs have standing to maintain a civil action against any person "alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A-4(a).

<u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs pray that this Court:

a.    Order Defendant Lockheed to reimburse Plaintiffs, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost value and reasonable assessment costs, that Plaintiffs have incurred as a result of the discharge of a hazardous substances from the Site onto the Property, with applicable interest;

b.    Enter declaratory judgment against Defendant Lockheed, jointly and severally, without regard to fault, for all cleanup and removal costs and damages, including lost value and reasonable assessment costs, that Plaintiffs have incurred as a result of the discharge of a hazardous substance from the Site onto the Property;

c.    Enter judgment against Defendant Lockheed, jointly and severally, without regard to fault, compelling Defendant Lockheed to perform, under the oversight of the Department of Environmental Protection, any further assessment and restoration of any natural resource that has been, or may be, injured as a result of the discharge of hazardous substances at the Property or Site, including restoring any injured resource

7

to its pre-discharge condition, and compelling the Defendants to compensate the

citizens of New Jersey for the lost value of any injured natural resource.

    d.   Award Plaintiffs their costs and fees in this action; and

    e.   Award Plaintiffs such other relief as this Court deems appropriate.

**SECOND COUNT**
**Water Pollution Control Act**
*Against Defendant Lockheed Martin*

    40.    Plaintiffs repeat each allegation of paragraph nos. 1 though 39 above as though

fully set out in its entirety herein.

    41.    Defendant Lockheed is a "person" within the meaning of N.J.S.A. 58:10A-31.

    42.    Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6d. and p., it is

unlawful for any person to discharge any pollutant except to the extent the discharge conforms

with a valid New Jersey Pollutant Discharge Elimination System permit issued by the

Commissioner of the New Jersey Department of Environmental Protection pursuant to the Water

Pollution Control Act, or pursuant to a valid National Pollutant Discharge Elimination System

permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C. §1251 to 1387.

N.J.S.A. 58:10A-6a.

    43.    The unauthorized discharge of pollutants is a violation of the Water Pollution

Control Act for which any person who is the discharger is strictly liable, without regard to fault.

N.J.S.A. 58:10A-6a.

    44.    Plaintiffs have incurred, or will incur, costs as a result of the discharge of

pollutants onto their Property.

    45.    The costs and damages Plaintiffs have incurred, and will incur, for the Property

are recoverable within the meaning of N.J.S.A. 58:10A-10c.(2)-(4).

8

46.    Defendant Lockheed is the person, or successor-in-interest to the persons, that discharged pollutants at the Borton Landing Road facility, which discharges were neither permitted pursuant to N.J.S.A. 58:10-6a., nor exempted pursuant to N.J.S.A. 58:10A-6d. or p., and is liable, without regard to fault, for all costs and damages, including compensatory damages and any other actual damages. N.J.S.A. 10A-6a.

47.    Plaintiffs are "persons" within the meaning of N.J.S.A. 2A:35A-4.

48.    Plaintiffs have standing to maintain a civil action against any person "alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment." N.J.S.A. 2A:35A-4(a).

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Permanently enjoin Defendant Lockheed, by requiring said Defendant to remove, correct, or terminate the adverse effects upon water quality resulting from any unauthorized discharge of pollutants, including performing any further assessment and restoration of any natural resource that has been, or may be, injured as a result of the discharge of pollutants at the Site to its pre-discharge condition, under the oversight of the Department of Environmental Protection;

b.  Enter an order assessing Defendant Lockheed, without regard to fault, for the reasonable costs for any investigation, inspection, or monitoring survey, which led to establishment of the violation, including the costs of preparing and litigating the case;

c.  Enter declaratory judgment against Defendant Lockheed, without regard to fault, assessing all reasonable costs that will be incurred for any investigation, inspection, or monitoring survey, which led, or will lead, to establishment of the violation.

9

    d.  Enter an order assessing Defendant Lockheed, without regard to fault, for all

reasonable costs incurred for removing, correcting, or terminating the adverse effects

upon water quality resulting from any unauthorized discharge of pollutants at the Site

and Property;

    e.  Enter declaratory judgment against Defendant Lockheed, without regard to fault,

assessing all reasonable costs incurred for removing, correcting, or terminating the

adverse effects upon water quality resulting from any unauthorized discharge of

pollutants at the Site and Property;

## THIRD COUNT
### Resource Conservation and Recovery Act
*Against Defendant Lockheed Martin*

49.    Plaintiffs repeat each allegation of paragraph nos. 1 though 48 above as though

fully set out in its entirety herein.

50.    TCE and PCE are both listed by the Environmental Protection Agency as

hazardous wastes pursuant to the Resource Conservation and Recovery Act ("RCRA"). 42

U.S.C. 6921; 40 C.F.R. 261.31.

51.    Defendant Lockheed is, or is the successor-in-interest to, the generators of

hazardous wastes at the Borton Landing Road facility, and is liable as a generator of hazardous

waste. 42 U.S.C. 6922.

52.    Defendant Lockheed is, or is the successor-in-interest to, the owners of the Borton

Landing Road facility at the time hazardous substances were stored there in excess of ninety

days, and is thus liable as a treatment, storage, or disposal facility. 42 U.S.C. 6924.

53.    Plaintiffs are "persons" within the meaning of 42 U.S.C. 6972(a), which allows

any person to commence a civil action on his own behalf:

10

(1)(A) against any person... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter; or

(B) against any person... including any past or present generator, past or present transporter, or past and present owner or operator of a treatment, storage, or disposal facility, who has contributed to or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment... 42 U.S.C. 6972(a).

54.    Defendant Lockheed has violated and/or is violating the applicable standards, regulations, and/or requirements for a generator, or a treatment, storage, and disposal facility. 42 U.S.C. 6972(a)(1)(A).

55.    Defendant Lockheed, as a generator, or as a treatment, storage, and disposal facility, has contributed to or is contributing to the past or present handling, storage, treatment, transportation, or disposal of hazardous wastes, and has created an imminent and substantial endangerment to the environment and to Plaintiffs' health. 42 U.S.C. 6972(a)(1)(B).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that this Court:

a.  Permanently enjoin Defendant Lockheed by requiring said Defendant to remove all hazardous materials, including PCE and TCE, from the Site and the Property, and fully remediate the Site and the Property under the oversight of the Department of Environmental Protection and/or the Environmental Protection Agency;

b.  Enter an order assessing Defendant Lockheed, without regard to fault, for the reasonable costs for any investigation, inspection, or monitoring survey, which led to establishment of the violation, including the costs of preparing and litigating the case;

11

c.  Enter declaratory judgment against Defendant Lockheed, without regard to fault, assessing all reasonable costs that will be incurred for any investigation, inspection, or monitoring survey, which led, or will lead, to establishment of the violation.

d.  Grant Plaintiffs their reasonable litigation fees, including attorney's fees and expert witness fees, pursuant to 42 U.S.C. 6972(e).

## FOURTH COUNT
### Public Nuisance
*Against Defendant Lockheed Martin*

56.  Plaintiffs repeat each allegation of paragraph nos. 1 though 51 above as though fully set out in its entirety herein.

57.  Ground water is a natural resource of the State held in trust by the State for the benefit of the public.

58.  The use, enjoyment, and existence of uncontaminated natural resources are rights common to the general public.

59.  The groundwater contamination at the Site leaked onto the Property, which constitutes a physical invasion of public property and an unreasonable and substantial interference, both actual and potential, with the exercise of the public's common right to these natural resources.

60.  As long as the groundwater contamination continues, the public nuisance continues.

61.  Until the groundwater is restored to its pre-injury quality and the vapor intrusion and soil contamination problems are remedied, the Defendants are liable for the creation, and continued maintenance, of a public nuisance in contravention of the public's common right to clean groundwater.

12

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a. Permanently enjoin Defendant Lockheed by requiring said Defendant to remove, correct, or terminate the adverse effects upon water quality resulting from any unauthorized discharge of pollutants, including performing any further assessment and restoration of any natural resource that has been, or may be, injured as a result of the discharge of pollutants at the Site to its pre-discharge condition, under the oversight of the Department of Environmental Protection;

b. Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

c. Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

d. Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's nuisance;

e. Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's nuisance.

13

### FIFTH COUNT
**Private Nuisance**
*Against Defendant Lockheed Martin*

62.     Plaintiffs repeat each allegation of paragraph nos. 1 though 61 above as though fully set out in its entirety herein.

63.     Plaintiffs are lawfully in possession of the Property.

64.     Defendants have intentionally, recklessly, or negligently released hazardous substances onto Plaintiff's property via the groundwater.  The contamination in the groundwater has led to vapor intrusion and soil contamination.

65.     The groundwater contamination on the Property constitutes a physical invasion of Plaintiffs' property and an unreasonable and substantial interference, both actual and potential, with the exercise of Plaintiffs' rights to use and enjoy their property.

66.     As long as the groundwater contamination continues, the private nuisance continues.

67.     Until the groundwater is restored to its pre-injury quality, Defendants are liable for the creation, and continued maintenance, of a private nuisance in contravention of Plaintiffs' property rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

14

b.  Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

c.  Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's nuisance;

d.  Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's nuisance.

## SIXTH COUNT
### Trespass
*Against Defendant Lockheed Martin*

68.  Plaintiffs repeat each allegation of paragraph nos. 1 though 67 above as though fully set out in its entirety herein.

69.  Plaintiffs are lawfully in possession of the Property.

70.  Defendant Lockheed discharged hazardous substances onto the Property and the hazardous substances remain on the property.  Thus, Defendant Lockheed is liable for trespass and continued trespass.

71.  As long as the groundwater beneath the Property remains contaminated, Defendant's trespass continues.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

15

a. Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

b. Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

c. Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's trespass;

d. Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's trespass.

### SEVENTH COUNT
### Strict Liability
*Against Defendant Lockheed Martin*

72.     Plaintiffs repeat each allegation of paragraph nos. 1 though 71 above as though fully set out in its entirety herein.

73.     New Jersey courts have recognized that in some circumstances, the release of a hazardous substance may be an abnormally dangerous activity, for which the actor who releases the hazardous substance may be held strictly liable, without regard to fault, according to the principle established by the famous English case, Rylands v. Fletcher, L.R. 1 Ex. 265 (1866), aff'd, L.R. 3 H.L. 330 (1868).  See City of Bridgeton v. B.P. Oil, Inc., 146 N.J. Super. 169, 179 (Law Div. 1976); State, Dept. of Environmental Protection v. Ventron Corp., 94 N.J. 473, 488 (1983).

16

74.     Defendant Lockheed is, or is the successor-in-interest to, the cause of an abnormally dangerous activity that damaged, and is damaging, Plaintiff's property, and should thus be held strictly liable, without regard to fault, for the resulting damage.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

a.  Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

b.  Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Lockheed, including loss of property value;

c.  Enter an order assessing Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's abnormally dangerous activity;

d.  Enter declaratory judgment against Defendant Lockheed for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries as a result of Defendant Lockheed's abnormally dangerous activity.

a.  Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendants' non-disclosure.

17

### EIGHTH COUNT
### Negligence
*Against Defendants Lockheed Martin and Orleans Homebuilders*

75.     Plaintiffs repeat each allegation of paragraph nos. 1 though 74 above as though fully set out in its entirety herein.

76.     Defendants owed Plaintiffs a duty of care.

77.     Defendants breached their duty of care by causing, or failing to prevent, the release of TCE and PCE onto the Property.

78.     As a result of Defendants' negligence, Plaintiffs have suffered degradation to their property and a decrease in property value; Plaintiffs, A. Leese, A.K. Leese, and I. Leese, have had numerous serious health issues.  Further, Plaintiffs remain at risk for future health problems, as TCE and PCE are known carcinogens.  As a result, Plaintiffs have suffered severe emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Enter an order assessing Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendants, including loss of property value;

b.  Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendants, including loss of property value;

18

c. Enter an order assessing Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendants' negligence;

d. Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendants' negligence.

### NINTH COUNT
### Battery
#### *Against Defendant Lockheed Martin*

79. Plaintiffs repeat each allegation of paragraph nos. 1 though 78 above as though fully set out in its entirety herein.

80. Defendant Lockheed intentionally caused, or failed to prevent, the release of TCE and PCE onto the Property.

81. Via the process of vapor intrusion, TCE and PCE have come into contact with Plaintiffs.

82. As a result of Defendant Lockheed's harmful and unwanted contact, Plaintiffs have suffered numerous serious health issues and emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a. Enter an order assessing Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries and emotional distress as a result of Defendant Lockheed's battery;

19

b. Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily injuries and emotional distress as a result of Defendant Lockheed's battery.

## TENTH COUNT
### Non-disclosure
*Against Defendant Orleans Homebuilders*

83.     Plaintiffs repeat each allegation of paragraph nos. 1 though 82 above as though fully set out in its entirety herein.

84.     The New Residential Construction Off-Site Disclosure Act, N.J.S.A. 46:3C, mandates the disclosure of certain off-site environmental conditions by the sellers of new homes.

85.     Defendant Orleans failed to disclose the existence of PCE contamination on the Property and the Site.

86.     As a result of Orleans' failure to disclose the existence of PCE contamination, Plaintiffs have suffered degradation to their property, a decrease in property value, numerous serious health issues, and emotional distress.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

a. Enter an order assessing Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendants, including loss of property value;

b. Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendants, including loss of property value;

20

c.   Enter an order assessing Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendants' non-disclosure;

d.   Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendants' non-disclosure;

### TWELFTH COUNT
### Breach of Warranty
*Against Defendant Orleans Homebuilders*

87.   Plaintiffs repeat each allegation of paragraph nos. 1 though 86 above as though fully set out in its entirety herein.

88.   The "Agreement of Sale" between Plaintiffs and Defendant Orleans contained an express warranty of ten (10) years.  Defendant Orleans was to provide a New Home Warranty Insurance Policy pursuant to the New Home Warranty and Builders Registration Act.

89.   Defendant Orleans failed to disclose the existence of PCE contamination on the Property and the Site.

90.   Defendant Orleans has not remedied the contamination on the property.

91.   As a result of Defendant Orleans' failure to remedy the Property's PCE contamination, Plaintiffs have suffered degradation to their property, a decrease in property value, numerous health issues, and emotional distress.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

21

### THIRTEENTH COUNT
### Breach of Implied Warranty of Habitability
*Against Defendant Orleans Homebuilders*

92.     Plaintiffs repeat each allegation of paragraph nos. 1 though 87 above as though fully set out in its entirety herein.

93.     The sale of a new home carries with it an implied warranty that the home was constructed in a reasonably workmanlike manner and is fit for habitation, and this implied warranty survives merger with the deed even if not expressly incorporated therein. See McDonald v. Mianecki, 159 N.J. Super. 1, 14-15 (App. Div. 1978).

94.     The sale of the Property from Defendant Orleans to Plaintiffs thus carried with it an implied warranty of habitability.

95.     Due to contamination with PCE and TCE, and the intrusion of said chemicals into the home by way of vapor intrusion, the home on the Property is not fit for habitation.

96.     As a result of Defendant Orleans' breach of the implied warranty of habitability, Plaintiffs have suffered degradation to their property, a decrease in property value, numerous health issues, and emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.  Enter an order assessing Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Orleans' breach of warranty, including loss of property value;

b.  Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred by Plaintiffs due to damage to their property caused by Defendant Orleans' breach of warranty, including loss of property value;

c. Enter an order assessing Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendant Orleans' breach of warranty;

d. Enter declaratory judgment against Defendants for all compensatory damages and other actual damages incurred for Plaintiffs' bodily and emotional injuries as a result of Defendant Orleans' breach of warranty;

_Julie A La Van_
Julie A. LaVan, Esq.
Attorney for Plaintiffs

Dated: 7/25/11

23

### JURY DEMAND

Plaintiff hereby demands trial by jury of all issues in this action.

Dated: 7/25/2011

Julie A. LaVan, Esq.
Attorney for Plaintiffs

### DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, the Court is advised that Julie A. LaVan is hereby designated as trial counsel for Plaintiffs in this action.

### CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES

Undersigned counsel hereby certifies, in accordance with R. 4:5-1(b)(2), that the matters in controversy in this action are not the subject of any other pending or contemplated action in any court or arbitration proceeding known to the Plaintiffs at this time, nor is any non-party known to the Plaintiffs at this time who should be joined in this action pursuant to R. 4:28, or who is subject to joinder pursuant to R. 4:29-1. If, however, any such non-party later becomes known to Plaintiffs, an amended certification shall be filed and served on all other parties and with this Court in accordance with R. 4:5-1(b)(2).

Julie A. LaVan, Esq.
Attorney for Plaintiffs

Dated: 7/25/2011

24

 **XHIBIT A**

Rev 1



### AGREEMENT OF SALE

THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS.

**FILED**

## PROPERTY DESCRIPTION:

Block: 6008     Lot: 003     Model: MILFORD III FARMHOUSE S/S BS   Bedrms: 4   Baths: 2.5

Street Address: 5 VICTORIA COURT     Model Code: S40 MILFOR3     ELEVATION: 141

County: Burlington     State: New Jersey     Agreement Dated: 06/05/2003   6/7/03

Community: Wexford

1. **Table of contents.** See Page 2 of this Agreement of Sale for the Table of Contents.

2. **Parties and agreement to purchase.**

BUYER:   MICHAEL LEESE  & ASHLEY LEESE
ADDRESS: 55 E. GREENWOOD AVE  LANSDOWNE PA 19050
HOME PHONE NUMBER: (610)622-8048     BUSINESS PHONE NUMBER   (215)665-3960
SELLER:   Orleans Corporation, a Pennsylvania Corporation
ADDRESS: c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101 Bensalem, PA 19020
AGENT:   A. P. Orleans, Incorporated
ADDRESS: c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101 Bensalem, PA 19020

Seller hereby agrees to sell to Buyer and Buyer agrees to purchase the property described above in Moorestown Township, New Jersey (such substantial conformity expressly warranted by Seller) on which there is to be erected a new home. (from now on referred to as the "Property") under the following terms and conditions:

(a) **THE TOTAL PURCHASE PRICE WILL BE PAID IN THE FOLLOWING MANNER:**

| | |
|---|---|
| INITIAL DEPOSIT | |
| DEPOSIT AT THE SIGNING OF THIS AGREEMENT ............................................... | $1,000.00 |
| ADDITIONAL DEPOSIT TO BE PAID ON OR BEFORE 30 | |
| DAYS FOLOWING DATE OF THIS AGREEMENT | $7,000.00 |
| BALANCE IN CASH, CERTIFIED OR CASHIER'S CHECK | |
| AT THE TIME OF SETTLEMENT ............................................... | –0– |
| TOTAL PURCHASE PRICE | $437,990.00 |
| ALL OPTIONS OR EXTRA ITEMS WILL BE REFLECTED IN A SEPARATE | |
| AUTHORIZATION SIGNED BY BOTH BUYER AND SELLER | 445,990.00 |

(b) Settlement will take place on or about  **June 30, 2003**  in accordance with the terms and conditions more fully set forth in paragraphs 5 and 7 of this Agreement.

(c) Buyer represents to Seller that Buyer intends to purchase the Property as: (check one)
[X] Primary residence     [ ] Secondary residence or vacation home     [ ] Rental Property

3. **SPECIAL CLAUSES,RIDERS,AMENDMENTS AND ADDENDA.**

(a) This sale is NOT contigent upon any mortgage financing unless otherwise provided by Rider.

(b) The following Riders, Amendments and Addenda are hereby attached to and made a part of this Agreement:

[X]  Mortgage Contingency Rider.  Mortgage Amount is     $ 389,600
Mortgage Contingency date is :   06/15/2003

[ ]  Cash Sale Amendment

[X]  New Residential Construction Off-Site Conditions Disclosure Amendment (NJ)

[ ]  Amendment to Agreement of Sale - Agency Disclosure (NJ)

[ ]  Resale Contingency Rider

[X]  Declination of Resale Contingency Rider

01559PB1

1

## TABLE OF CONTENTS

1.   TABLE OF CONTENTS

2.   PARTIES AND AGREEMENT TO PURCHASE

3.   SPECIAL CLAUSES, RIDERS, AMENDMENTS AND ADDENDA

4.   DEPOSITS

5.   COMPLETION; SETTLEMENT

6.   ADJUSTMENTS

7.   SETTLEMENT

8.   TITLE

9.   POSSESSION

10.  DEED RESTRICTIONS

11.  FIRE AND OTHER CASUALTY

12.  NOTICE AND AGREEMENT REGARDING RADON GAS

13.  LICENSE

14.  DEFAULT OF BUYER

15.  DEFAULT OF SELLER

16.  ASSIGNMENT

17.  CHANGES IN PLANS

18.  STANDARD FEATURES/MATERIALS

19.  DECORATOR SELECTIONS

20.  WARRANTIES

21.  INSULATION

22.  MOLD DISCLAIMER

23.  DISCLOSURE REGARDING HORSEFARM AND DOG KENNEL

24.  DISCLOSURE OF ENVIRONMENTAL CONDITIONS

25.  ENTIRE AGREEMENT; REPRESENTATIONS

26.  SITE VISITS

27.  GOVERNMENTAL REGULATIONS

28.  FORMAL TENDER OF DEED

29.  APPROVAL OF SALE

30.  AGREEMENT NOT TO BE RECORDED

31.  CHANGES IN PRICE/TERMS

32.  ALTERATIONS IN AGREEMENT

33.  CORNER STAKES/MONUMENTS

34.  TIME OF THE ESSENCE

35.  AGENTS

36.  CONDEMNATION

37.  ASSESSMENTS FOR MUNICIPAL IMPROVEMENTS

38   PARTIAL INVALIDITY

39.  CONSTRUCTION

40.  CAPTIONS

41.  NO WAIVER

42.  REPRODUCED SIGNATURES BINDING

43.  ATTORNEY REVIEW

4.    **DEPOSITS.**  All deposit money shall be held by A. P. Orleans, Incorporated, <u>Gary G. Schaal</u>, Broker of Re. 478, Hainesport, New Jersey in escrow with First Union National Bank, Cuthbert Boulevard and MacArthur Drive, Hado. until settlement or termination of this Agreement.

5.    **COMPLETION; SETTLEMENT.**  Completion, conveyance, payment and settlement under this Agreement shall be n. or about the date stated in subparagraph 2.(b) above.  If for any reason Seller is unable to commence construction or make settleme. the Property by the above date, the time or times set forth in this Agreement shall be reasonably extended but in no event more than t. hundred and eighty (180) days, after which Buyer may terminate this Agreement at any time by written notice to Seller whereupon a. deposit monies paid by Buyer shall be returned without penalty.

6.    **ADJUSTMENTS.**  Taxes for the current quarter, utilities, water rent, sewer rent, and interest, if any, are to be apportioned as of the date of settlement.  Municipal assessments against the Property for improvements completed by the date of settlement will be paid by Seller at or before closing.  Municipal assessments against the Property for improvements completed after the date of settlement are the responsibility of Buyer.

7.    **SETTLEMENT.**  Settlement is to take place immediately after completion of the Property, at the time, date and place specified by Seller in notice to Buyer.  Completion shall be evidenced by a Certificate of Occupancy issued by the municipality.  If Buyer is unprepared to make settlement on the date specified by Seller in notice to Buyer, Buyer may request that Seller delay settlement for a reasonable period of time.  If Seller grants a delay in settlement after receiving a request from Buyer, Buyer agrees to pay to Seller a sum equal to .0352% of the balance due the Seller at settlement for each day settlement is delayed beyond the date specified in the notice to Buyer.  Any delay in settlement under this provision shall be at the sole discretion of the Seller.  Neither Seller nor Buyer's Lender supplies or pays for an attorney for Buyer.  Buyer may have his/her attorney at Buyer's own expense.  Buyer will settle even if all off-site improvements and other improvements have not been completed.  In the event Buyer fails to make settlement within ten (10) days of completion as defined in this paragraph, Seller shall have the sole option of either charging Buyer(s) .0352% per diem charge on the balance of purchase price until settlement actually takes place, or declare Buyer in default pursuant to Paragraph 14.  In the event of delay in completion of the Property or settlement due to circumstances involving weather, strikes, or other labor disputes involving the Seller and/or its suppliers, delays in the issuance of permits or inspections, or delays in the delivery of supplies and labor or otherwise, the parties agree that settlement and the rights and liabilities of this Agreement shall be reasonably extended until such time as the Unit and settlement are completed, but such delay shall be limited to not more than one hundred and eighty (180) days.  In the event that Seller determines that settlement will be delayed in excess of 180 days, Seller will so notify Buyer.  This notice will provide Buyer with the revised date by which the home will be completed and settlement scheduled.  Not later than the close of business on the 10th calendar day following receipt of such notice of delay, Buyer must elect to either (1) terminate this Agreement, whereupon all deposit monies paid by Buyer shall be returned without penalty, or (2) agree to accept the revised settlement date as set forth in Seller's notice of delay.  In the event Seller does not notify Buyer in accordance with the foregoing, Buyer may terminate this Agreement anytime after the 180th day by written notice to the Seller, whereupon all deposit monies paid by Buyer shall be refunded without penalty..

8.    **TITLE.**  Seller agrees to deliver a Bargain and Sale Deed with Covenant against Grantors Acts and an Affidavit of Title at settlement.  Title shall be good and marketable and such as will be insured at regular rates by a reputable title company licensed to do business in the State of New Jersey.  Title shall be subject to any restrictions, conditions, covenants, agreements and easements existing at the time of settlement, as well as any zoning ordinances, and any other act or ordinances affecting the use of improvements to the Property provided, however, that such restrictions, conditions, etc., do not prevent the property from being used as a residence.  Buyer agrees that in the event any of the covenants contained in this Agreements of Sale are violated before or after settlement, Seller has the right to enter upon the Property for the purpose of correcting the violation(s).  Buyer acknowledges and agrees that title to the Property will be subject to an easement to be recorded by Seller prior to settlement hereunder which will require Buyer to pay the pro-rata cost of the maintenance and preservation of the community entrance monuments.  Buyer assumes liability for, and agrees to indemnify Seller against any loss or damage resulting from any such violation(s) caused by Buyer.  This paragraph shall survive the closing of title.

9.    **POSSESSION.**  Possession will be given by delivery of the Deed, keys and physical possession to a vacant building, broom clean and free of debris at the day and time of settlement upon receipt of the Total Purchase Price by Seller as provided in this Agreement.

10.    **DEED RESTRICTIONS.**  At Seller's option, the Deed to Buyer may contain any or all of the following conditions:

a.  No "For Sale" sign may be displayed on the Property for a period of two (2) years from the date of settlement.

b.  No television, radio or shortwave antennas, satellite dishes in excess of 18 inches in diameter, or any type of communications devices, antennae or facilities shall be placed on any portion of the exterior of the dwelling or Property where they are visible from any other property.

c.  No fence shall be installed on the Property other than unpainted cedar board-on-board fencing, black or white wrought iron fencing or white vinyl fencing which is 5 feet in height or such other height or material as may be required by regulation or ordnance of the municipality.

d.  No unlicensed or unregistered motor vehicles of any type shall be permitted on the property unless garaged.

11.    **FIRE AND OTHER CASUALTY.**  The risk of loss or damage to the Property by fire or other casualty until the time of settlement is on the Seller.  Any loss or damage to the property due to fire or other casualty will not make this Agreement void or voidable. In the event of such damage, Seller shall have the option to either rebuild the damaged portion of the Property within one hundred eighty (180) days of the date stated in subparagraph 2.(b) of this Agreement, or within one hundred twenty (120) days of the date of casualty, whichever is later, or to cancel this Agreement.  Seller will notify Buyer within forty-five (45) days of the date of casualty of its option. If Seller opts to cancel this Agreement, Seller's sole obligation shall be to return all deposit monies to Buyer, without penalty or interest, whereupon neither Buyer nor Seller shall have any further liability under this Agreement.

12.    **NOTICE AND AGREEMENT REGARDING RADON GAS.**  The United States Environmental Protection Agency (EPA) has indicated that some homes experience elevated levels of radon gas.  Radon gas is a naturally occurring phenomenon which, according to the EPA, escapes from some types of soils.  This phenomenon can occur in any home, regardless of the type of home or who builds it. The EPA has stated that prolonged exposure to elevated levels of radon gas for a sufficient period of time may increase the risk of certain types of health hazards.

3

Seller claims no expertise in the measurement or reduction of radon gas in homes, nor does Seller provide any advice regarding acceptable indoor radon gas levels or the possible health hazards related to radon gas. The EPA and state and local environmental authorities are best equipped to render advise regarding the risk associated with elevated radon gas levels, methods of detection and measurement, and what, if any, remedial measures may be advisable in particular circumstances to reduce the risk of radon gas exposure.

Information on radon gas may be obtained from the following government agency:

The United States Environmental Protection Agency
Office of Radiation & Indoor Air, EPA Region 3,
290 Broadway, 28th Floor
New York, NY 1007-1866
Phone: (212) 637-4013

Buyer may wish to contact the EPA to obtain a copy of publication EPA-RD-681 "Radon Reduction Methods: A Homeowner's Guide" or other publications dealing with radon gas which the EPA has made available.

It is understood by Buyer that Seller makes no representations, of any kind, regarding the present or future existence of radon gas or about acceptable levels of radon gas in or around the Property. Further, Buyer understands that Seller does not make any warranty, express or implied, including, but not limited to, warranties of good workmanship, habitability, merchantability or fitness for a particular purpose, regarding radon gas as it relates to the Property. Buyer releases Seller from any present or future claims or liability of any kind that Buyer may ever have against Seller, which in any way relates to the existence of radon gas in or around the Property, including, but not limited to, any expenses Buyer may incur in any radon reduction methods that Buyer may pursue if elevated levels of radon gas ever occur. The terms of this paragraph shall survive settlement.

13.    LICENSE. The Buyer does hereby authorize and grant to Seller the irrevocable right to enter into, upon, over or under the Property for a period of two (2) years after the date of delivery of Deed for the completion of construction, repair, emergency matters or pursuant to governmental order or requirement. This provision shall survive settlement.

14.    DEFAULT OF BUYER. If Buyer fails to make payments in accordance with the provisions of subparagraph 2.(a) above, violates any of the conditions or covenants of this Agreement, makes false material representations or fails, for any reason, to complete settlement according to the terms and conditions of this Agreement, Buyer shall be in default. If the Buyer is in default, Seller shall retain all payments made by Buyer, but not more than ten percent (10%) of the Purchase Price, plus the amount of any extras or changes installed by Seller, as liquidated damages or on account of the Purchase Price, as Seller may elect. If retained as liquidated damages, this Agreement shall be immediately null and void and of no further effect and the Seller shall then have no further liability whatsoever to Buyer and will resell the property. ("Liquidated Damages" is the exact amount which the Buyer and Seller expressly agree must be paid in the event of Buyer's default.)

15.    DEFAULT OF SELLER. If Seller's title proves unmarketable, or if Seller elects not to construct, complete or convey the Property referred to in this Agreement for any reason whatsoever, including but not limited to any present or future rules, regulations or restrictions of any Federal, State or Municipal government or any subdivision of government, the Seller's sole obligation shall be to return all deposit monies paid under this Agreement, without interest, and reimburse Buyer for reasonable out-of-pocket expenses for title search and survey actually expended, if any.

16.    ASSIGNMENT. Buyer expressly agrees not to assign, sell or in any manner transfer this Agreement or any right, title or interest in this Agreement without the express written consent of Seller. Subject to that restriction, this Agreement will be binding upon the parties and all who succeed to their rights, duties and responsibilities.

17.    CHANGES IN PLANS. Seller shall have the right to make substitutions of materials or equipment and to make design changes whenever Seller shall find it necessary or expedient in its absolute discretion, provided that such substitutions or changes are of substantially equal quality. Seller reserves the right to select and establish the elevation of the home to be constructed in this Agreement on the lot and to locate the home on the lot in the manner best suitable to the topography and aesthetics of the Property as determined in the sole judgement of the Seller. Seller also reserves the right to reverse the plan on the home if required in the opinion of the Seller. It is understood and agreed that dimensions of the home may vary from the plans due to field conditions encountered during the course of construction.

18.    STANDARD FEATURES/MATERIALS. Buyer acknowledges that the model or sample homes are built, decorated and displayed in a manner presumed to fit the taste and lifestyle of the average prospective homeowner. Furnishings as in the model or otherwise, are not included. Many decorator effects and features including, but not limited to, wall mirrors, mirrored doors, additional and upgraded appliances, furnishings, decorator light fixtures, upgraded floor and wall coverings, special paint and custom patios and decks may have been added to display the variety of possible additional features offered or available from some other source and to provide the feeling that the model or sample home is occupied. Brochure and wall display floor plans, scale models, renderings and site plan displays may not be accurate in every detail. Buyer acknowledges that architectural plans, landscaping plans and approved final site plans showing site details are available for review at the on-site sales office. Buyer is urged to review these plans before entering into this Agreement. The community and Property will be constructed according to these plans unless amended. Seller makes no representations with regard to the type or location of electrical transformers, retention basins or other drainage facilities or trash receptacles, if applicable. Further, Seller makes no representations whatsoever regarding the retention, removal or location of trees, shrubs or other vegetation located on the property, in common areas or on adjoining properties. Buyer acknowledges that detailed information regarding the standard features, equipment and materials provided in the new home is readily available for review in the sales office.

4

19.   DECORATOR SELECTIONS. Buyer agrees to make decorator selections and option/upgrade selections, if applicable, within ten (10) days of Seller's request of Buyer to make such selections but in no event later than thirty (30) days following the date of this Agreement. If Buyer fails to make such selections within the required time, Buyer shall be deemed to have authorized Seller to make standard selections on Buyer's behalf. Option and upgrade items are offered at the sole discretion of the Seller and are subject to changes in price and availability without prior notice. Buyer acknowledges that the only way to protect the prices of such items is to execute the appropriate order form and tender the required deposit within the time allotted for selections. Any order place after the allotted time will be at the then current prices only. Ordering early helps insure availability and orderly construction of the new home. Since mistakes are sometimes caused by change orders, all selections are final and changes are not allowed. Buyer acknowledges responsibility for accurately identifying ordered options and upgrades and agrees that all purchases will be made without reliance upon verbal representations. Further, Buyer acknowledges that the Seller's CCO (Customer Change Order) Manual which contains detailed information regarding options and upgrades offered is readily available for review in the on-site sales office and is incorporated herein by reference.

20.   WARRANTIES. Seller shall warrant the construction of the home to the Buyer as provided in the New Home Warranty and Builders Registration Act. At the time of settlement, Seller, at is sole cost and exepense, will provide Buyer a ten (10) year (from completion) New Home Warranty Insurance Policy as authorized and approved by the New Jersey Division of Housing. EXCEPT AS STATED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED. IN PARTICULAR, THERE IS NO IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR IS THERE ANY IMPLIED WARRANTY OF MERCHANTABILITY.

21.   INSULATION. Seller will install ceiling, wall and slab insulation as follows:

(a)   Ceiling Insulation. Fiberglass ceiling insulation above all second floor living areas shall be (R-30) kraft-faced fiberglass batts, loose fill fiberglass insulation or comparable materials yielding an R value of R-30.

(b)   Roof Insulation. Fiberglass roof/ceiling insulation above all second floor living areas shall be (R-30) 9" thick kraft-faced fiberglass batts.

(c)   Slab Insulation. All exterior slab perimeters shall be insulated with twenty-four inch (24") wide and two inch (2") thick styro-foam sheathing installed in a vertical position by the concrete subcontractor.

(d)   Wall Insulation. All insulation in exterior frame walls adjacent to living areas will be RT-15.44 made up of three and five-eights inch (3-5/8") Kraft-fact fiberglass batts in stud cavities and nominal one-half inch (½") aspenite sheathing. All band joints between floors shall be insulated to the same specifications as the walls.

(e)   Exterior Wall Insulation. Exterior composite wall R-Value calculations are as follows:

| WALL VALUE | CAVITY R-Value |
| --- | --- |
| Outside Air Film | .17R |
| Aluminum or Vinyl Siding | .61 |
| Air Infiltration Barrier | .00 |
| Nominal ½" Aspenite Sheathing | .53 |
| R-13 Fiberglass Insulation | 13.00 |
| ½" Drywall | .45 |
| Inside Air Film | .68 |
| Total R-Value | 15.44 RT |

R values are based on New Jersey Department of Energy small dwelling energy sub-code compliance manual.

22.   MOLD DISCLAIMER. According to the U. S. Environmental Protection Agency mold is present almost everywhere, both indoors and outdoors and there is no practical way to eliminate all mold and mold spores in the indoor environment, other than to control moisture.

It is understood by Buyer that Seller makes no representations, of any kind, regarding the present or future existence of mold in or around the Property. Further, Buyer understands that Seller does not make any warranty, express or implied, including, but not limited to, warranties of good workmanship, habitadbity, merchantability or fitness for a particular purpose, regarding mold as it relates to the Property. Buyer releases Seller from any present or future claims or liability of any kind that Buyer may ever have against Seller, which in any way relates to the existence of mold in or around the Property, including, but not limited to, property damage, personal injury, adverse health effects, loss of use, loss of value of any expenses Buyer may incur in any mold abatement methods that Buyer may pursue if the presence of mold should ever occur. The terms of this paragraph shall survive settlement.

23.   DISCLOSURE REGARDING HORSE FARM AND DOG KENNEL. As required by the Planning Board of Moorestown Township, Seller discloses to Purchaser the existence of a horse farm(s) and dog kennel which are in close proximity to the property which is the subject matter of this Agreement of Sale. This disclosure is made as a condition of subdivision approval by the Township of Moorestown Planning Board and is not a complete list of all offsite conditions which may affect the subject property. The horse farm and dog kennel, including certain special events conducted thereon, may cause potential problems including but not limited to odors, noise, increased traffic and aesthetics. Seller encourages Purchaser to fully investigate these conditions prior to execution of this Agreement of Sale or during the attorney review period.

24.   DISCLOSURE OF ENVIRONMENTAL CONDITION. As required by the Planning Board of Moorestown Township, Seller discloses to Purchaser that a preliminary assessment, site investigation and the remedial investigation of the property forming the subdivision known as Wexford at Moorestown is available for review at the sales office. These reports indicated that the site contained contaminant concentrations which exceeded applicable standards. Remedial actions where conducted by a prior owner of the site and No Further Action (NFA) Letters were dated October 15, 1999 and October 20, 2000 were obtained from the New Jersey Department of Environmental Protection. Copies of the NFA letters are available for review at the sales office. A summary of the remedial investigation report for the Wexford property is attached hereto as Exhibit A and is titled "Executive Summary". Copies of the environmental reports are available for review and inspection by Buyer. Seller encourages Buyer to fully investigate the environmental condition of the property prior to execution of this Agreement of Sale or during the attorney review period.

25.   ENTIRE AGREEMENT; REPRESENTATIONS. This entire writing and any riders, amendments or addenda attached to this Agreement contain the entire Agreement between the parties. Any modification of this Agreement shall not be binding unless such modification shall be in a separate writing and signed by both the Buyer and the Seller.

5

26.   **SITE VISITS.** Neither Buyer nor any contractor designated by the Buyer shall be allowed to do any work whatsoever on the Property prior to settlement. Visits to the Property under construction are limited to one accompanied visit except for a formal walk-through, when those items which may be required to be completed and/or repaired by Seller will be entered on a Pre-Occupancy Inspection Report. The listed items will be repaired within fourteen (14) business days after settlement, subject to the availability of required skilled manpower, materials and suitable weather conditions, as applicable. It is understood that the listed items shall not constitute a bar to settlement and settlement shall be held in accordance with the terms and conditions of this Agreement. In no event will Seller be required to escrow monies to guarantee the completion of items listed on the Pre-Occupancy Inspection Report.

27.   **GOVERNMENTAL REGULATIONS.** Seller has the right to cancel this Agreement upon written notice to Buyer if the terms of this Agreement do not comply with existing or future rules, regulations or conditions of any Federal, State or Municipal government or governmental agencies.

28.   **FORMAL TENDER OF DEED.** Formal tender of deed and tender of purchase monies are hereby waived. This means that if Buyer is in default under this Agreement, Seller need not attend settlement.

29.   **APPROVAL OF SALE.** It is understood that this sale is made subject to the acceptance of the Seller. In the event Seller does not accept this Agreement within fourteen (14) days of Buyer's execution of this Agreement, all deposit monies paid by Buyer will be returned to Buyer without interest, whereupon this Agreement shall be "null and void," and Seller shall have no further liability whatsoever to Buyer.

30.   **AGREEMENT NOT TO BE RECORDED.** This Agreement shall not be recorded or filed in any court or public office. Buyer shall do nothing to affect Seller's title to the Property. If Buyer does so, Seller has the right to cancel this Agreement and Buyer agrees to pay Seller for any and all resulting loss, damage, legal and attorney's fees and other related costs. Nothing in this Agreement or related documents shall have the effect of impairing the title to the Property.

31.   **CHANGES IN PRICE/TERMS.** Buyer understands that Seller may offer similar properties at prices higher or lower than this Property's Purchase Price, or with different terms and conditions, and that any such offerings shall have no effect on the Total Purchase Price or the terms of the purchase for this Property.

32.   **ALTERATIONS IN AGREEMENT.** Neither party shall make any changes to the pre-printed portion of this Agreement. If any change is made by interlineation or otherwise, such change shall be invalid and the pre-printed provision shall govern. Changes may be made only by amendment or other writing, signed by both Buyer and Seller.

33.   **CORNER STAKES/MONUMENTS.** It is expressly agreed that Seller will provide corner stakes to mark the corners of the property. Monuments will not be provided on the Property.

34.   **TIME OF THE ESSENCE.** Time, whenever specified in this Agreement for the performance by Seller or Buyer of any of their respective obligations, is hereby made of the essence of this Agreement. This means that the terms and conditions of this Agreement must be performed within the time stated in the Agreement, or if no time is stated, within a reasonable time.

35.   **AGENT(S).** A. P. Orleans, Incorporated, its officers, partners, employees and independent contractors are agents for the Seller and not the Buyer; however, they may perform services for the Buyer in connection with financing, insurance and document preparation. The parties understand and acknowledge that A.P. Orleans, Incorporated has no control or responsibility over the construction of the property and is solely acting as real estate broker in this transaction.

36.   **CONDEMNATION.** If, after the date of this Agreement and prior to settlement, all or any material portion of the Property is condemned or taken by eminent domain (or is the subject of a pending or contemplated proceeding), Seller shall have two (2) options. The Seller may elect to (1) terminate this Agreement, in which case the Seller will so notify the Buyer, in writing, within twenty (20) days after it receives notice of such action whereupon the deposit monies paid by Buyer shall be returned to Buyer and neither party shall have any further rights or obligations under this Agreement; or (2) proceed with settlement, without any reduction in the Purchase Price and at settlement Seller shall assign to Buyer any and all condemnation proceeds allocatable to the Property and any and all claims that Seller may have with respect to the condemnation of the Property.

37.   **ASSESSMENTS FOR MUNICIPAL IMPROVEMENTS.** The governmental authorities having jurisdiction over the Property have the right to make improvements which benefit the Property. If such an improvement benefiting the Property is completed prior to settlement, the Seller will pay the assessment, if any. If such an improvement benefiting the property is completed after settlement, Buyer will pay the assessment, if any. The improvements in this paragraph 34 do not include the improvements required to be completed by the Seller as a condition of the governmental authorities approvals which are a part of the construction process.

38.   **PARTIAL INVALIDITY.** If any term or provision of this Agreement or its application to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

39.   **CONSTRUCTION.** This Agreement shall be governed by and construed in accordance with, the laws of the State of New Jersey without giving any effect to any New Jersey or other laws regarding conflicts of law or to any presumption, canon or rule of law requiring or permitting construction against the party who drafted this Agreement.

40.   **CAPTIONS.** The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of its provisions.

41.   **NO WAIVER.** No consent or waiver, express or implied, by Seller to or of a breach of any representation, covenant, condition, agreement or warranty of Buyer shall be construed as a consent to or waiver of any other breach of the same or any other representation, covenant, condition, agreement or warrant of Buyer.

42.   **REPRODUCED SIGNATURES BINDING.** It is understood and agreed that the original signatures of Buyer or Seller affixed to this Agreement, amendments, endorsements, addendum or riders to this Agreement or any related document(s) may be reproduced by photocopy carbon paper, NCR paper or any other means of reproduction. Any document containing a reproduction of an original signature of Buyer or Seller will have the same legal force and effect as if an original signature were upon the document and copies of any documents bearing such reproduced signature shall be deemed as valid and binding as those bearing an original signature.

43.   **ATTORNEY REVIEW.**

·   **Study by Attorney** - The Buyer or the Seller may choose to have an attorney study this Contract. If an attorney is consulted, the attorney must complete his or her review of the Contract within a three (3) day period. This contract will be legally binding at the end of this three (3) day period unless an attorney for the Buyer or for the Seller reviews and disapproves of the contract.

·   **Counting the time** - You count the three (3) days from the date of delivery of the signed contract to the Buyer and the Seller. You do not count Saturdays, Sundays or legal holidays. The Buyer and Seller may agree in writing to extend the three (3) day period for attorney review.

·   **Notice of Disapproval** - If an attorney for the Buyer or the Seller reviews and disapproves of this contract, the attorney must notify the Broker(s) and the other party named in this contract within the three (3) day period. Otherwise, this contract will be legally binding as written. The attorney must send a notice of disapproval to the Broker(s) by certified mail, by telegram, or by delivering it personally to One Greenwood Square, 3333 Street Road, Suite 101, Bensalem, PA 19020 Attention: John P. White. The telegram or certified letter will be effective upon sending. The personal delivery will be effective upon delivery to the Broker's office. The attorney may also, but need not, inform the Broker(s) of any suggested revision(s) in the contract that would make it satisfactory.

**AGENCY DISCLOSURE**
**CONSUMER INFORMATION STATEMENT ACKNOWLEDGMENT AND**
**DECLARATION OF LICENSEE BUSINESS RELATIONSHIP(S)**

By signing below, the Seller and Buyer(s) acknowledge they received the Consumer Information Statement on New Jersey Real Estate Relationships from the brokerage firms involved in this transaction prior to the first discussion at which the Buyer(s) motivation or financial ability to buy was discussed and prior to the first discussion at which the Seller's motivation or desired selling price was discussed.

A. P. ORLEANS, INCORPORATED (name of firm) AND _Patricia Block / Susan Keyes_ (name of licensee) AS ITS AUTHORIZED REPRESENTATIVE ARE WORKING IN THIS TRANSACTION AS: SELLER'S AGENT ONLY.

APPROVAL OF BUYER:

Buyer: _Michael S. Leese_

Buyer: _Ashley L. Leese_          Witness: _____   Date: 6/7/03

                                  Witness: _____   Date: 6/7/03

Buyer: _____                   Witness: _____   Date: _____

APPROVAL BY SELLER:

Seller: _____
By: _____                      Witness/Attest: _____   Date: 6/4/03
   **Authorized Signatory**

# MORTGAGE CONTINGENCY RIDER

BUYER and SELLER hereby agree that the provisions contained in this Rider shall become a part of the Agreement of Sale (the Agreement) for the property identified above.

This Agreement is contingent upon Buyer receiving a mortgage commitment for the mortgage amount stated in subparagraph 3(b) of the Agreement under the terms and conditions more fully stated in this Rider not later than the date which is also specified in subparagraph 3(b). Buyer shall pay the cost of the title search, title examination, fee title insurance policy, recording fees and survey, if required, as well as any and all other charges normally paid by the Buyer. Buyer shall also pay the application fee, credit report fee, document preparation fee, appraisal fee and settlement fee as well as any additional fees or costs required by the mortgagee. These fees are in addition to escrows and prepaid charges incidental to a mortgage closing. Buyer will also pay any required insurance premiums and related costs at or before the time of settlement. Insofar as permitted by law, Buyer hereby authorizes agent for Seller to prepare such papers as may be necessary to affect and complete settlement. In addition, Buyer shall execute the note or bond and mortgage document. Neither the Seller nor the mortgagee provides or pays for an attorney to represent the Buyer. Buyer may elect to be represented by an attorney at Buyer's own expense.

In reliance upon the occupancy representation made by Buyer in paragraph 2.(c) of this Agreement and upon the credit and financial information provided Seller by Buyer, which information Buyer represents and warrants to be true and correct, the Seller agrees that this Agreement shall be subject to the following additional terms and conditions:

(a)  Loan Application and Terms:  Buyer agrees to make a full and complete mortgage application within ten (10) days of the date of this Agreement of Sale for a mortgage secured loan for not more than the amount stated in subparagraph 3.(b) of the Agreement, for a term of not more than thirty (30) years and at the prevailing rate of interest. For this purpose, prevailing rate of interest shall be defined as the net interest rate quoted by the Federal National Mortgage Association (Fannie Mae) for thirty year, fixed rate loans for mandatory delivery within sixty (60) days, plus .375%. Buyer acknowledges that no representations have been made with regard to a specific mortgage program to be provided by the mortgage lender unless stated in writing and signed by the parties to this Agreement.

(b)  Loan Type; Project Approvals; Commitments: Unless otherwise agreed to by the parties in writing by Addendum or Amendment to this Agreement, the mortgage loan will be a conventional mortgage for which the Buyer qualifies and for which the project, section and/or phase has been approved or for which project approval is not required. Seller makes no representations and gives no warranties as to the final approval/acceptance of the project, section and/or phase by FNMA, FHLMC, FHA, VA or any other private or public organization involved in the review of condominiums or planned unit developments. It is incumbent upon Buyer to select a lender able to process and close a mortgage loan on the property as the Seller assumes no obligation whatsoever to provide evidence of project acceptance or approval and/or any documentation other than that normally provided a mortgage lender in the normal course of business. The Seller provides only one copy of the Public Offering State, where required, which includes the Declaration of Condominium or Master Deed, as may be applicable. Buyer assumes responsibility for supplying a copy of required documents to the lender, if required.

(c)  Notification of Seller:  Buyer agrees to notify Seller, in writing, to One Greenwood Square, 3333 Street Road, Bensalem, PA 19020, of the name, address, phone number and contact person of the lender to whom application is made as well as the type of mortgage loan for which application was made. Such notification is to be received by the Seller within twenty (20) days of the date of this Agreement. Further, Buyer agrees to immediately notify Seller when a mortgage commitment has been obtained and to provide Seller with a copy of such commitment if not provided to Seller by the lender. Buyer hereby authorizes and directs the lender to provide Seller and/or its agents with written or verbal status reports on the progress of Buyer's mortgage application upon request and to provide Seller with a copy of the mortgage commitment document or other relevant notices when issued.

(d)  Lender's Performance: Buyer takes full responsibility for the performance of the mortgage lender selected by Buyer and hereby acknowledges that a lender's failure to perform shall not constitute a justifiable reason for delaying settlement within the terms of this Agreement of Sale. Buyer also assumes responsibility for notifying Buyer's lender of the date, time and place of settlement. If settlement is delayed because of the failure of Buyer's lender to perform, Seller shall be entitled to compensation for the additional carrying costs incurred in accordance with paragraph 7 of this Agreement.

(e)  Non-Receipt of Mortgage Commitment.  In the event Buyer does not receive a written mortgage commitment by the date stated in subparagraph 3.(b) of the Agreement, Buyer agrees to notify Seller that Buyer has not received a commitment, in writing to: One Greenwood Square, Suite 101, 3333 Street Road, Bensalem, PA 19020 within five (5) calendar days after that date. In the event Buyer so notifies the Seller or if the Buyer's mortgage application is denied by the lender on or before the specified date, the Seller may elect to (1) return all deposit monies, without interest, in which event this Agreement shall be immediately canceled and of no further effect and neither Buyer nor Seller shall have further liability whatsoever to each other, or (2) extend the mortgage contingency date as contained in subparagraph 3.(b) of the Agreement, or (3) require Buyer to apply for a mortgage secured loan in the amount stated in above with a lender designated by Seller. In this event, it is agreed and understood that the mortgage secured loan may be a fixed rate, adjustable rate, variable rate, graduated payment loan or any other type of loan for which the Buyer will qualify based on the financial qualifications of Buyer. Buyer agrees to pay all reasonable and customary financing charges for such loan, including but not limited to the application, credit report, appraisal and origination fees as well as discount/commitment and other reasonable fees charged by lender.

(f)  Failure to Notify Seller: If the Buyer does not notify Seller, in writing, that a mortgage commitment has not been received pursuant to subparagraph (e) above, this contingency will be deemed to be null and void and of no further effect. In this event, this Agreement of Sale shall be and remain in full force and effect with no mortgage contingency whatsoever.

(¿¿) calendar days of the len¿¿¿ 's written or oral request or furnishes false ¿ , complete, accurate and verifiable documentation and/or information within Buyer's legal or financial status . ¿ ne Seller, Seller's Agent and/or the Lender or fails to cooperate in the processing complete information concerning of the mortgage loan application, the buyer shall be considered to be in default. In this event, Seller may declare the provisions of this paragraph null and void and of no further effect, whereupon the balance of this Agreement shall remain in full force and effect with no mortgage contingency or invoke those remedies as stated in paragraph 14 (Default of Buyer) of the Agreement, as the Seller may elect.

(h)  Fulfillment of Contingency; Risk of Non-Renewal: After the mortgage contingency date stated in subparagraph 3.(b) above has expired and/or a mortgage commitment is obtained by Buyer, the mortgage contingency shall be considered fulfilled and the Agreement of Sale shall remain in full force and effect with no contingencies or conditions whatsoever, unless otherwise agreed to in writing by the parties. All risk of non-renewal of the mortgage commitment and all risk of maintaining mortgage qualification until the date of settlement stated in Seller's notice to buyer shall be borne by Buyer. Buyer agrees to take no action whatsoever which could adversely affect Buyer's creditworthiness, thus causing the lender to deny Buyer's mortgage application or to withdraw, refuse to renew or to cancel a previously approved mortgage commitment. This Agreement is specifically not in any manner contingent or conditioned upon the sale or settlement of any other real estate unless expressly agreed to, in writing, by the parties to this Agreement.

(i)  Acceptance of Mortgage Commitment/Satisfaction of Conditions: Buyer agrees to accept a mortgage commitment issued by Lender within five (5) business days of receipt of the written commitment to Buyer. In the event Buyer receives a mortgage commitment containing conditions or contingencies for which Buyer is responsible, it shall be Buyer's obligation to promptly satisfy such conditions or contingencies so that settlement may take place in a timely manner in accordance with paragraph 7 of the Agreement. Failure of Buyer to satisfy such conditions or contingencies shall be deemed a default by Buyer. Unless otherwise agreed, in writing, if Buyer received a mortgage commitment containing the condition or contingency requiring that Buyer sell, settle or lease real estate presently owned by Buyer and Buyer fails to satisfy such condition or contingency and subsequently fails to complete settlement in accordance with this Agreement, then Buyer shall be in default of this Agreement and Seller shall have available all remedies provided for in this Agreement.

(j)  Funds to Close: Buyer hereby represents that Buyer has or will have sufficient liquid assets available to obtain a mortgage commitment and close title by the date set for settlement in the Seller's notice to Buyer. Despite the provisions contained in this Amendment, any provision contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date 6/17/2003

_____
Witness as to Buyer

_____
Witness as to Buyer

_____
Witness/Attest

_Michael S Leuse_
Buyer

_Ashley J. Leose_
Buyer

Seller
By: _____

Authorized Signatory

Block: 6008   Lot: 3
Bldg: _____   Qual: C-
Community: _Wexfod_

## AMENDMENT TO AGREEMENT OF SALE

Dated _6|7|03_____ by and between

_Orleans_____ (Seller) and

_Michael Leese + Ashley Leese_____ (Buyer(s)

**FOR THE PROPERTY KNOWN AS** _5 Victoria Ct_____

   **THE PARTIES TO THIS AGREEMENT,** intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Mortgage Contingency Rider or Paragraph to the Agreement of Sale described above as follows:

Provided Buyer is qualified and has made mortgage application to Seller's subsidiary, Alambry Funding, Inc., Buyer may elect to participate in any one of the following three special mortgage programs offered by Alambry Funding, Inc. exclusively to new home buyers of Orleans Homebuilders, Inc. and its subsidiaries:

**(1)   Orleans 3 Step Mortgage**

**Type of Loan**  Provided Buyer has made mortgage application with Alambry Funding, Inc. for a Conventional Fixed Rate Mortgage  with a term of note more than 30 years said mortgage will, if so elected by Buyer, contain the following provisions at no additional cost to Buyer:

**Note Rate:** The Buyer's Note Rate will be established and set in accordance with the Lender's lock-in or rate cap policy which will be explained at the time of mortgage application.

**Payment Rate:**  The principal and interest portion of the first twenty-four monthly mortgage payments due the mortgage lender will be calculated based on a "payment" rate rather than the interest (note) rate in accordance with the following:

      (a) The "payment" rate for the first twelve (12) payments due the mortgage lender will be the interest (note) rate less one and one-half percent (150 basis points).

      (b) The "payment" rate for second 12 payments (payments 13 through 24) will be the interest (note) rate less one-half of one percent (50 basis points).

      (c)  The principal and interest portion of the month mortgage payment will be calculated on the full interest (note) rate for the balance of the loan term and will be computed based on the original principal balance of the mortgage loan.

**Points:** The Buyer will be responsible for origination and/or discount fees (points), if any, for the Note Rate as set by the Lender at the time the interest rate is locked-in in accordance with the Lender's policy.  The Buyer will not be responsible for the applicable temporary buydown fees.

**(2)   Orleans Points Lite Mortgage**

**Type of Loan:** Provided Buyer has made mortgage application with Alambry Funding, Inc. for any Conventional mortgage, conforming or jumbo, fixed or adjustable rate, with a term of not more than 30 years, said mortgage will, if elected by Buyer, contain the following terms.

**Points:** When the final interest rate and points are locked in prior to settlement, the origination/discount points due from the Buyer will be reduced by one and one-half percent (1.5%) of the mortgage amount. Accordingly, at mortgage lock-in, if the Buyer opts for a rate with a total

of three points, the Buyer will be responsible for one and one-half (1.5) points. If the Buyer opts for a rate with one and one-half (1.5) points, the Buyer will not pay any points. In the event Buyer opts for a rate with less than one and one-half (1.5) points, the difference will be credited to Buyer's other eligible closing costs. This reduction in the points applied to market rate quotes and not to quotes which already include the Points Lite Discount.

(3)     Orleans Best Rate Mortgage

**Type of Loan:** Provided Buyer has made mortgage application with Alambry Funding, Inc. for a Conventional Fixed Rate Mortgage with a term of not more than thirty years, said mortgage will, if elected by Buyer, contain the following provisions at no additional cost to Buyer:

**Cap Rate:** The Buyer will be permitted to set the maximum interest rate (Cap Rate) and points by executing a Rate Cap Addendum at any time after the Resale Contingency, if any, has been satisfied and construction on the property has started. The Cap Rate will be the interest rate and points quoted by the Lender for settlements taking place within sixty (60) days of the date on which the Rate Cap Addendum is executed for the mortgage program selected by Buyer. At the time the Rate Cap Addendum is executed, the Buyer will pay a fee equal to one percent (1%) of the mortgage amount as a rate guarantee fee. At settlement, this amount will be credited again the Buyers total points and, in the event Buyer opts for a zero point loan, the credit will be applied towards other eligible closing costs.

**Maximum Interest Rate:** Provided settlement takes place within nine months of the date on which the Rate Cap Addendum is executed by Buyer, the final interest rate and points will be no greater than the interest rate and points specified in the Rate Cap Addendum.

**Final Interest Rate:** Within fifteen (15) days prior to settlement, Buyer may set the final interest rate by executing a Rate Lock Agreement. Provided the rate cap period has not expired for reasons other than construction delay, the final interest rate and points will be those specified in the Rate Cap Addendum. If the interest rate and points quoted by the Lender for the mortgage program selected by Buyer are lower than the rate and points specified in the Rate Cap Addendum at the time of rate lock, Buyer may opt to take the lower rate and/or points by paying a re-lock fee of one-quarter of one percent (.25%) of the mortgage amount.

Buyer's selection of one of the above programs must be made within five (5) business days of a written or oral request for such selection by any representative of Alambry Funding, Inc. The execution of this Amendment does not in any way obligate Buyer to make mortgage application to Alambry Funding, Inc. and Buyer may use any reputable mortgage lender. In the event Buyer elects to apply with any other lender, the terms of this Amendment will be null and void.

**DESPITE** the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: _6/7/03_

WITNESS as to BUYER

WITNESS as to BUYER

WITNESS/ATTEST

BUYER

BUYER

SELLER
By:_____
AUTHORIZED SIGNATORY

EXHIBIT "A" TO THE AGREEMENT OF SALE

Dated: 6/7/03

for the property located at: 5 Victoria Ct

Wexford at Moorestown, Township of Moorestown, County of Burlington, State of New Jersey.

## EXECUTIVE SUMMARY

D'Anastasio Corp., through is consultant, Environmental Resolutions, Inc.,(ERI) conducted a preliminary assessment, site investigation and a remedial investigation at the Wexford at Moorestown property(site) located at Lot 16, Block 6000 and Lot 48, block 5800 in Moorestown Township, Burlington County, New Jersey. These investigations revealed the following:

**Ground Water Contamination**

Ground water beneath the southeastern quarter of the site known to have been contaminated due to migration from the adjacent Lockheed Martin Property.

**Historic Pesticide Usage**

Due to the historic agricultural usage of the site, the past application of pesticides were believed to have adversely impacted the soil.

**Ground Water Contamination**

The New Jersey Department of Environmental Protection (NJDEP) has determined that the contamination in the southeastern quarter of the Wexford at Moorestown site is due to migration from the adjacent Lockheed Martin facility and that Lockheed Martin is the responsible party. Ground water contamination beneath the Lockheed Martin facility is being remediated presently pursuant to an approved NJDEP remedial action work plan. This NJDEP approved remedial action work plan includes three(3) ground water remediation systems, recovery wells, as well as monitoring wells from which ground water samples are being collected on a quarterly basis. Lockheed Martin has reported that trichloroethene(TCE) which was the primary contaminant of concern, has decreased by more than 90% since treatment began in 1995. ERI agrees the current remediation undertaken by Lockheed Martin is the appropriate course of action and no remediation is required on the Wexford at Moorestown site. Residual ground water contamination, if any, is planned to dissipate by natural factors.

Due to the utilization of public water and sewer and the depth of the ground water table on the Wexford at Moorestown site the risk of contact with the contaminants, if any is remote. Inasmuch as the problem was caused from an off-site property,(Lockheed Martin), a letter of No Further Action is expected to be issued from NJDEP pertaining to the Wexford at Moorestown site concerning this issue.

**Historic Pesticide Usage**

Soil sampling investigation indicated that lead and residual organic pesticides(DDT, DDE, DDD, and Dieldrin)did not exceed NJDEP Residential Soil Clean Up Criteria (RSCC). However, the investigation revealed that arsenic concentrations exceeded the Residential Soil Clean Up Criteria by 7.9 parts per million. It appears that residual arsenical pesticides have impacted the upper six(6) inches of the entire previously farmed area of the Wexford at Moorestown site. It has been demonstrated by the NJDEP in pilot projects, that arsenic levels can be effectively reduced by blending the upper soils with lower soils. The Remedial Investigation results indicate that the arsenical pesticides are confined to the near surface soils beneath the site and that arsenic concentrations decrease rapidly with depth. The laboratory results indicate that average concentrations for the upper two(2) feet are lower than the RSCC. Based on these results, it appears that soil blending will be an effective remedy for the Wexford at Moorestown site. It is proposed that the upper two(2) feet of soil be blended during soil grading and stripping operations.

Remedial verification samples will be collected from the blended soil for laboratory analysis for arsenic under NJDEP oversight. Inasmuch as the NJDEP recommends this course of action as an effective means of remediation, a letter of No Further Action from NJDEP is expected for all lots. A letter of No Further Action from the NJDEP in this context means the residential lots are in compliance with the NJDEP Residential Soil Clean Up Criteria(RSCC).

Acknowledged:

_____

Witness

_____

Witness

_____

Witness/Attest

_____
Buyer   _Michael A. Leese_

_____
Buyer   _Ashley A. Leese_

_____
Seller

EXHIBIT "A"

# AMENDMENT TO AGREEMENT OF SALE

## DECLINATION OF RESALE CONTINGENCY

THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable consideration, hereby agree that the following provisions shall become a part of the Agreement of Sale (the "Agreement") for the above described property.

Buyer hereby acknowledges that Seller has offered to add its standard form of Resale Contingency Rider to this Agreement of Sale. Under the terms and conditions of the Resale Contingency Rider offered by Seller, the Buyer's purchase would be contingent and conditioned upon the Listing Broker producing a purchaser for Buyer's present home within the contingency period. Buyer has reviewed the terms of the Resale Contingency Rider and has elected not to execute the Resale Contingency Rider.

Accordingly, it is fully understood and agreed that Buyer's purchase under this Agreement of Sale is specifically not contingent or conditioned upon the sale of Buyer's present home or any other real estate. Further, should Buyer obtain a mortgage commitment conditioned upon the sale and/or settlement of Buyer's present home or any other real estate, such condition shall not in any manner relieve Buyer of Buyer's obligation to complete settlement on the date and at the time and place specified by Seller pursuant to this Agreement of Sale.

DESPITE the provisions contained in this Amendment, all provisions contained in the Agreement of Sale not inconsistent with this Amendment shall remain in full force and effect.

Date: 6/7/05

WITNESS _____

WITNESS _____

WITNESS/ATTEST _____

BUYER _____

BUYER _____

SELLER
By: _____
AUTHORIZED SIGNATORY

Block: __6008__  Lot: __3__

Community: _____ Wexford

## AMENDMENT TO AGREEMENT OF SALE

Dated __6/7/03__ by and between

Orleans Corporation, a Pennsylvania Corporation

__Michael Leese + Ashley Leese__ _____ (Seller) and

FOR THE PROPERTY KNOWN AS __5 Victoria Ct__ _____ (Buyer(s)

THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

NOTIFICATION REGARDING OFF-SITE CONDITIONS

Pursuant to the "New Residential Construction Off-Site Conditions Disclosure Act," P. L. 1995, c.253 (C.46:3C-1 et seq.), Sellers of newly constructed residential real estate are required to notify purchasers of the availability of lists disclosing the existence and location of off-site conditions which may affect the value of the residential real estate being sold. The lists are to be made available by the municipal clerk of the municipality within which the residential real estate is located and in other municipalities which are within one-half mile of the residential real estate. The address(es) and telephone number(s) of the municipalities relevant to this project and the appropriate municipal offices where the lists are made available are listed below. Purchasers are encouraged to exercise all due diligence in order to obtain any additional or more recent information that they believe may be relevant to their decision to purchase the residential real estate. Purchasers are also encouraged to undertake an independent examination of the general area within which the residential real estate is located in order to become familiar with any and all conditions which may affect the value of the residential real estate.

The purchaser has five (5) business days from the date the contract is executed by the purchaser and the seller to send notice of cancellation of the contract to the seller. The notice of cancellation shall be sent by certified mail. The cancellation will be effective upon the notice of cancellation being mailed. If the purchaser does not send a notice of cancellation to the seller in the time or manner described above, the purchaser will lose the right to cancel the contract as provided in this notice.

MUNICIPALITY:      Moorestown Township Deputy Clerk
ADDRESS:      111 W Second St
      Moorestown, NJ 08057
TELEPHONE NUMBER:    (856) 235-0912

DESPITE the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: __6/7/03__

WITNESS as to BUYER _____  BUYER _____

WITNESS as to BUYER _____  BUYER _____

WITNESS/ATTEST _____  SELLER
Rev 8/2001      By: _____

       AUTHORIZED SIGNATORY

Block: _6008_ Lot: _3_
Bldg: _____ Qual: _C__
Community: _Wexford_

## AMENDMENT TO AGREEMENT OF SALE

Dated _6/7/03_ by and between

_Orleans_

_Michael Leese + Ashley Leese_ (Seller) and
_____ (Buyer(s)

FOR THE PROPERTY KNOWN AS _5 Victoria Ct_

**THE PARTIES TO THIS AGREEMENT,** intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

**MEGAN'S LAW STATEMENT.** Under New Jersey law, the county prosecutor determines whether and how to provide notice of the presence of convicted sex offenders in an area. In their professional capacity, real estate licensees are not entitled to notification by the county prosecutor under Megan's Law and are unable to obtain such information for you. Upon closing, the county prosecutor may be contacted for such further information as may be disclosable to you.

**DESPITE** the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: _6/7/03_

WITNESS as to BUYER _____

WITNESS as to BUYER _____

WITNESS/ATTEST _____

New 12/97

_Michael S. Leese_
BUYER

_Ashley J. Leese_
BUYER

SELLER
By: _____
AUTHORIZED SIGNATORY



Block: **600 8** Lot: **3**

Community: **Wexford**

## AMENDMENT TO AGREEMENT OF SALE

Dated **6/7** 200**3** by and between

**Orleans**

_____ (Seller) and

**Michael Leese + Ashley Leese**

_____ (Buyer(s)

FOR THE PROPERTY KNOWN AS
THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable
consideration, hereby agree to amend the Agreement of Sale described above as follows:

### ARBITRATION OF DISPUTES

BUYER AND SELLER AGREE THAT ANY AND ALL WARRANTY CLAIMS OR DISPUTES OF
ANY KIND ARISING FROM OR RELATED TO THIS AGREEMENT OF SALE SHALL BE SUBMITTED
TO FINAL AND BINDING ARBITRATION PURSUANT TO AND IN ACCORDANCE WITH THE
PROVISIONS CONTAINED IN THE SELLER'S LIMITED WARRANTY, INCORPORATED BY
REFERENCE HEREIN AS THOUGH FULLY SET FORTH.

ALL OTHER DISPUTES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR
IN THE INTERPRETATION OR ENFORCEMENT THEREOF, SHALL BE DECIDED FINALLY BY
ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES
OF COMMERCIAL ARBITRATION OF THE AMERICAN ARBITRATION ASSOCIATION AND THE
FEDERAL ARBITRATION ACT, 9 U.S.C. 1, ET SEQ.

DESPITE the provisions contained in this Amendment, any provisions contained in the original Agreement
of Sale which are not inconsistent with this Amendment shall remain in full force and effect.

Date: **6/7/03**

_____
WITNESS as to BUYER

_____
WITNESS as to BUYER

_____
WITNESS/ATTEST

New 10/2002

_____
BUYER

_____
BUYER
SELLER
By: _____
AUTHORIZED SIGNATORY

Block **6008** Lot **3**

Bldg_____ Unit_____

Community **Wexford**

## AMENDMENT TO AGREEMENT OF SALE

Dated **6/7**_____, 20**03** by and between

**Orleans** by and between

**Michael Leese + Ashley Leese** (Seller) and

**S Victoria Ct** (Buyer)(s) For the property known as

The parties to this Agreement, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

Buyer acknowledges that Buyer may be referred by Seller or Seller's employees to a model or home in another community built by Seller, for the purpose of affording Buyer an opportunity to observe the general appearance or characteristics of home exteriors, interiors, floor plans, designs, features or options not available for inspection in the community in which Buyer intends to purchase. Seller represents and Buyer acknowledges that the designs, options or features offered by Seller may have variations in size, dimension, appearance, color, availability, etc. from one community to another depending upon the supplier and the model purchased, and Buyer represents that Buyer did not rely upon anything displayed or installed in any other model or home in another community offered by Seller, in making Buyer's decision to purchase a home or the options for that home.

DESPITE the provisions contained in this Amendment, all provisions contained in the original agreement of sale not inconsistent with this Amendment shall remain in full force and effect.

DATE: **6/7/03**

_____  
Witness

_____  
Witness

_____  
Attest

Phillips/Amend

_____  
Buyer

_____  
Buyer

_____  
Seller



BLOCK _6008_ LOT: _3_

BLDG _____ UNIT _____

COMMUNITY: _Wexford_

## AMENDMENT TO AGREEMENT OF SALE

Dated _6/7_____, 19_03_ by and between

_Orleans_____

_Michael Leese + Ashley Leese_ (Seller) and
_____ (Buyer(s))

FOR THE PROPERTY KNOWN AS _5 Victoria Ct_

THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

Provided Buyer completes settlement on the above described property, Buyer is to receive a membership to the Larchmont Swim Club for the _2004_ swimming season at 50% of the cost. To obtain this discounted membership, Buyer will, upon applying for membership, present a copy of this Amendment together with a copy of the Settlement Statement (HUD Form 1) as evidence that settlement has been completed.

DESPITE the provisions contained in this Amendment, all provisions contained in the original agreement of sale not inconsistent with this Amendment shall remain in full force and effect.

DATE: _6/7/03_

WITNESS _____

WITNESS _____

WITNESS/ATTEST _____
Rev. 8/94

BUYER _Michael S Leese_

BUYER _Ashley J Leese_

SELLER
BY: _____
AUTHORIZED SIGNATORY

Rev 1

## AGREEMENT OF SALE

THIS IS A LEGALLY BINDING CONTRACT THAT WILL BECOME FINAL WITHIN THREE BUSINESS DAYS. DURING THIS PERIOD YOU MAY CHOOSE TO CONSULT AN ATTORNEY WHO CAN REVIEW AND CANCEL THE CONTRACT. SEE SECTION ON ATTORNEY REVIEW FOR DETAILS.

**PROPERTY DESCRIPTION:**

Block: 6008     Lot: 003     Model: MILFORD III FARMHOUSE S/S BS   Bedrms: 4   Baths: 2.5

Street Address: 5 VICTORIA COURT     Model Code: S40 MILFOR3

County: Burlington     State: New Jersey     Agreement Dated: 06/05/2003   6/7/03   ELEVATION: 141

Community: Wexford

1. **Table of contents.** See Page 2 of this Agreement of Sale for the Table of Contents.

2. **Parties and agreement to purchase.**

BUYER: MICHAEL LEESE & ASHLEY LEESE

ADDRESS: 55 E. GREENWOOD AVE   LANSDOWNE PA 19050

HOME PHONE NUMBER: (610)622-8048     BUSINESS PHONE NUMBER (215)665-3960

SELLER: Orleans Corporation, a Pennsylvania Corporation

ADDRESS: c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101 Bensalem, PA 19020

AGENT: A. P. Orleans, Incorporated

ADDRESS: c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101 Bensalem, PA 19020

Seller hereby agrees to sell to Buyer and Buyer agrees to purchase the property described above in Moorestown Township, New Jersey (such substantial conformity expressly warranted by Seller) on which there is to be erected a new home. (from now on referred to as the "Property") under the following terms and conditions.

(a) THE TOTAL PURCHASE PRICE WILL BE PAID IN THE FOLLOWING MANNER:

INITIAL DEPOSIT ..................................................................

DEPOSIT AT THE SIGNING OF THIS AGREEMENT ........................................ $1,000.00

ADDITIONAL DEPOSIT TO BE PAID ON OR BEFORE 30 DAYS FOLOWING DATE OF THIS AGREEMENT .......... $7,000.00

BALANCE IN CASH, CERTIFIED OR CASHIER'S CHECK AT THE TIME OF SETTLEMENT .......... -0-

TOTAL PURCHASE PRICE .......................................... $437,990.00

ALL OPTIONS OR EXTRA ITEMS WILL BE REFLECTED IN A SEPARATE AUTHORIZATION SIGNED BY BOTH BUYER AND SELLER     445,990.00

(b) Settlement will take place on or about **June 30, 2003** in accordance with the terms and conditions more fully set forth in paragraphs 5 and 7 of this Agreement.

(c) Buyer represents to Seller that Buyer intends to purchase the Property as: (check one)
[X] Primary residence
[ ] Secondary residence or vacation home
[ ] Rental Property

3. **SPECIAL CLAUSES, RIDERS, AMENDMENTS AND ADDENDA.**

(a) This sale is NOT contigent upon any mortgage financing unless otherwise provided by Rider.

(b) The following Riders, Amendments and Addenda are hereby attached to and made a part of this Agreement:

[X] Mortgage Contingency Rider. Mortgage Amount is     $ 389,600

Mortgage Contingency date is   06/15/2003

[ ] Cash Sale Amendment

[X] New Residential Construction Off-Site Conditions Disclosure Amendment (NJ)

[ ] Amendment to Agreement of Sale - Agency Disclosure (NJ)

[ ] Resale Contingency Rider

[X] Declination of Resale Contingency Rider

59PB1

1

## TABLE OF CONTENTS

1.    TABLE OF CONTENTS

2.    PARTIES AND AGREEMENT TO PURCHASE

3.    SPECIAL CLAUSES, RIDERS, AMENDMENTS
      AND ADDENDA

4.    DEPOSITS

5.    COMPLETION; SETTLEMENT

5.    ADJUSTMENTS

7.    SETTLEMENT

3.    TITLE

9.    POSSESSION

10.   DEED RESTRICTIONS

11.   FIRE AND OTHER CASUALTY

12.   NOTICE AND AGREEMENT REGARDING
      RADON GAS

13.   LICENSE

14.   DEFAULT OF BUYER

15.   DEFAULT OF SELLER

16.   ASSIGNMENT

17.   CHANGES IN PLANS

18.   STANDARD FEATURES/MATERIALS

19.   DECORATOR SELECTIONS

20.   WARRANTIES

      INSULATION

      MOLD DISCLAIMER

      DISCLOSURE REGARDING HORSEFARM AND
      DOG KENNEL

24.   DISCLOSURE OF ENVIRONMENTAL
      CONDITIONS

25.   ENTIRE AGREEMENT; REPRESENTATIONS

26.   SITE VISITS

27.   GOVERNMENTAL REGULATIONS

28.   FORMAL TENDER OF DEED

29.   APPROVAL OF SALE

30.   AGREEMENT NOT TO BE RECORDED

31.   CHANGES IN PRICE/TERMS

32.   ALTERATIONS IN AGREEMENT

33.   CORNER STAKES/MONUMENTS

34.   TIME OF THE ESSENCE

35.   AGENTS

36.   CONDEMNATION

37.   ASSESSMENTS   FOR   MUNICIPAL
      IMPROVEMENTS

38    PARTIAL INVALIDITY

39.   CONSTRUCTION

40.   CAPTIONS

41.   NO WAIVER

42.   REPRODUCED SIGNATURES BINDING

43.   ATTORNEY REVIEW

4. **DEPOSITS.** All deposit money shall be held by A. P. Orleans, Incorporated, Gary G. Schaal, Broker of Record, P. O. Box 478, Hainesport, New Jersey in escrow with First Union National Bank, Cuthbert Boulevard and MacArthur Drive, Haddon Township, until settlement or termination of this Agreement.

5. **COMPLETION; SETTLEMENT.** Completion, conveyance, payment and settlement under this Agreement shall be made on or about the date stated in subparagraph 2.(b) above. If for any reason Seller is unable to commence construction or make settlement for the Property by the above date, the time or times set forth in this Agreement shall be reasonably extended but in no event more than one hundred and eighty (180) days, after which Buyer may terminate this Agreement at any time by written notice to Seller whereupon all deposit monies paid by Buyer shall be returned without penalty.

6. **ADJUSTMENTS.** Taxes for the current quarter, utilities, water rent, sewer rent, and interest, if any, are to be apportioned as of the date of settlement. Municipal assessments against the Property for improvements completed by the date of settlement will be paid by Seller at or before closing. Municipal assessments against the Property for improvements completed after the date of settlement are the responsibility of Buyer.

7. **SETTLEMENT.** Settlement is to take place immediately after completion of the Property, at the time, date and place specified by Seller in notice to Buyer. Completion shall be evidenced by a Certificate of Occupancy issued by the municipality. If Buyer is unprepared to make settlement on the date specified by Seller in notice to Buyer, Buyer may request that Seller delay settlement for a reasonable period of time. If Seller grants a delay in settlement after receiving a request from Buyer, Buyer agrees to pay to Seller a sum equal to .0352% of the balance due the Seller at settlement for each day settlement is delayed beyond the date specified in the notice to Buyer. Any delay in settlement under this provision shall be at the sole discretion of the Seller. Neither Seller nor Buyer's Lender supplies or pays for an attorney for Buyer. Buyer may have his/her attorney at Buyer's own expense. Buyer will settle even if all off-site improvements and other improvements have not been completed. In the event Buyer fails to make settlement within ten (10) days of completion as defined in this paragraph, Seller shall have the sole option of either charging Buyer(s) .0352% per diem charge on the balance of purchase price until settlement actually takes place, or declare Buyer in default pursuant to Paragraph 14. In the event of delay in completion of the Property or settlement due to circumstances involving weather, strikes, or other labor disputes involving the Seller and/or its suppliers, delays in the issuance of permits or inspections, or delays in the delivery of supplies and labor or otherwise, the parties agree that settlement and the rights and liabilities of this Agreement shall be reasonably extended until such time as the Unit and settlement are completed, but such delay shall be limited to not more than one hundred and eighty (180) days. In the event that Seller determines that settlement will be delayed in excess of 180 days, Seller will so notify Buyer. This notice will provide Buyer with the revised date by which the home will be completed and settlement scheduled. Not later than the close of business on the 10th calendar day following receipt of such notice of delay, Buyer must elect to either (1) terminate this Agreement, whereupon all deposit monies paid by Buyer shall be returned without penalty, or (2) agree to accept the revised settlement date as set forth in Seller's notice of delay. In the event Seller does not notify Buyer in accordance with the foregoing, Buyer may terminate this Agreement anytime after the 180th day by written notice to the Seller, whereupon all deposit monies paid by Buyer shall be refunded without penalty.

**TITLE.** Seller agrees to deliver a Bargain and Sale Deed with Covenant against Grantors Acts and an Affidavit of Title at settlement. Title shall be good and marketable and such as will be insured at regular rates by a reputable title company licensed to do business in the State of New Jersey. Title shall be subject to any restrictions, conditions, covenants, agreements and easements existing at the time of settlement, as well as any zoning ordinances, and any other act or ordinances affecting the use of and improvements to the property provided, however, that such restrictions, conditions, etc., do not prevent the property from being used as a residence. Buyer agrees that in the event any of the covenants contained in this Agreements of Sale are violated before or after settlement, Seller has the right to enter upon the Property for the purpose of correcting the violation(s). Buyer acknowledges and agrees that title to the Property will be subject to an easement to be recorded by Seller prior to settlement hereunder which will require Buyer to pay the pro-rata cost of the maintenance and preservation of the community entrance monuments. Buyer assumes liability for, and agrees to indemnify Seller against any loss or damage resulting from any such violation(s) caused by Buyer. This paragraph shall survive the closing of title.

**POSSESSION.** Possession will be given by delivery of the Deed, keys and physical possession to a vacant building, broom clean and free of debris at the day and time of settlement upon receipt of the Total Purchase Price by Seller as provided in this Agreement.

**DEED RESTRICTIONS.** At Seller's option, the Deed to Buyer may contain any or all of the following conditions:

a. No "For Sale" sign may be displayed on the Property for a period of two (2) years from the date of settlement.

b. No television, radio or shortwave antennas, satellite dishes in excess of 18 inches in diameter, or any type of communications devices, antennae or facilities shall be placed on any portion of the exterior of the dwelling or Property where they are visible from any other property.

c. No fence shall be installed on the Property other than unpainted cedar board-on-board fencing, black or white wrought iron fencing or white vinyl fencing which is 5 feet in height or such other height or material as may be required by regulation or ordnance the municipality.

d. No unlicensed or unregistered motor vehicles of any type shall be permitted on the property unless garaged.

**FIRE AND OTHER CASUALTY.** The risk of loss or damage to the Property by fire or other casualty until the time of settlement is on the Seller. Any loss or damage to the property due to fire or other casualty will not make this Agreement void or voidable. In the event of such damage, Seller shall have the option to either rebuild the damaged portion of the Property within one hundred eighty (180) days of the date stated in subparagraph 2.(b) of this Agreement, or within one hundred twenty (120) days of the date of casualty, whichever is later, or to cancel this Agreement. Seller will notify Buyer within forty-five (45) days of the date of casualty, if Seller opts to cancel this Agreement, Seller's sole obligation shall be to return all deposit monies to Buyer, without penalty or interest, whereupon neither Buyer nor Seller shall have any further liability under this Agreement.

**NOTICE AND AGREEMENT REGARDING RADON GAS.** The United States Environmental Protection Agency (EPA) indicated that some homes experience elevated levels of radon gas. Radon gas is a naturally occurring phenomenon which, according to the EPA, escapes from some types of soils. This phenomenon can occur in any home, regardless of the type of home or who builds it. The EPA has stated that prolonged exposure to elevated levels of radon gas for a sufficient period of time may increase the risk of certain types of health hazards.

3

Seller claims no expertise in the measurement or reduction of radon gas in homes, nor does Seller provide any advice regarding acceptable indoor radon gas levels or the possible health hazards related to radon gas. The EPA and state and local environmental authorities are best equipped to render advise regarding the risk associated with elevated radon gas levels, methods of detection and measurement, and what, if any, remedial measures may be advisable in particular circumstances to reduce the risk of radon gas exposure.

Information on radon gas may be obtained from the following government agency:

The United States Environmental Protection Agency
Office of Radiation & Indoor Air, EPA Region 3,
290 Broadway, 28th Floor
New York, NY 1007-1866
Phone: (212) 637-4013

Buyer may wish to contact the EPA to obtain a copy of publication EPA-RD-681 "Radon Reduction Methods: A Homeowner's Guide" or other publications dealing with radon gas which the EPA has made available.

It is understood by Buyer that Seller makes no representations, of any kind, regarding the present or future existence of radon gas or about acceptable levels of radon gas in or around the Property. Further, Buyer understands that Seller does not make any warranty, express or implied, including, but not limited to, warranties of good workmanship, habitability, merchantability or fitness for a particular purpose, regarding radon gas as it relates to the Property. Buyer releases Seller from any present or future claims or liability of any kind that Buyer may ever have against Seller, which in any way relates to the existence of radon gas in or around the Property, including, but not limited to, any expenses Buyer may incur in any radon reduction methods that Buyer may pursue if elevated levels of radon gas ever occur. The terms of this paragraph shall survive settlement.

13.   **LICENSE.**  The Buyer does hereby authorize and grant to Seller the irrevocable right to enter into, upon, over or under the Property for a period of two (2) years after the date of delivery of Deed for the completion of construction, repair, emergency matters or pursuant to governmental order or requirement.  This provision shall survive settlement.

14.   **DEFAULT OF BUYER.**  If Buyer fails to make payments in accordance with the provisions of subparagraph 2.(a) above, violates any of the conditions or covenants of this Agreement, makes false material representations or fails, for any reason, to complete settlement according to the terms and conditions of this Agreement, Buyer shall be in default. If the Buyer is in default, Seller shall retain all payments made by Buyer, but not more than ten percent (10%) of the Purchase Price, plus the amount of any extras or changes installed by Seller, as liquidated damages or on account of the Purchase Price, as Seller may elect. If retained as liquidated damages, this Agreement shall be immediately null and void and of no further effect and the Seller shall then have no further liability whatsoever to Buyer and will resell the property. ("Liquidated Damages" is the exact amount which the Buyer and Seller expressly agree must be paid in the event of Buyer's default).

15.   **DEFAULT OF SELLER.**  If Seller's title proves unmarketable, or if Seller elects not to construct, complete or convey the Property referred to in this Agreement for any reason whatsoever, including but not limited to any present or future rules, regulations or restrictions of any Federal, State or Municipal government or any subdivision of government, the Seller's sole obligation shall be to return all deposit monies paid under this Agreement, without interest, and reimburse Buyer for reasonable out-of-pocket expenses for title search and survey actually expended, if any.

16.   **ASSIGNMENT.**  Buyer expressly agrees not to assign, sell or in any manner transfer this Agreement or any right, title or interest in this Agreement without the express written consent of Seller. Subject to that restriction, this Agreement will be binding upon the parties and all who succeed to their rights, duties and responsibilities.

17.   **CHANGES IN PLANS.**  Seller shall have the right to make substitutions of materials or equipment and to make design changes whenever Seller shall find it necessary or expedient in its absolute discretion, provided that such substitutions or changes are of substantially equal quality.  Seller reserves the right to select and establish the elevation of the home to be constructed in this Agreement on the lot and to locate the home on the lot in the manner best suitable to the topography and aesthetics of the Property as determined in the sole judgement of the Seller.  Seller also reserves the right to reverse the plan on the home if required in the opinion of the Seller.  It is understood and agreed that dimensions of the home may vary from the plans due to field conditions encountered during the course of construction.

18.   **STANDARD FEATURES/MATERIALS.**  Buyer acknowledges that the model or sample homes are built, decorated and displayed in a manner presumed to fit the taste and lifestyle of the average prospective homeowner.  Furnishings as in the model or otherwise, are not included. Many decorator effects and features including, but not limited to, wall mirrors, mirrored doors, additional and upgraded appliances, furnishings, decorator light fixtures, upgraded floor and wall coverings, special paint and custom patios and decks may have been added to display the variety of possible additional features offered or available from some other source and to provide the feeling that the model or sample home is occupied. Brochure and wall display floor plans, scale models, renderings and site plan displays may not be accurate in every detail. Buyer acknowledges that architectural plans, landscaping plans and approved final site plans showing site details are available for review at the on-site sales office.  Buyer is urged to review these plans before entering into this Agreement. The community and Property will be constructed according to these plans unless amended.  Seller makes no representations with regard to the type or location of electrical transformers, retention basins or other drainage facilities or trash receptacles, if applicable.  Further, Seller makes no representations whatsoever regarding the retention, removal or location of trees, shrubs or other vegetation located on the Property, in common areas or on adjoining properties.  Buyer acknowledges that detailed information regarding the standard features, equipment and materials provided in the new home is readily available for review in the sales office.

4

19.   **DECORATOR SELECTIONS.** Buyer agrees to make decorator selections and option/upgrade selections, if applicable, within ten (10) days of Seller's request of Buyer to make such selections but in no event later than thirty (30) days following the date of this Agreement. If Buyer fails to make such selections within the required time, Buyer shall be deemed to have authorized Seller to make standard selections on Buyer's behalf. Option and upgrade items are offered at the sole discretion of the Seller and are subject to changes in price and availability without prior notice. Buyer acknowledges that the only way to protect the prices of such items is to execute the appropriate order form and tender the required deposit within the time allotted for selections. Any order place after the allotted time will be at the then current prices only. Ordering early helps insure availability and orderly construction of the new home. Since mistakes are sometimes caused by change orders, all selections are final and changes are not allowed. Buyer acknowledges responsibility for accurately identifying ordered options and upgrades and agrees that all purchases will be made without reliance upon verbal representations. Further, Buyer acknowledges that the Seller's CCO (Customer Change Order) Manual which contains detailed information regarding options and upgrades offered is readily available for review in the on-site sales office and is incorporated herein by reference.

20.   **WARRANTIES.** Seller shall warrant the construction of the home to the Buyer as provided in the New Home Warranty and Builders Registration Act.   At the time of settlement, Seller, at is sole cost and expense, will provide Buyer a ten (10) year (from completion) New Home Warranty Insurance Policy as authorized and approved by the New Jersey Division of Housing. EXCEPT AS STATED IN THIS AGREEMENT, THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED.  IN PARTICULAR, THERE IS NO IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR IS THERE ANY IMPLIED WARRANTY OF MERCHANTABILITY.

21.   **INSULATION.**  Seller will install ceiling, wall and slab insulation as follows:

(a)   Ceiling Insulation. Fiberglass ceiling insulation above all second floor living areas shall be (R-30) kraft-faced fiberglass batts, loose fill fiberglass insulation or comparable materials yielding an R value of R-30.

(b)   Roof Insulation. Fiberglass roof/ceiling insulation above all second floor living areas shall be (R-30) 9" thick kraft-faced fiberglass batts.

(c)   Slab Insulation. All exterior slab perimeters shall be insulated with twenty-four inch (24") wide and two inch (2") thick yro-foam sheathing installed in a vertical position by the concrete subcontractor.

(d)   Wall Insulation. All insulation in exterior frame walls adjacent to living areas will be RT-15.44 made up of three and ve-eights inch (3-5/8") Kraft-fact fiberglass batts in stud cavities and nominal one-half inch (½") aspenite sheathing. All band joints tween floors shall be insulated to the same specifications as the walls.

(e)   Exterior Wall Insulation. Exterior composite wall R-Value calculations are as follows:

| WALL VALUE | CAVITY R-Value |
|---|---|
| Outside Air Film | .17R |
| Aluminum or Vinyl Siding | .61 |
| Air Infiltration Barrier | .00 |
| Nominal ½" Aspenite Sheathing | .53 |
| R-13 Fiberglass Insulation | 13.00 |
| ¼" Drywall | .45 |
| Inside Air Film | .68 |
| Total R-Value | 15.44 RT |

values are based on New Jersey Department of Energy small dwelling energy sub-code compliance manual.

**MOLD DISCLAIMER.**  According to the U. S. Environmental Protection Agency mold is present almost everywhere, h indoors and outdoors and there is no practical way to eliminate all mold and mold spores in the indoor environment, other than to trol moisture.

It is understood by Buyer that Seller makes no representations, of any kind, regarding the present or future existence of mold in around the Property. Further, Buyer understands that Seller does not make any warranty, express or implied, including, but not limited warranties of good workmanship, habitablity, merchantability or fitness for a particular purpose, regarding mold as it relates to perty. Buyer releases Seller from any present or future claims or liability of any kind that Buyer may ever have against Seller, which ny way relates to the existence of mold in or around the Property, including, but not limited to, property damage, personal injury, erse health effects, loss of use, loss of value of any expenses Buyer may incur in any mold abatement methods that Buyer may pursue e presence of mold should ever occur. The terms of this paragraph shall survive settlement.

**DISCLOSURE REGARDING HORSE FARM AND DOG KENNEL.**  As required by the Planning Board of Moorestown vnship, Seller discloses to Purchaser the existence of a horse farm(s) and dog kennel which are in close proximity to the property which e subject matter of this Agreement of Sale.  This disclosure is made as a condition of subdivision approval by the Township of orestown Planning Board and is not a complete list of all offsite conditions which may affect the subject property. The horse farm and kennel, including certain special events conducted thereon, may cause potential problems including but not limited to odors, noise, eased traffic and aesthetics. Seller encourages Purchaser to fully investigate these conditions prior to execution of this Agreement of or during the attorney review period.

**DISCLOSURE OF ENVIRONMENTAL CONDITION.**  As required by the Planning Board of Moorestown Township, Seller loses to Purchaser that a preliminary assessment, site investigation and the remedial investigation of the property forming the livision known as *Wexford at Moorestown* is available for review at the sales office.   These reports indicated that the site contained aminant concentrations which exceeded applicable standards. Remedial actions where conducted by a prior owner of the site and No her Action (NFA) Letters were dated October 15, 1999 and October 20, 2000 were obtained from the New Jersey Department of ironmental Protection. Copies of the NFA letters are available for review at the sales office. A summary of the remedial investigation rt for the *Wexford* property is attached hereto as Exhibit A and is titled "Executive Summary".  Copies of the environmental reports vailable for review and inspection by Buyer. Seller encourages Buyer to fully investigate the environmental condition of the property r to execution of this Agreement of Sale or during the attorney review period.

**ENTIRE AGREEMENT; REPRESENTATIONS.**  This writing and any riders, amendments or addenda attached to this ement contain the entire Agreement between the parties. Any modification of this Agreement shall not be binding unless such ification shall be in a separate writing and signed by both the Buyer and the Seller.

5

26.   SITE VISITS. Neither Buyer nor any contractor designated by the Buyer shall be allowed to do any work whatsoever on the Property prior to settlement. Visits to the Property under construction are limited to one accompanied visit except for a formal walk-through, when those items which may be required to be completed and/or repaired by Seller will be entered on a Pre-Occupancy Inspection Report. The listed items will be repaired within fourteen (14) business days after settlement, subject to the availability of required skilled manpower, materials and suitable weather conditions, as applicable. It is understood that the listed items shall not constitute a bar to settlement and that settlement shall be held in accordance with the terms and conditions of this Agreement. In no event will Seller be required to escrow monies to guarantee the completion of items listed on the Pre-Occupancy Inspection Report.

27.   GOVERNMENTAL REGULATIONS. Seller has the right to cancel this Agreement upon written notice to Buyer if the terms of this Agreement do not comply with existing or future rules, regulations or conditions of any Federal, State or Municipal government or governmental agencies.

28.   FORMAL TENDER OF DEED. Formal tender of deed and tender of purchase monies are hereby waived. This means that if Buyer is in default under this Agreement, Seller need not attend settlement.

29.   APPROVAL OF SALE. It is understood that this sale is made subject to the acceptance of the Seller. In the event Seller does not accept this Agreement within fourteen (14) days of Buyer's execution of this Agreement, all deposit monies paid by Buyer will be returned to Buyer without interest, whereupon this Agreement shall be "null and void," and Seller shall have no further liability whatsoever to Buyer.

30.   AGREEMENT NOT TO BE RECORDED. This Agreement shall not be recorded or filed in any court or public office. Buyer shall do nothing to affect Seller's title to the Property. If Buyer does so, Seller has the right to cancel this Agreement and Buyer agrees to pay Seller for any and all resulting loss, damage, legal and attorney's fees and other related costs. Nothing in this Agreement or related documents shall have the effect of impairing the title to the Property.

31.   CHANGES IN PRICE/TERMS. Buyer understands that Seller may offer similar properties at prices higher or lower than this Property's Purchase Price, or with different terms and conditions, and that any such offerings shall have no effect on the Total Purchase Price or the terms of the purchase for this Property.

2.   ALTERATIONS IN AGREEMENT. Neither party shall make any changes to the pre-printed portion of this Agreement. If any change is made by interlineation or otherwise, such change shall be invalid and the pre-printed provision shall govern. Changes may e made only by amendment or other writing, signed by both Buyer and Seller.

3.   CORNER STAKES/MONUMENTS. It is expressly agreed that Seller will provide corner stakes to mark the corners of the operty. Monuments will not be provided on the Property.

TIME OF THE ESSENCE. Time, whenever specified in this Agreement for the performance by Seller or Buyer of any of their spective obligations, is hereby made of the essence of this Agreement. This means that the terms and conditions of this Agreement must performed within the time stated in the Agreement, or if no time is stated, within a reasonable time.

AGENT(S). A. P. Orleans, Incorporated, its officers, partners, employees and independent contractors are agents for the Seller d not the Buyer; however, they may perform services for the Buyer in connection with financing, insurance and document preparation. e parties understand and acknowledge that A.P. Orleans, Incorporated has no control or responsibility over the construction of the operty and is solely acting as real estate broker in this transaction.

CONDEMNATION. If, after the date of this Agreement and prior to settlement, all or any material portion of the Property is demned or taken by eminent domain (or is the subject of a pending or contemplated proceeding), Seller shall have two (2) options. Seller may elect to (1) terminate this Agreement, in which case the Seller will so notify the Buyer, in writing, within twenty (20) days r it receives notice of such action whereupon the deposit monies paid by Buyer shall be returned to Buyer and neither party shall have further rights or obligations under this Agreement; or (2) proceed with settlement, without any reduction in the Purchase Price and at lement Seller shall assign to Buyer any and all condemnation proceeds allocatable to the Property and any and all claims that Seller may e with respect to the condemnation of the Property.

ASSESSMENTS FOR MUNICIPAL IMPROVEMENTS. The governmental authorities having jurisdiction over the Property e the right to make improvements which benefit the Property. If such an improvement benefiting the Property is completed prior to ement, the Seller will pay the assessment, if any. If such an improvement benefiting the property is completed after settlement, Buyer pay the assessment, if any. The improvements in this paragraph 34 do not include the improvements required to be completed by the r as a condition of the governmental authorities approvals which are a part of the construction process.

PARTIAL INVALIDITY. If any term or provision of this Agreement or its application to any person or circumstance shall, to extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or umstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision is Agreement shall be valid and enforceable to the fullest extent permitted by law.

CONSTRUCTION. This Agreement shall be governed by and construed in accordance with, the laws of the State of New Jersey ut giving any effect to any New Jersey or other laws regarding conflicts of law or to any presumption, canon or rule of law requiring rmitting construction against the party who drafted this Agreement.

6

40.   **CAPTIONS.** The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of its provisions.

41.   **NO WAIVER.** No consent or waiver, express or implied, by Seller to or of a breach of any representation, covenant, condition, agreement or warranty of Buyer shall be construed as a consent to or waiver of any other breach of the same or any other representation, covenant, condition, agreement or warrant of Buyer.

42.   **REPRODUCED SIGNATURES BINDING.** It is understood and agreed that the original signatures of Buyer or Seller affixed to this Agreement, amendments, endorsements, addendum or riders to this Agreement or any related document(s) may be reproduced by photocopy carbon paper, NCR paper or any other means of reproduction. Any document containing a reproduction of an original signature of Buyer or Seller will have the same legal force and effect as if an original signature were upon the document and copies of any documents bearing such reproduced signature shall be deemed as valid and binding as those bearing an original signature.

43.   **ATTORNEY REVIEW.**

   • Study by Attorney - The Buyer or the Seller may choose to have an attorney study this Contract. If an attorney is consulted, the attorney must complete his or her review of the Contract within a three (3) day period. This contract will be legally binding at the end of this three (3) day period unless an attorney for the Buyer or for the Seller reviews and disapproves of the contract.

   • Counting the time - You count the three (3) days from the date of delivery of the signed contract to the Buyer and the Seller. You do not count Saturdays, Sundays or legal holidays. The Buyer and Seller may agree in writing to extend the three (3) day period for attorney review.

   • Notice of Disapproval - If an attorney for the Buyer or the Seller reviews and disapproves of this contract, the attorney must notify the Broker(s) and the other party named in this contract within the three (3) day period. Otherwise, this contract will be legally binding as written. The attorney must send a notice of disapproval to the Broker(s) by certified mail, by telegram, or by delivering it personally to One Greenwood Square, 3333 Street Road, Suite 101, Bensalem, PA 19020 Attention: John P. White. The telegram or certified letter will be effective upon sending. The personal delivery will be effective upon delivery to the Broker's office. The attorney may also, but need not, inform the Broker(s) of any suggested revision(s) in the contract that would make it satisfactory.

**AGENCY DISCLOSURE**
**CONSUMER INFORMATION STATEMENT ACKNOWLEDGMENT AND**
**DECLARATION OF LICENSEE BUSINESS RELATIONSHIP(S)**

   By signing below, the Seller and Buyer(s) acknowledge they received the Consumer Information Statement on New Jersey Real Estate Relationships from the brokerage firms involved in this transaction prior to the first discussion at which the Buyer(s) motivation or financial ability to buy was discussed and prior to the first discussion at which the Seller's motivation or desired selling price was discussed.

   A. P. ORLEANS, INCORPORATED (name of firm) AND Patricia Block / Susan Keyes (name of licensee) AS ITS AUTHORIZED REPRESENTATIVE ARE WORKING IN THIS TRANSACTION AS: SELLER'S AGENT ONLY.

PROVAL OF BUYER:

_Michael S Leese_ (signature)

/er

_Ashley J Leese_ (signature)

/r

Witness _[signature]_            6/7/03
                                 Date

Witness _[signature]_            6/7/03
                                 Date

er

Witness _____            _____
                                 Date

ROVAL BY SELLER:

r:

_____            _____            _____
Authorized Signatory            Witness/Attest            Date

# MORTGAGE CONTINGENCY RIDER

BUYER and SELLER hereby agree that the provisions contained in this Rider shall become a part of the Agreement of Sale (the Agreement) for the property identified above.

This Agreement is contingent upon Buyer receiving a mortgage commitment for the mortgage amount stated in subparagraph 3(b) of the Agreement under the terms and conditions more fully stated in this Rider not later than the date which is also specified in subparagraph 3(b). Buyer shall pay the cost of the title search, title examination, fee title insurance policy, recording fees and survey, if required, as well as any and all other charges normally paid by the Buyer. Buyer shall also pay the application fee, credit report fee, document preparation fee, appraisal fee and settlement fee as well as any additional fees or costs required by the mortgagee. These fees are in addition to escrows and prepaid charges incidental to a mortgage closing. Buyer will also pay any required insurance premiums and related costs at or before the time of settlement. Insofar as permitted by law, Buyer hereby authorizes agent for Seller to prepare such papers as may be necessary to affect and complete settlement. In addition, Buyer shall execute the note or bond and mortgage document. Neither the Seller nor the mortgagee provides or pays for an attorney to represent the Buyer. Buyer may elect to be represented by an attorney at Buyer's own expense. In reliance upon the occupancy representation made by Buyer in paragraph 2.(c) of this Agreement and upon the credit and financial information provided Seller by Buyer, which information Buyer represents and warrants to be true and correct, the Seller agrees that this Agreement shall be subject to the following additional terms and conditions:

(a)  Loan Application and Terms:  Buyer agrees to make a full and complete mortgage application within ten (10) days of the date of this Agreement of Sale for a mortgage secured loan for not more than the amount stated in subparagraph 3.(b) of the Agreement, for a term of not more than thirty (30) years and at the prevailing rate of interest. For this purpose, prevailing rate of interest shall be defined as the net interest rate quoted by the Federal National Mortgage Association (Fannie Mae) for thirty year, fixed rate loans for mandatory delivery within sixty (60) days, plus .375%. Buyer acknowledges that no representations have been made with regard to a specific mortgage program to be provided by the mortgage lender unless stated in writing and signed by the parties to this Agreement.

(b)  Loan Type; Project Approvals; Commitments: Unless otherwise agreed to by the parties in writing by Addendum or Amendment to this Agreement, the mortgage loan will be a conventional mortgage for which the Buyer qualifies and for which the project, section and/or phase has been approved or for which project approval is not required. Seller makes no representations and gives no warranties as to the final approval/acceptance of the project, section and/or phase by FNMA, FHLMC, FHA, VA or any other private or public organization involved in the review of condominiums or planned unit developments. It is incumbent upon Buyer to select a lender able to process and close a mortgage loan on the property as the Seller assumes no obligation whatsoever to provide evidence of project acceptance or approval and/or any documentation other than that normally provided a mortgage lender in the normal course of business. The Seller provides only one copy of the Public Offering State, where required, which includes the Declaration of Condominium or Master Deed, as may be applicable. Buyer assumes responsibility for supplying a copy of required documents to the lender, if required.

(c)  Notification of Seller:  Buyer agrees to notify Seller, in writing, to One Greenwood Square, 3333 Street Road, Bensalem, PA 19020, of the name, address, phone number and contact person of the lender to whom application is made as well as the type of mortgage loan for which application was made. Such notification is to be received by the Seller within twenty (20) days of the date of this Agreement. Further, Buyer agrees to immediately notify Seller when a mortgage commitment has been obtained and to provide Seller with a copy of such commitment if not provided to Seller by the lender. Buyer hereby authorizes and directs the lender to provide Seller and/or its agents with written or verbal status reports on the progress of Buyer's mortgage application upon request and to provide Seller with a copy of the mortgage commitment document or other relevant notices when issued.

(d)  Lender's Performance: Buyer takes full responsibility for the performance of the mortgage lender selected by Buyer and hereby acknowledges that a lender's failure to perform shall not constitute a justifiable reason for delaying settlement within the terms of this Agreement of Sale. Buyer also assumes responsibility for notifying Buyer's lender of the date, time and place of settlement. If settlement is delayed because of the failure of Buyer's lender to perform, Seller shall be entitled to compensation for the additional carrying costs incurred in accordance with paragraph 7 of this Agreement.

(e)  Non-Receipt of Mortgage Commitment. In the event Buyer does not receive a written mortgage commitment by the date stated in subparagraph 3.(b) of the Agreement, Buyer agrees to notify Seller that Buyer has not received a commitment, in writing to: One Greenwood Square, Suite 101, 3333 Street Road, Bensalem, PA 19020 within five (5) calendar days after that date. In the event Buyer so notifies the Seller or if the Buyer's mortgage application is denied by the lender on or before the specified date, the Seller may elect to (1) return all deposit monies, without interest, in which event this Agreement shall be immediately canceled and of no further effect and neither Buyer nor Seller shall have further liability whatsoever to each other, or (2) extend the mortgage contingency date as contained in subparagraph 3.(b) of the Agreement, or (3) require Buyer to apply for a mortgage secured loan in the amount stated in above with a lender designated by Seller. In this event, it is agreed and understood that the mortgage secured loan may be a fixed rate, adjustable rate, graduated payment loan or any other type of loan for which the Buyer will qualify based on the financial qualifications of Buyer. Buyer agrees to pay all reasonable and customary fees and charges for such loan, including but not limited to the application, credit report, appraisal and origination fees as well as discount/commitment and other reasonable fees charged by lender.

(f)  Failure to Notify Seller: If the Buyer does not notify Seller, in writing, that a mortgage commitment has not been received pursuant to subparagraph (e) above, this contingency will be deemed to be null and void and of no further effect. In this event, this Agreement of Sale shall be and remain in full force and effect with no mortgage contingency whatsoever.

(g)  Buyer's Default: In the event Buyer fails to comply

(10) calendar days of the ie ...an complete, accurate and verifiable doc ...ntation and/or information within Buyer's legal or financial status to the Seller, Seller's Agent and/or the Lender or fails to cooperate in the processing of the mortgage loan application, the buyer shall be considered to be in default. In this event, Seller may declare the , provisions of this paragraph null and void and of no further effect, whereupon the balance of this Agreement shall remain in full force and effect with no mortgage contingency or invoke those remedies as stated in paragraph 14 (Default of Buyer) of the Agreement, as the Seller may elect.

(h)   Fulfillment of Contingency; Risk of Non-Renewal: After the mortgage contingency date stated in subparagraph 3.(b) above has expired and/or a mortgage commitment is obtained by Buyer, the mortgage contingency shall be considered fulfilled and the Agreement of Sale shall remain in full force and effect with no contingencies or conditions whatsoever, unless otherwise agreed to in writing by the parties. All risk of non-renewai of the mortgage commitment and all risk of maintaining mortgage qualification until the date of settlement stated in Seller's notice to buyer shall be borne by Buyer. Buyer agrees to take no action whatsoever which could adversely affect Buyer's creditworthiness, thus causing the lender to deny Buyer's mortgage application or to withdraw, refuse to renew or to cancel a previously approved mortgage commitment. This Agreement is specifically not in any manner contingent or conditioned upon the sale or settlement of any other real estate unless expressly agreed to, in writing, by the parties to this Agreement.

(i)   Acceptance of Mortgage Commitment/Satisfaction of Conditions: Buyer agrees to accept a mortgage commitment issued by Lender within five (5) business days of receipt of the written commitment to Buyer. In the event Buyer receives a mortgage commitment containing conditions or contingencies for which Buyer is responsible, it shall be Buyer's obligation to promptly satisfy such conditions or contingencies so that settlement may take place in a timely manner in accordance with paragraph 7 of the Agreement. Failure of Buyer to satisfy such conditions or contingencies shall be deemed a default by Buyer. Unless otherwise agreed, in writing, if Buyer received a mortgage commitment containing the condition or contingency requiring that Buyer sell, settle or lease real estate presently owned by Buyer and Buyer fails to satisfy such condition or contingency and subsequently fails to complete settlement in accordance with this Agreement, then Buyer shall be in default of this Agreement and Seller shall have available all remedies provided for in this Agreement.

(j)   Funds to Close: Buyer hereby represents that Buyer has or will have sufficient liquid assets available to obtain a mortgage commitment and close title by the date set for settlement in the Seller's notice to Buyer. Despite the provisions contained in this Amendment, any provision contained in the original agreement of sale which is not inconsistent with this Amendment shall remain im full force and effect.

ate 6/17/2003

_____
Witness as to Buyer

_____
Witness as to Buyer

_____
Witness/Attest

_____
Buyer

_____
Buyer

Seller
By: _____

_____
Authorized Signatory

TO THE AGREEMENT OF SALE

Dated: 6/7/03

for the property located at: _5 Victoria Ct_

Wexford at Moorestown, Township of Moorestown, County of Burlington, State of New Jersey.

## EXECUTIVE SUMMARY

D'Anastasio Corp., through is consultant, Environmental Resolutions, Inc.,(ERI) conducted a preliminary assessment, site investigation and a remedial investigation at the Wexford at Moorestown property(site) located at Lot 16, Block 6000 and Lot 48, block 5800 in Moorestown Township, Burlington County, New Jersey. These investigations revealed the following:

**Ground Water Contamination**

Ground water beneath the southeastern quarter of the site known to have been contaminated due to migration from the adjacent Lockheed Martin Property.

**Historic Pesticide Usage**

Due to the historic agricultural usage of the site, the past application of pesticides were believed to have adversely impacted the soil.

**Ground Water Contamination**

The New Jersey Department of Environmental Protection (NJDEP) has determined that the contamination in the southeastern quarter of the Wexford at Moorestown site is due to migration from the adjacent Lockheed Martin facility and that Lockheed Martin is the responsible party. Ground water contamination beneath the Lockheed Martin facility is being remediated presently pursuant to an approved NJDEP remedial action work plan. This NJDEP approved remedial action work plan includes three(3) ground water remediation systems, recovery wells, as well as monitoring wells from which ground water samples are being collected on a quarterly basis. Lockheed Martin has reported that trichloroethene(TCE) which was the primary contaminant of concern, has decreased by more than 90% since treatment began in 1995. ERI agrees the current remediation undertaken by Lockheed Martin is the appropriate course of action and no remediation is required on the Wexford at Moorestown site. Residual ground water contamination, if any, is planned to dissipate by natural factors.

Due to the utilization of public water and sewer and the depth of the ground water table on the Wexford at Moorestown site the risk of contact with the contaminants, if any is remote. Inasmuch as the problem was caused from an off-site property,(Lockheed Martin), a letter of No Further Action is expected to be issued from NJDEP pertaining to the Wexford at Moorestown site concerning this issue.

**Historic Pesticide Usage**

Soil sampling investigation indicated that lead and residual organic pesticides(DDT, DDE, DDD, and Dieldrin)did not exceed NJDEP Residential Soil Clean Up Criteria (RSCC). However, the investigation revealed that arsenic concentrations exceeded the Residential Soil Clean Up Criteria by 7.9 parts per million. It appears that residual arsenical pesticides have impacted the upper six(6) inches of the entire previously farmed area of the Wexford at Moorestown site. It has been demonstrated by the NJDEP in pilot projects, that arsenic levels can be effectively reduced by blending the upper soils with lower soils. The Remedial investigation results indicate that the arsenical pesticides are confined to the near surface soils beneath the site and that arsenic concentrations decrease rapidly with depth. The laboratory results indicate that average concentrations for the upper two(2) feet are lower than the RSCC. Based on these results, it appears that soil blending will be an effective remedy for the Wexford at Moorestown site. It is proposed that the upper two(2) feet of soil be blended during soil grading and stripping operations.

Remedial verification samples will be collected from the blended soil for laboratory analysis for arsenic under NJDEP oversight. Inasmuch as the NJDEP recommends this course of action as an effective means of remediation, a letter of No Further Action from NJDEP is expected for all lots. A letter of No further Action from the NJDEP in this context means the residential lots are in compliance with the NJDEP Residential Soil Clean Up Criteria(RSCC).

Acknowledged:

_____          _____
Witness                          Buyer

_____          _____
Witness                          Buyer

_____          _____
Witness/Attest                   Seller

EXHIBIT "A"

Aug   31  3:22   P.04

Block: **6008**   Lot: **3**

Community: _____ Wexford

## AMENDMENT TO AGREEMENT OF SALE

Dated **6/7/03** _____ by and between

_Orleans Corporation, a Pennsylvania Corporation_

**Michael Leese + Ashley Leese** _____ (Seller) and

FOR THE PROPERTY KNOWN AS **5 Victoria Ct** _____ (Buyer(s)

**THE PARTIES TO THIS AGREEMENT,** intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

NOTIFICATION REGARDING OFF-SITE CONDITIONS

Pursuant to the "New Residential Construction Off-Site Conditions Disclosure Act," P. L. 1995, c.253 (C.46:3C-1 et seq.), Sellers of newly constructed residential real estate are required to notify purchasers of the availability of lists disclosing the existence and location of off-site conditions which may affect the value of the residential real estate being sold. The lists are to be made available by the municipal clerk of the municipality within which the residential real estate is located and in other municipalities which are within one-half mile of the residential real estate. The address(es) and telephone number(s) of the municipalities relevant to this project and the appropriate municipal offices where the lists are made available are listed below. Purchasers are encouraged to exercise all due diligence in order to obtain any additional or more recent information that they believe may be relevant to their decision to purchase the residential real estate. Purchasers are also encouraged to undertake an independent examination of the general area within which the residential real estate is located in order to become familiar with any and all conditions which may affect the value of the residential real estate.

The purchaser has five (5) business days from the date the contract is executed by the purchaser and the seller to send notice of cancellation of the contract to the seller. The notice of cancellation shall be sent by certified mail. The cancellation will be effective upon the notice of cancellation being mailed. If the purchaser does not send a notice of cancellation to the seller in the time or manner described above, the purchaser will lose the right to cancel the contract as provided in this notice.

MUNICIPALITY:
ADDRESS:           Moorestown Township Deputy Clerk
                   111 W Second St
                   Moorestown, NJ 08057
TELEPHONE NUMBER:  (856) 235-0912

DESPITE the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: **6/7/03**

WITNESS as to BUYER

WITNESS as to BUYER

BUYER

BUYER

WITNESS/ATTEST
Rev 8/2001

SELLER
By: _____

AUTHORIZED SIGNATORY

Block: 6008  Lot: 3
Bldg: _____  Qual: C-
Community: Wexford

## AMENDMENT TO AGREEMENT OF SALE

Dated  6/7/03  by and between

Orleans _____ (Seller) and

Michael Leese + Ashley Leese _____ (Buyer(s)

FOR THE PROPERTY KNOWN AS  5 Victoria Ct _____

THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

MEGAN'S LAW STATEMENT. Under New Jersey law, the county prosecutor determines whether and how to provide notice of the presence of convicted sex offenders in an area. In their professional capacity, real estate licensees are not entitled to notification by the county prosecutor under Megan's Law and are unable to obtain such information for you. Upon closing, the county prosecutor may be contacted for such further information as may be disclosable to you.

DESPITE the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: 6/7/03 _____

_____
WITNESS as to BUYER

_____
WITNESS as to BUYER

_____
WITNESS/ATTEST

New 12/97

_____Michael S. Leese_____
BUYER

_____Ashley J. Leese_____
BUYER

SELLER
By: _____
AUTHORIZED SIGNATORY



Block: _600 8_ Lot: _3_

Community: _Wexford_

## AMENDMENT TO AGREEMENT OF SALE

Dated _6 7_ 200_5_ by and between

_Orleans_ _____ (Seller) and

_Michael Leese + Ashley Leese_ _____ (Buyer(s)

**FOR THE PROPERTY KNOWN AS** _____

**THE PARTIES TO THIS AGREEMENT**, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

### ARBITRATION OF DISPUTES

BUYER AND SELLER AGREE THAT ANY AND ALL WARRANTY CLAIMS OR DISPUTES OF ANY KIND ARISING FROM OR RELATED TO THIS AGREEMENT OF SALE SHALL BE SUBMITTED TO FINAL AND BINDING ARBITRATION PURSUANT TO AND IN ACCORDANCE WITH THE PROVISIONS CONTAINED IN THE SELLER'S LIMITED WARRANTY, INCORPORATED BY REFERENCE HEREIN AS THOUGH FULLY SET FORTH.

ALL OTHER DISPUTES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR IN THE INTERPRETATION OR ENFORCEMENT THEREOF, SHALL BE DECIDED FINALLY BY ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES OF COMMERCIAL ARBITRATION OF THE AMERICAN ARBITRATION ASSOCIATION AND THE FEDERAL ARBITRATION ACT, 9 U.S.C. 1, ET SEQ.

DESPITE the provisions contained in this Amendment, any provisions contained in the original Agreement of Sale which are not inconsistent with this Amendment shall remain in full force and effect.

Date: _6/7/03_

_____
WITNESS as to BUYER

_____
WITNESS as to BUYER

_____
WITNESS/ATTEST

New 10/2002

_Michael S Leese_ _____
BUYER

_Ashley J Leese_ _____
BUYER
SELLER
By:_____
AUTHORIZED SIGNATORY

3333 Street Road, One Greenwood Square, Suite 101, Bensalem, PA 19020 • Phone: (215) 245-7500 • Website: www.orleanshomes.com

Block 6008 Lot 3

Bldg_____ Unit_____

Community Wexford

## AMENDMENT TO AGREEMENT OF SALE

Dated 6/7, 2003 by and between

Orleans _____ (Seller) and

Michael Leese + Ashley Leese (Buyer)(s) For the property known as

5 Victoria Ct _____

The parties to this Agreement, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

Buyer acknowledges that Buyer may be referred by Seller or Seller's employees to a model or home in another community built by Seller, for the purpose of affording Buyer an opportunity to observe the general appearance or characteristics of home exteriors, interiors, floor plans, designs, features or options not available for inspection in the community in which Buyer intends to purchase. Seller represents and Buyer acknowledges that the designs, options or features offered by Seller may have variations in size, dimension, appearance, color, availability, etc. from one community to another depending upon the supplier and the model purchased, and Buyer represents that Buyer did not rely upon anything displayed or installed in any other model or home in another community offered by Seller, in making Buyer's decision to purchase a home or the options for that home.

DESPITE the provisions contained in this Amendment, all provisions contained in the original agreement of sale not inconsistent with this Amendment shall remain in full force and effect.

DATE: 6/7/03

_____          Michael S. Leese
Witness                           Buyer

_____          Ashley J. Leese
Witness                           Buyer

_____          _____
Attest                            Seller

Phillips/Amend

# ORLEANS
### BUILDS VALUE
AJ ORLEANS INCORPORATED, LICENSED REAL ESTATE BROKER

BLOCK _6008_ LOT: _3_

BLDG _____ UNIT _____

COMMUNITY: _Wexford_

## AMENDMENT TO AGREEMENT OF SALE

Dated _6/7_ , 19_03_ by and between

_Orleans_

_Michael Leese + Ashley Leese_ (Seller) and

_____ (Buyer(s))

FOR THE PROPERTY KNOWN AS _5 Victoria Ct_

THE PARTIES TO THIS AGREEMENT, intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

Provided Buyer completes settlement on the above described property, Buyer is to receive a membership to the Larchmont Swim Club for the _2004_ swimming season at 50% of the cost. To obtain this discounted membership, Buyer will, upon applying for membership, present a copy of this Amendment together with a copy of the Settlement Statement (HUD Form 1) as evidence that settlement has been completed.

DESPITE the provisions contained in this Amendment, all provisions contained in the original agreement of sale not inconsistent with this Amendment shall remain in full force and effect.

DATE: _6/7/03_

WITNESS

WITNESS

_Michael S Leese_
BUYER

_Ashley J Leese_
BUYER

SELLER
BY: _____
AUTHORIZED SIGNATORY

WITNESS/ATTEST
Rev. 8/94

# AMENDMENT TO AGREEMENT OF SALE

## DECLINATION OF RESALE CONTINGENCY

**THE PARTIES TO THIS AGREEMENT,** intending to be legally bound and for other good and valuable consideration, hereby agree that the following provisions shall become a part of the Agreement of Sale (the "Agreement") for the above described property.

Buyer hereby acknowledges that Seller has offered to add its standard form of. Resale Contingency Rider to this Agreement of Sale. Under the terms and conditions of the Resale Contingency Rider offered by Seller, the Buyer's purchase would be contingent and conditioned upon the Listing Broker producing a purchaser for Buyer's present home within the contingency period. Buyer has reviewed the terms of the Resale Contingency Rider and has elected not to execute the Resale Contingency Rider.

Accordingly, it is fully understood and agreed that Buyer's purchase under this Agreement of Sale is specifically not contingent or conditioned upon the sale of Buyer's present home or any other real estate. Further, should Buyer obtain a mortgage commitment conditioned upon the sale and/or settlement of Buyer's present home or any other real estate, such condition shall not in any manner relieve Buyer of Buyer's obligation to complete settlement on the date and at the time and place specified by Seller pursuant to this Agreement of Sale.

**DESPITE** the provisions contained in this Amendment, all provisions contained in the Agreement of Sale not inconsistent with this Amendment shall remain in full force and effect.

Date: 6/7/05

WITNESS

WITNESS

WITNESS/ATTEST

BUYER

BUYER

SELLER
By:
AUTHORIZED SIGNATORY

## N̲ -BINDING RESERVATION AGRE̲ -.ENT

**Community:** Wexford

**Block:** 6008       **Lot:** 003

**Address:** 5 VICTORIA COURT

**Model:** MILFORD III FARMHOUSE S/S

**Reservation Expiration Date:** 06/18/2003

I (We), the undersigned hereby wish to reserve the above unit from Orleans Corporation, a Pennsylvania (the "Developer") with its address at __ c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101, __ The above unit is located at Wexford in Burlington County, Pennsylvania . Said property is to be substantially similar to Developer 's above indicated Model at a price of $ 445,990 to be paid in the following manner:

| | |
|---|---|
| BASE PRICE | $445,990 |
| PREMIUMS | $0 |
| OPTIONS | $41,010 |
| TOTAL PURCHASE PRICE | $445,990 |
| NON-BINDING RESERVATION DEPOSIT (not to exceed $2,500.00) | $0 |

**CUSTODY OF DEPOSIT:**

Receipt of a Non-Binding Reservation Deposit in the amount of      $1,000 is hereby acknowledged and will be held in an escrow account in the name of A .P. Orleans, Incorporated (Gary G. Schaal, Broker of Record, c/o Orleans Homebuilders, Inc., 3333 Street Rd., Ste. 101, Bensalem., PA 19020) at First Union New Jersey National Bank , Cuthbert Boulevard and MacArthur Drive, Haddon Township, New Jersey. At its option, Agent for the Seller may hold any check uncashed pending execution of an agreement of sale or termination of this non-binding reservation.

**AGREEMENT NON-BINDING:**

THIS NON - BINDING RESERVATION DOES NOT IN ANY WAY OBLIGATE YOU TO PURCHASE THE UNIT RESERVED. YOU MAY RECEIVE A REFUND OF THE DEPOSIT, WITHOUT INTEREST, UPON REQUEST AT ANY TIME PRIOR TO THE EXECUTION OF THE AGREEMENT OF SALE.

**TERM OF NON-BINDING RESERVATION:**

Unless canceled by one of the parties, this Non-Binding Reservation Agreement shall be effective until 15 days after notice by Developer or its successor to you that the Public Offering Statement and required Community Documants have been finalized. Such notice will include a copy of the Public Offering Statement and Required Community Documents. If at the end of said period, you have not entered into an Agreement of Sale for the purchase of this Property, the Developer will be free to offer for sale to other without any further notice or responsibility to you whereupon Developer shall refund your deposit money and Developer and you shall have no further liability whatsoever to each other.

**CHANGES IN OFFERING OR TERMS:**

THIS NON-BINDING RESERVATION DOES NOT IN ANY WAY OBLIGATE YOU TO PURCHASE THE PROPERTY RESERVED. DEVELOPER DOES NOT GUARANTEE THAT THE PURCHASE PRICE AND TERMS WILL NOT CHANGE DURING THE TERM OF THIS NON-BINDING RESERVATION AGREEMENT. DEVELOPER DOES NOT GUARANTEE THAT THE PROPERTY DESCRIBED IN THIS AGREEMENT WILL BE BUILT OR OTHERWISE MADE AVAILABLE FOR PURCHASE BY YOU. YOU MAY RECEIVE A REFUND OF THE DEPOSIT UPON REQUEST AT ANY TIME PRIOR TO THE EXECUTION OF THE AGREEMENT OF SALE.

1

# ORLEANS
**BUILDS VALUE**
A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER

Block __6008__ Lot ___003___ Building __803__ Unit __63__
Community __Wexford__
Job Number : 676038

PPAA Number ___2___

# PURCHASE PRICE ADJUSTMENT AMENDMENT
AMENDMENT TO AGREEMENT OF SALE DATED _____ June 15, 2003 _____  BY AND BETWEEN
____ Orleans Corporation ____
AND __ Michael Leese & Ashley Leese __                                        ("Seller")
FOR THE PREMISES KNOWN AS ___ 5 Victoria Court ___                    ("Buyer")

**THE PARTIES HERETO,** intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Agreement of Sale described above as follows:

(1)   Seller agrees to cause the options and/or upgrades identified in the Decorator Selections, Options and Upgrades, Additional Work Authorization and/or Customer Construction Change Order, as applicable, to be installed or completed during the construction of the property.  It is understood that no further changes or alterations will be permitted for the purposes of financing and in the event Buyer requests additional options and/or upgrades.  Buyer must pay for said options or upgrades in full upon ordering them and that Seller retains the right to accept or reject such requests.

(2)   The purchase price of the property, as set forth in the Agreement of Sale, shall be adjusted as follow:

|     |     | Total | Deposit Paid or Due | Balance Due at Closing in Cash, Certified or Cashier's Check |
|-----|-----|-------|---------------------|------------------------------------------------------------|
| (a) | Total Adjustments from prior Purchase Price Adjustment Amendment, if applicable | $ 41,010 | $ 0 | $ 41,010 |
| (b) | Decorator Selections, Options and Upgrades & Additional Work Authorization(s) attached hereto | $ 0 | $ 0 | $ 0 |
| (c) | Credit Amendment attached hereto | ($ 0 ) | | ($ 0 ) |
| (d) | Customer Construction Change Order(s) attached hereto | $ 0 | $ 0 | $ 0 |
| (e) | Total Adjustments | $ 41,010 | $ 0 | $ 41,010 |
| (f) | Original Purchase Price and Terms | | | |
|     | (1)  Initial Deposit | | | |
|     | (2)  Deposit at Signing of Agreement | | $ 1,000 | |
|     | (3)  Additional Deposit | | $ 7,000 | |
|     | (4)  Balance in Cash, Certified or Cashier's Check | | $ -0- | |
|     | (5)  Total Purchase Price | $ 445,990 | | $ 437,990.00 |
| (g) | New fully Adjusted Purchase Price and Terms | $ 487,000 | $ 8,000.00 | $ 479,000 |

(3)  The Mortgage Contingency Rider or Paragraph, if applicable, shall be adjusted as follows:

|     | Original Mortgage Contingency | Amended Mortgage Contingency |
|-----|-------------------------------|------------------------------|
| Mortgage Commitment by | June 15, 2003  (Date) | June 15, 2003  (Date) |
| Mortgage Amount | $ 389,600.00 | $ 389,600.00 |

All other terms and conditions as contained in the original Mortgage Contingency Rider or Paragraph not inconsistent with this Amendment remain in full force and effect.  Buyer agrees that in the event an increase in the mortgage amount would prevent Buyer from obtaining a mortgage commitment because of the ratio between Buyer's gross monthly income and the increased mortgage payment, Buyer agrees to pay cash for such options and/or upgrades or shall, with the cooperation of the Seller, reduce the options and/or upgrades to a level consistent with the Buyer's ability to qualify for the required mortgage amount.  Buyer agrees that if the mortgage lender deems any options or upgrade to be personal property rather than real property, Buyer shall pay cash for that item.  It is agreed and understood that in no event will the unavailability of any option and/or upgrade cause a delay in completing settlement.  In the event any option and/or upgrade is not available prior to settlement, Seller may elect either to install such items within a reasonable time following settlement or to refund the price of such option/upgrade.

**ALL PROVISIONS contained in the original agreement of sale not inconsistent with this Amendment shall remain in full force and effect.**

Date: __06/07/2003__

_____
Witness

_____
Witness

_____
Witness/Attest

_____
Buyer

_____
Buyer

Seller
By: _____
        Authorized Signatory

Rev. 9/93   2
0607201228PB1

676038

SUPERINTENDE  'S - DECORATOR SELECTIONS,    TIONS & UPGRADES    Page 1

| Purchaser:<br>LEESE, MICHAEL & ASHLEY | | | | Date:<br>06/07/2003 | **O**RLEANS |
|---|---|---|---|---|---|
| Building:<br>803 | Unit:<br>63 | Block:<br>6008 | Lot:<br>003 | Contract Date:<br>06/05/2003 | BUILDS VALUE |
| Project:<br>Wexford | | Floor Plan:<br>MILFORD III FARMHOUSE S/S BS | | | A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER |

PPAA Number ___2___

Job Number : 676038

| UPGRADE LISTING | CCO # | ORIGINAL<br>PRICE | PRICE |
|---|---|---|---|
| **Upg 3 42" Kit Cabs Grmt**<br>COMMENT: UPGRADE 3 - 42" CENTURY GOURMET KITCHEN<br>CABINETS.<br><br>C). Windmere Square - Cherry cabinet with raised panel.<br>Finishes: Natural / Auburn<br><br>WINDMERE SQUARE<br>NATURAL | 20043 | | $2730 |
| **Upg 3 Master Bath Vanities**<br>COMMENT: UPGRADE 3 - Century Vanity Cabinets in Master Bath.<br><br>C). Windmere Square - Cherry cabinet with raised panel.<br>Finishes: Natural / Auburn<br><br>WINDMERE CHERRY<br>NATURAL | 22133 | | $270 |
| **Std Vanity Top Master Bath**<br>COMMENT: STANDARD - CULTURED MARBLE TOP IN MASTER BATH<br>COLOR: EGGSHELL WITH WHITE VEIN | 22140 | | STD |
| **Upg 3 Hall Bath # 1 Vanity**<br>COMMENT: UPGRADE 3 - Century Vanity Cabinets in Hall Bath.<br><br>C). Windmere Square - Cherry cabinet with raised panel.<br>Finishes: Natural / Auburn<br><br>WINDMERE CHERRY<br>NATURAL | 22163 | | $180 |
| **Std Vanity Top Hall Bath # 1**<br>COMMENT: STANDARD - CULTURED MARBLE TOP IN HALL BATH<br>COLOR: EGGSHELL WITH WHITE VEIN | 22170 | | STD |
| **Upg 4 Gnt ILO Lam Lyt A Grmt**<br>COMMENT: UPGRADE 4 GRANITE - Gourmet Kitchen counter from standard<br>laminate (price does not include island)<br>GROUP 2: Giallo Veneziano, Ghibli , Sapphire Blue, Butterfly, Cranbury Brown,<br>New Tunis Green, Violetta.<br>Edge 2: Demi, Demi bullnose, Full bullnose, Ogee.<br><br>GHILBI<br>EDGE: OGEE | 23064 | | $4600 |
| **Upg 4 Gnt ILO Lam Isl Lyt A Grmt**<br>COMMENT: UPGRADE 4 - GRANITE GOURMET KITCHEN ISLAND.<br>Install granite on island in lieu of standard laminate: GROUP 2: Giallo Veneziano,<br>Ghibli, Butterfly, Cranbury Brown, Sapphire Blue, New Tunis Green, Violetta.<br>Edge 2: Demi, Demi Bullnose, Full Bullnose, Ogee.<br><br>MATCH KITCHEN | 23264 | | $2050 |
| **Upg 7 Whirlpool Appls Gourmet Kitchen**<br>COMMENT: UPGRADE 2 - Whirlpool Gourmet Kitchen Appliances in<br>STAINLESS STEEL include:<br><br>GBD307PDS    30 inch Electric Double Oven with upper<br>                        convection<br>GLT3014GB   30 inch Gas cooktop with sealed burners | 28047 | | $4010 |

*** This is a new item or new cancellation.

SUPERINTENDE...'S - DECORATOR SELECTIONS ...'TIONS & UPGRADES   Page 2

| Purchaser: LEESE, MICHAEL & ASHLEY | | | | Date: 06/07/2003 |
|---|---|---|---|---|
| Building: 803 | Unit: 63 | Block: 6008 | Lot: 003 | Contract Date: 06/05/2003 |
| Project: Wexford | | Floor Plan: MILFORD III FARMHOUSE S/S BS | | |
| Job Number : 676038 | | | | |

**O**RLEANS
BUILDS VALUE
A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER

PPAA Number ___2___

| UPGRADE LISTING | CCO# | ORIGINAL PRICE | PRICE |
|---|---|---|---|

GH7155XHS  1.5 cubic foot Microwave Hood combo
with sunken turntable
GU1200XTKS  Built in Dishwasher with 7 cycles and
delay start time
GC2000XE    1/2 Horsepower Disposer

Also includes four (4) additional recessed lights, a Kohler Lakefield 1/3 2/3 sink
and a Moen Extensa faucet.

COMMENT: Install Undertone stainless steel sink in lieu of Lakefield gourmet     40049          $495
sink. Installation to be an undermount; High/Low with large sink compartment and
disposal compartment.. Model K-3354. 33" minimum sink base size required.
Includes Moen Extensa faucet in Sand, Chrome, Glacier or Stainless. Note: Sink
only available with Corian and Granite countertops.

Std C/B Fixture Powder Room
COMMENT: Powder Room - STANDARD Pedestal Sink / Toilet (choice of white     40102          STD
or almond); comes with Moen Monticello Chrome and Brass faucet.

COLOR: ALMOND

STANDARD 6 X 6 CERAMIC TILE:
COLOR:   PROVINCIAL  (ALMOND)

Std Chrome Fixture Master Bath/2 Sinks
COMMENT: Master Bath - 2 sinks- includes tub or stall shower, toilet, towel rack     40201          STD
and toilet paper dispenser.
All faucets, diverter valve, and drain are Moen Chateau Chrome.

SELECT FIXTURE COLOR: Almond

Std Chrome Fixture Hall Bath/2 Sinks
COMMENT: Hall Bath - 2 sinks Standard fixtures-includes tub, toilet, towel rack     40221          STD
and toilet paper dispenser; comes in white or almond. All faucets, diverter valve,
drain, etc. are Moen Chataeu Chrome.

fixture color: almond

Std Custom Lighting Package C
COMMENT: Standard Custom Lighting Package C - Old World Charm In Iron     42413          STD

Security System Single - 1st Floor
COMMENT: Install a base security system to a single family house. System     42621          $1935
includes the following: two LED keypads - one on the first floor (location at front
door or garage), and one on the second floor in the master bedroom; (1) control
panel with a battery backup; (1) interior electronic sounder, and (1) motion detector
with magnetic contacts on all first floor windows & doors and basement windows.
Default location is at the garage unless otherwise specified. SELECT LOCATION
OF KEYPAD ON FIRST FLOOR.

Std Stairs & Rails-Oak Caps
COMMENT: Standard rail and spindles on staircase withoak caps. Includes choice     43000          STD
of stain rail color and matching spindles or painted white spindles. See color
selections.

WHITE: SPINDLES
STAIN RAIL: CHESTNUT

4' Nook Extension To Bsmt
COMMENT: Breakfast Area - Add 4 Foot Nook Extension. This includes     45012          $4375
additional basement underneath. Please check with your salesperson for the

**\*\*\***  This is a new item or new cancellation.
PPI     Price Protected Item

SUPERINTENDE 'S - DECORATOR SELECTIONS, TIONS & UPGRADES  Page 3

| Purchaser: LEESE, MICHAEL & ASHLEY | | Date: 06/07/2003 |
|---|---|---|
| Building: 803 | Unit: 63 | Block: 6008 | Lot: 003 | Contract Date: 06/05/2003 |

**ORLEANS**
BUILDS VALUE
A.P. ORLEANS INC, LICENSED REAL ESTATE BROKER

Project: Wexford
Floor Plan: MILFORD III FARMHOUSE S/S BS

Job Number: 676038

PPAA Number ___2___

| UPGRADE LISTING | CCO# | ORIGINAL PRICE | PRICE |
|---|---|---|---|

window and door configurations. NOTE: IF ALSO PURCHASING WALK-OUT BAY OPTION, MUST CHECK WITH CONSTRUCTION MANAGER FOR FIT IN BUILDING.

| | | | |
|---|---|---|---|
| **Raised Ceiling - Master Bedroom**<br>COMMENT: Install raised ceiling in Master Bedroom.  Does not include optional crown and neck molding. | | 45762 | $1850 |
| **Std 36" Gas F/P B**<br>COMMENT: STANDARD 36" Gas Fireplace with choice of painted white mantle and white or beige marble or black slate and direct vent shed.<br>MANTLE: MOUNT VERNON<br>COLOR OF MARBLE: BEIGE<br>MANTEL: STAINED CHESTNUT | | 46030 | STD |
| **Opt Oak Mantle ILO std Paint Grade**<br>COMMENT: UPGRADE Standard painted mantle to stained oak mantle.<br>STAINED CHESTNUT | | 48603 | $335 |
| **Andersen windows ILO std FX/DV/VG/MC**<br>COMMENT: Install ANDERSEN windows in lieu of standard vinyl windows through out house.  Andersen windows are double hung, vinyl clad wood windows with double pane insulating glass, removable grills and screens.  Includes wood side jambs and wood casing.  Also, includes an Andersen 6 foot sliding glass door per model plan. | | 51911 | $7035 |
| **Exterior Color Selections**<br>COMMENT: Select exterior color selection combination number. 12 | | 54000 | STD |
|     Roof:  WEATHERED WOOD | | | |
|     Siding:  WICKER | | | |
|     Trim:  HERRINGBONE | | | |
|     Shutters:  COBBLESTONE GRAY | | | |
|     Doors:  OLD COLONIAL RED | | | |
|     Garage Door:  WICKER | | | |
|     Stucco:  CHABLIS | | | |
|     Brick:  N/A | | | |
|     Stone:  BUCKS COUNTY RUBBLE | | | |
| NOTE: ALL PAINTS, STUCCO, BRICK, ROOFING MATERIAL, ETC... ARE SUBJECT TO COLOR VARIATIONS DUE TO DYE LOTS,  APPLICATIONS AND WEATHER CONDITIONS. | | | |
| **Increase Basement Height**<br>COMMENT: Increase basement wall and ceiling height approximately  8 inches. | | 56022 | $2640 |
| **Ext Bsmt Steps Inground - Vinyl**<br>COMMENT: Walk-Up Basement - To install exterior concrete steps from the basement to the outside grade for a non-walkout basement lot.  This includes the concrete step with hand rail, drain, 5068 sliding door with screen, white handle set and light with switch.  Location to be approved by the Construction Manager. | | 56051 | $6875 |
| **AWA-01**<br>COMMENT: ALL BATHROOMS TO HAVE STANDARD CERAMIC TILE 6 X 6 | | 59001 | STD |

**\*\*\*** This is a new item or new cancellation.
PPI  Price Protected Item

SUPERINTENDE___"S - DECORATOR SELECTIONS, ___TIONS & UPGRADES   Page 3

| Purchaser: LEESE, MICHAEL & ASHLEY | | | | Date: 06/07/2003 |
|---|---|---|---|---|
| Building: 803 | Unit: 63 | Block: 6008 | Lot: 003 | Contract Date: 06/05/2003 |
| Project: Wexford | | | Floor Plan: MILFORD III FARMHOUSE S/S BS | |
| Job Number: 676038 | | | | |

**ORLEANS**
BUILDS VALUE
A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER

PPAA Number ___2___

| UPGRADE LISTING | CCO# | ORIGINAL PRICE | PRICE |
|---|---|---|---|

window and door configurations. NOTE: IF ALSO PURCHASING WALK-OUT BAY OPTION, MUST CHECK WITH CONSTRUCTION MANAGER FOR FIT IN BUILDING.

**Raised Ceiling - Master Bedroom** — 45762 — $1850
COMMENT: Install raised ceiling in Master Bedroom. Does not include optional crown and neck molding.

**Std 36" Gas F/P B** — 46030 — STD
COMMENT: STANDARD 36" Gas Fireplace with choice of painted white mantle and white or beige marble or black slate and direct vent shed.
MANTLE: MOUNT VERNON
COLOR OF MARBLE: BEIGE
MANTEL: STAINED CHESTNUT

**Opt Oak Mantle ILO Paint Grade** — 48603 — $335
COMMENT: UPGRADE Standard painted mantle to stained oak mantle.
STAINED CHESTNUT

**Andersen windows ILO std FX/DV/VG/MC** — 51911 — $7035
COMMENT: Install ANDERSEN windows in lieu of standard vinyl windows through out house. Andersen windows are double hung, vinyl clad wood windows with double pane insulating glass, removable grills and screens. Includes wood side jambs and wood casing. Also, includes an Andersen 6 foot sliding glass door per model plan.

**Exterior Color Selections** — 54000 — STD
COMMENT: Select exterior color selection combination number. 12

Roof: WEATHERED WOOD

Siding: WICKER

Trim: HERRINGBONE

Shutters: COBBLESTONE GRAY

Doors: OLD COLONIAL RED

Garage Door: WICKER

Stucco: CHABLIS

Brick: N/A

Stone: BUCKS COUNTY RUBBLE

NOTE: ALL PAINTS, STUCCO, BRICK, ROOFING MATERIAL, ETC... ARE SUBJECT TO COLOR VARIATIONS DUE TO DYE LOTS, APPLICATIONS AND WEATHER CONDITIONS.

**Increase Basement Height** — 56022 — $2640
COMMENT: Increase basement wall and ceiling height approximately 8 inches.

**Ext Bsmt Steps Inground - Vinyl** — 56051 — $6875
COMMENT: Walk-Up Basement - To install exterior concrete steps from the basement to the outside grade for a non-walkout basement lot. This includes the concrete step with hand rail, drain, 5068 sliding door with screen, white handle set and light with switch. Location to be approved by the Construction Manager.

**AWA-01** — 59001 — STD
COMMENT: ALL BATHROOMS TO HAVE STANDARD CERAMIC TILE 6 X 6

* * *   This is a new item or new cancellation.
PPI    Price Protected Item

SUPERINTENDE 'S - DECORATOR SELECTIONS, TIONS & UPGRADES   Page 4

| Purchaser: LEESE, MICHAEL & ASHLEY | | | | Date: 06/07/2003 |
|---|---|---|---|---|
| Building: 803 | Unit: 63 | Block: 6008 | Lot: 003 | Contract Date: 06/05/2003 |
| Project: Wexford | | | Floor Plan: MILFORD III FARMHOUSE S/S BS | |
| Job Number: 676038 | | | | |

**O RLEANS**
BUILDS VALUE
A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER

PPAA Number   2

| UPGRADE LISTING | CCO # | ORIGINAL PRICE | PRICE |
|---|---|---|---|
| COLOR:  PROVINCIAL (ALMOND) | | | |
| AWA-02 | | | |
| COMMENT: 2 FOOT FAMILY ROOM EXTENSION | 59002 | $0 | $3550 |
| AWA-03 | | | |
| COMMENT: flooring upgrade  see attached | 59003 | $0 | $10836 |
| AWA-04 | | | |
| COMMENT: WATERPROOF COATING SYSTEM INSTALL ON EXTERIOR WALLS OF BASEMENT  STANDARD | 59004 | | STD |
| AWA-05 | | | |
| COMMENT: ELECTRICAL UPGRADES $1,390.00 | 59005 | $0 | $1390 |
| AWA-06 | | | |
| COMMENT: tile extras | 59006 | $0 | $350 |
| AWA-07 | | | |
| COMMENT: ON FRONT PORCH INSTALL  TREX MATERIAL WITH VINYL RAILING. | 59007 | | STD |
| COLOR TO FOLLOW. | | | |
| *** PCI'S | | | |
| COMMENT: APPROVED INCENTIVE  $6,500 | 59999 | $0 | $-14496 PPI |
| ................. ADDITIONAL DISCOUNT APPROVED By JPO $ 7,996 | | | |

BECAUSE OF NATURAL SHADE  VARIATIONS AND OTHER FACTORS BYOND SELLER'S CONTROL, SELLER DOES NOT WARRANT THE EXACT COLOR MATCH OF CABINETS, VANITIES, STAINED WOOD, TRIM, MARBLE, CORIAN, OR STUCCO WITH PRODUCT SAMPLES PROVIDED BY THE VENDOR.

| Purchaser: *Michael S. Leese* | BUYER MUST CHECK THIS FORM FOR CORRECT DESCRIPTIONS, INCLUDING COLORS, MODEL NUMBERS, TOTALS, ETC. BUYER IS RESPONSIBLE FOR INSURING THAT SELECTIONS ARE COMPLETE AND CORRECT AND BY HIS SIGNATURE HEREON ACKNOWLEDGES ALL SELECTIONS ARE FINAL AND THAT CHANGES ARE NOT PERMITTED EXCEPT WHERE MATERIALS SELECTED ARE NOT AVAILABLE. OPTIONS AND UPGRADES SHALL BE PAID PURSUANT TO THE TERMS OF THE AGREEMENT OF SALE AND ANY AMENDMENTS THERETO. THIS SELECTION FORM IS HEREBY MADE A PART OF THE PURCHASE AGREEMENT. SELLER RESERVES THE RIGHT TO SUBSTITUTE MATERIALS AND EQUIPMENT WITH ITEMS OF COMPARABLE VALUE. | NET ADDITIONS THIS SESSION | $0 |
|---|---|---|---|
| Purchaser: *Ashley L. Leese* | | GRAND TOTAL | $41,010 |
| Date: 6-7-03 | | | |
| Sales Representative: | | NET AMOUNT DUE NOW.   PAID ☐ | $0 |
| Sales Manager: | | TOTAL DOWN | $0 |
| Construction Manager: *Jack Zimerman* | | TOTAL AMOUNT DUE AT CLOSING | $41,010 |
| 060720122 9PB1 | | | |

*** This is a new item or new cancellation.

Page 1

Prnrep

06/04/2003

**FIXED**



A.P. ORLEANS INC. LICENSED REAL ESTATE BROKER

## Estimated Settlement Costs and Monthly Payments

| | |
|---|---|
| **Buyer:** | Michael & Ashley Leese |
| **Community:** | Wexford |
| | Nj |
| **Anticipated closing date:** | 06/15/2003 |
| **Interest rate:** | 5.000 % |
| **Proposed mortgage amount:** | $389,600.00 |

THE FOLLOWING IS A GOOD FAITH ESTIMATE OF CLOSING COSTS AND MONTHLY EXPENSES:

**Proposed purchase price:** . . . . . . . . . . . . . . . . . . . . . . . . .    **487,000**

## SETTLEMENT EXPENSES:

| | |
|---|---|
| Title insurance: | $ 1,683.00 |
| Endorsements to title insurance: | 60.00 |
| Environmental Endorsement: | 50.00 |
| 100 & 300 (PA): | 0.00 |
| 710 (PA): | 0.00 |
| 800/810 (PA): | 0.00 |
| | |
| Title examination: | |
| Miscellaneous searches: | 90.00 |
| Recording of deed: | 90.00 |
| Title closing / settlement fee: | 30.00 |
| Survey fee: | 300.00 |
| Survey certification: | 300.00 |
| Notary fees: | 0.00 |
| Tax adjustment: | 30.00 |
| Realty transfer tax: | 600.00 |
| Attorney fee: | 0.00 |
| Preparation of deed, documents and conveyance: | 0.00 |

NJ

**Total settlement expenses:** . . . . . . . . . . . . . . . . . . . . . . . . .    **3,233.00**

## CONDOMINIUM/HOMEOWNERS ASSOCIATION FEES/EXPENSES:

| | |
|---|---|
| Homeowners insurance: | $ 936.00 |
| Contribution to provide working capital: | 0.00 |
| Condo/Homeowners Association fees (Settlement to the end of current period): | 0.00 |

**Total condo/homeowners association expenses:** . . . . . . .    **936.00**

## MORTGAGE EXPENSES (ACTUAL EXPENSES VARY BY LENDER):

| | |
|---|---|
| Broker Fees: | |
| Courier Fees: | $ 0.00 |
| Credit Report Fees: | 0.00 |
| Private mortgage insurance: | 50.00 |
| VA Funding fee: | $ 0.00 |
| FHA mortgage insurance premium: | 0.00 |
| Application fee: | 0.00 |
| Discount fees (FHA): | 330.00 |
| Origination / Discount fees: | 0.00 |
| Lender inspection fees: | 0.00 |
| Document preparation: | 100.00 |
| Tax service fee: | 0.00 |
| Appraisal review fee: | 83.00 |
| Recording of mortgage: | 275.00 |
| Interest on mortgage to end of month: | 30.00 |
| Flood Certification Fee: | 865.78 |
| | 17.00 |

.rep

**Total mortgage expenses:** . . . . . . . . . . . . . . . . . . . . . . . . .

**1,475.78**

Page 2

⌐ yer: Michael & Ashley Leese

PRNREP2

06/04/2003

### FIXED

## MORTGAGE ESCROW ITEMS:

| | |
|---|---|
| Real estate tax escrow: | |
| Private mortgage insurance: | $ 4,053.74 |
| FHA Mortgage insurance premium: | 0.00 |
| Insurance escrow: | 0.00 |
| Insurance escrow: | 156.00 |
| | 4,209.75 |

## LESS BUYER CREDITS:

| | |
|---|---|
| Proposed mortgage amount: | |
| Seller paid closing costs: | $389,600.00 |
| Seller paid buydown fee: | 0.00 |
| Total buyer credits: | 0.00 |
| | 389,600.00 |
| Approximate initial investment: | 107,404.53 |

THIS IS A GOOD FAITH ESTIMATE BASED ON TYPICAL CLOSING COSTS IN THE AREA SELECTED AND ARE PROVIDED FOR ILLUSTRATION PURPOSES ONLY. ACTUAL COSTS ARE COMPUTED BY THE TITLE COMPANY AT THE TIME OF SETTLEMENT. ACTUAL CLOSING COSTS ARE INFLUENCED BY PURCHASE PRICE, MORTGAGE AMOUNT, LENDER CHARGES AND OTHER FACTORS NOT KNOWN OR SUBJECT TO CHANGE.

BASED ON THE ABOVE INFORMATION, THE FOLLOWING IS AN ESTIMATE OF THE MONTHLY MORTGAGE AND HOME OWNER ASSOCIATION COSTS:

| | |
|---|---|
| Principal & interest: | $ 2,091.46 |
| Taxes: | $ 1,013.44 |
| Home owners Insurance: | $ 78.00 |
| Home owner association: | $ 0.00 |
| Mortgage Insurance Premium: | $ 0.00 |
| **Total Payment:** | $ 3,182.90 |

| | |
|---|---|
| Monthly income: | $ 15,000.00 |
| Monthly obligations: | $ 0.00 |
| Front ratio: | 21.22 % |
| Back ratio: | 21.22 % |

X *Michael S. Leese*

X *Ashley J. Leese*

FAX NO.   ?344                                    P. 02/02

## LANDSCAPE PACKAGE ADDENDUM

Your new home includes a professionally designed foundation landscape package to enhance the beauty of your home.  Weather permitting, this package is to be planted immediately before settlement during the planting season.  Typically the planting season runs April 15th through November 15th of each year.  However, seasonal weather conditions may result in adjustment to the actual planting schedule.  The pre-designed foundation landscape package includes the following:

| | |
|---|---|
| 1 | Ornamental Tree 2 - 2-1/2" caliber |
| 2 | Ornamental Trees 6' - 8' |
| 2 | Pyramidal Evergreens 5' - 6' |
| 14 | Spreading Evergreens 18" - 24" |
| 12 | Low Spreading Evergreens 15" |
| 4 | Flowering Shrubs 2' - 3' |
| | Mulch |
| | Installation |

All planting material is to be inspected by the homeowner at the time of settlement to identify any damaged material in need of replacement, which is to be included on the Homeowner Orientation Action List. The homebuyer is responsible for all plant materials subsequent to settlement since the plant materials are dependent on proper watering and maintenance by the homeowner.

Agreement of Sale dated: ___6 | 7 | 03___

Block/Lot: ___6008 / 3___

___Michael S Leese___
Homebuyer                                        ___6/7/03___
                                                      Date

___Ashley L. Leese___
Homebuyer                                        ___6/7/03___
                                                      Date

MAR-08-01 THU 08:34 PM   (   ANS                    FAX NO.  F  '344                        P. 02/02

## LANDSCAPE PACKAGE ADDENDUM

Your new home includes a professionally designed foundation landscape package to enhance the beauty of your home.  Weather permitting, this package is to be planted immediately before settlement during the planting season.  Typically the planting season runs April 15th through November 15th of each year.  However, seasonal weather conditions may result in adjustment to the actual planting schedule.  The pre-designed foundation landscape package includes the following:

    1   Ornamental Tree 2 - 2-1/2" caliber
    2   Ornamental Trees 6' - 8'
    2   Pyramidal Evergreens 5' - 6'
   14   Spreading Evergreens 18" - 24"
   12   Low Spreading Evergreens 15"
    4   Flowering Shrubs 2' - 3'
        Mulch
        Installation

All planting material is to be inspected by the homeowner at the time of settlement to identify any damaged material in need of replacement, which is to be included on the Homeowner Orientation Action List. The homebuyer is responsible for all plant materials subsequent to settlement since the plant materials are dependent on proper watering and maintenance by the homeowner.

Agreement of Sale dated: __6 | 7 | 03__

Block/Lot: __6008 / 3__

__Michael S Leese__ _____          __6/7/03_____
Homebuyer                                      Date

__Ashley J. Leese__ _____          __6/7/03_____
Homebuyer                                      Date



Date: 6/7/03

A.P. Orleans Insurance Agency, Inc.
One Greenwood Square #101
Bensalem, PA  19020

Re:  Block: 6008  Lot: 3
Address: 5 Victoria Ct
Community: Waxfad

Gentlemen:

You are hereby requested to have a licensed Agent contact the person identified below regarding property insurance coverage for the above property.

Please contact: _Michael S. Leese_

At: (215) 665-3960 (day phone)

or (610) 622-8048 (evening phone)

This request is made with the understanding that this is not an order for property insurance and that I/We are free to obtain any desired insurance coverage from any agent I/We may select.

Very truly yours,

_(signature)_
Signature of Buyer

_Ashley L. Leese_
Signature of Buyer

cc: A. P. Orleans, Inc.



Date: _6/7/03_

A.P. Orleans Insurance Agency, Inc.
One Greenwood Square #101
Bensalem, PA  19020

Re:  Block: _600 8_  Lot: _3_

Address: _5 Victoria Ct_

Community: _Jordan_

Gentlemen:

You are hereby requested to have a licensed Agent contact the person identified below regarding property insurance coverage for the above property.

Please contact: _Michael E Louse_

At: (_215_) _648-2760_  (day phone)

or (_600_) _____ _____  (evening phone)

This request is made with the understanding that this is not an order for property insurance and that I/We are free to obtain any desired insurance coverage from any agent I/We may select.

Very truly yours,

_____
Signature of Buyer

_____
Signature of Buyer

cc: A. P. Orleans, Inc.

# NOTICE

### To Buyer and Seller
### Read This Notice Before Signing The Contract

The Law requires real estate brokers to give you the following information before you sign this contract. It requires us to tell you that you must read all of it before you sign. The purpose is to help you in this purchase or sale.

1) As a real estate broker, I represent ☑ the seller, not the buyer; ❑ the buyer, not the seller, ❑ both the seller and the buyer; ❑ neither the seller nor the buyer. The title company does not represent either the seller or the buyer.

2) You will not get any legal advice unless you have your own lawyer. Neither I nor anyone from the title company can give legal advice to either the buyer or the seller. If you do not hire a lawyer, no one will represent you in legal matters now or at the closing. Neither I nor the title company will represent you in those matters.

3) The contract is the most important part of the transaction. It determines your rights, risks, and obligations. Signing the contract is a big step. A lawyer would review the contract, help you to understand it, and to negotiate its terms.

4) The contract becomes final and binding unless your lawyer cancels it within the following three business days. If you do not have a lawyer, you cannot change or cancel the contract unless the other party agrees. Neither can the real estate broker nor the title insurance company change the contract.

5) Another important service of a lawyer is to order a survey, title report, or other important reports. The lawyer will review them and help to solve any questions that may arise about the ownership and condition of the property. These reports and surveys can cost you a lot of money. A lawyer will also prepare the documents needed to close title and represent you at the closing.

6) A buyer without a lawyer runs special risks. Only a lawyer can advise a buyer about what to do if problems arise concerning the purchase of this property. The problems may be about the seller's title, the size and shape of the property, or other matters that may affect the value of the property. If either the broker or the title company knows about the problems, they should tell you. But they may not recognize the problem, see it from your point of view, or know what to do. Ordinarily, the broker and the title company have an interest in seeing that the sale is completed, because only then do they usually receive their commissions. So, their interests may differ from yours.

7) Whether you retain a lawyer is up to you. It is your decision. The purpose of this notice is to make sure that you have the information needed to make your decision.

| | |
|---|---|
| _____ Seller | _Michael S. Leese_ Buyer |
| _____ Seller | _Ashley J. Leese_ Buyer |
| _____ Date | _6/7/03_ Date |
| _____ Selling ~~Broker~~ Agent | |
| _____ Date | |

- BCAR  11/96

# NOTICE

### To Buyer and Seller
### Read This Notice Before Signing The Contract

The Law requires real estate brokers to give you the following information before you sign this contract. It requires us to tell you that you must read all of it before you sign. The purpose is to help you in this purchase or sale.

1) As a real estate broker, I represent ☑ the seller, not the buyer; ☐ the buyer, not the seller, ☐ both the seller and the buyer; ☐ neither the seller nor the buyer. The title company does not represent either the seller or the buyer.

2) You will not get any legal advice unless you have your own lawyer. Neither I nor anyone from the title company can give legal advice to either the buyer or the seller. If you do not hire a lawyer, no one will represent you in legal matters now or at the closing. Neither I nor the title company will represent you in those matters.

3) The contract is the most important part of the transaction. It determines your rights, risks, and obligations. Signing the contract is a big step. A lawyer would review the contract, help you to understand it, and to negotiate its terms.

4) The contract becomes final and binding unless your lawyer cancels it within the following three business days. If you do not have a lawyer, you cannot change or cancel the contract unless the other party agrees. Neither can the real estate broker nor the title insurance company change the contract.

5) Another important service of a lawyer is to order a survey, title report, or other important reports. The lawyer will review them and help to solve any questions that may arise about the ownership and condition of the property. These reports and surveys can cost you a lot of money. A lawyer will also prepare the documents needed to close title and represent you at the closing.

6) A buyer without a lawyer runs special risks. Only a lawyer can advise a buyer about what to do if problems arise concerning the purchase of this property. The problems may be about the seller's title, the size and shape of the property, or other matters that may affect the value of the property. If either the broker or the title company knows about the problems, they should tell you. But they may not recognize the problem, see it from your point of view, or know what to do. Ordinarily, the broker and the title company have an interest in seeing that the sale is completed, because only then do they usually receive their commissions. So, their interests may differ from yours.

7) Whether you retain a lawyer is up to you. It is your decision. The purpose of this notice is to make sure that you have the information needed to make your decision.

| | |
|---|---|
| _____ Seller | _____ Buyer |
| _____ Seller | _____ Buyer |
| _____ Date | _____ Date |
| _____ Selling Broker | |
| _____ Date | |

BCAR  11/96



## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE
## NOTICE

TO: _Michael Leese + Ashley Leese_
_(Buyer(s))_

FROM: A.P. Orleans, Inc., and _Orleans_
_(collectively Known as "Orleans")_ _(Seller)_

PROPERTY: _5 Victoria Ct_

COMMUNITY: _Wexford_

This is to give you notice that Orleans has a business relationship with Alambry Funding, LLC. Alambry Funding, LLC is a wholly-owned subsidiary of Orleans Homebuilders, Inc., the parent company of Orleans. Because of this relationship, this referral may provide Orleans a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement service listed. You are NOT required to use the listed provider as a condition of your purchase of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICE AND THE BEST RATE FOR THESE SERVICES.

SERVICE:                                      CHARGE OR RANGE OF CHARGES:
Mortgage Brokerage Fee                        1.125% to 2.50% of mortgage amount.
Broker/Application Processing Fee             $90.00 to $350.00

As a part of the buying process, it may also be necessary to insure your new home. We are most pleased to recommend the services of A.P. Orleans Insurance Agency, Inc. ("APO Insurance") for your insurance needs. This is to give you notice that Orleans has a business relationship with APO Insurance. APO Insurance is a wholly-owned subsidiary of Orleans Homebuilders, Inc., the parent company of Orleans. Because of this relationship, this referral may provide Orleans with a financial or other benefit.

Set forth below is the estimated charge or range of charges for the settlement service listed. You are NOT required to use the listed provider as a condition of your purchase of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICE AND THE BEST RATE FOR THESE SERVICES.

SERVICE:                                      RANGE OF CHARGES:
Homeowners Insurance Policy (HO-3)            Annual Premium
with Building Limit of $_____            $_____ to $_____

Homeowners Insurance Policy (HO-6)     _See Print out_    Annual Premium
with Contents Limit of $_____            $_____ to $_____

Please note that the above premium rates are subject to change periodically.

ACKNOWLEDGEMENT

I/We have read this disclosure form and understand that Orleans is referring me/us to purchase the above described settlement services and may receive a financial or other benefit as a result of this referral.

I/We have received a copy of this notice.

_Michael S. Leese_                            _6/7/03_
(Buyer)                                       (Date)

_Ashley J. Leese_                             _6/7/03_
(Buyer)                                       (Date)

333 Street Road, One Greenwood Square, Suite 101, Bensalem, PA 19020 • (215) 245-7500 • Website: www.orleanshomes.com



Date: 6/7/03

Settlers Title Agency
Pavilions at Greentree, Suite 302
Marlton, NJ  08053

Re:  Block: 6008  Lot: 3
Address: 5 Victoria Ct
Gentlemen:                                Community: Wexford

    You are hereby instructed to conduct a title search on the above property and to issue a Title Insurance Commitment to show the basis on which a Title Insurance Policy will be issued by your company.

    Further, you are hereby authorized and directed to provide copies of the Title Insurance Commitment to the undersigned Buyer and the Seller as well as Buyer's counsel and mortgage lender, if any.

Title to the property will be taken in the following names:

Michael S. Leese
_____                    M
Name                                       Marital Status

Ashley A. Leese
_____                    M
Name                                       Marital Status

_____                    _____
Name                                       Marital Status

_____                    _____
Name                                       Marital Status

Title will be held in the following manner:

    {  } Tenant in Severalty (one owner)

    {  } Tenancy by the Entirety (married couple only)

    {  } Tenancy in Common (two or more owners)

    {X} Joint Tenants with the Right of Survivorship (two or more owners)

Note:  If in doubt about the manner in which title will be held, it is suggested that buyer consult legal counsel.

Very truly yours,

_____
Signature of Buyer

_____
Signature of Buyer

cc:  A. P. Orleans, Inc.



Date: 6/7/03

Settlers Title Agency
Pavilions at Greentree, Suite 302
Marlton, NJ 08053

Re: Block: 6008  Lot: 3

Address: 5 Victoria Ct

Gentlemen:                              Community: Wexford

You are hereby instructed to conduct a title search on the above property and to issue a Title Insurance Commitment to show the basis on which a Title Insurance Policy will be issued by your company.

Further, you are hereby authorized and directed to provide copies of the Title Insurance Commitment to the undersigned Buyer and the Seller as well as Buyer's counsel and mortgage lender, if any.

Title to the property will be taken in the following names:

Michael S. Leese
_____                    M
Name                                   Marital Status

Ashley A. Leese
_____                    M
Name                                   Marital Status

_____            _____
Name                                   Marital Status

_____            _____
Name                                   Marital Status

Title will be held in the following manner:

    {   } Tenant in Severalty (one owner)

    {   } Tenancy by the Entirety (married couple only)

    {   } Tenancy in Common (two or more owners)

    {X} Joint Tenants with the Right of Survivorship (two or more owners)

Note: If in doubt about the manner in which title will be held, it is suggested that buyer consult legal counsel.

Very truly yours,

_____
Signature of Buyer

_____
Signature of Buyer

cc: A. P. Orleans, Inc.



Date: 6/7/03

Settlers Title Agency
Pavilions at Greentree, Suite 302
Marlton, NJ 08053

Re: Block: 6008  Lot: 2

Address: 5 Victoria CT

Gentlemen:

Community: Dexter X

You are hereby instructed to conduct a title search on the above property and to issue a Title Insurance Commitment to show the basis on which a Title Insurance Policy will be issued by your company.

Further, you are hereby authorized and directed to provide copies of the Title Insurance Commitment to the undersigned Buyer and the Seller as well as Buyer's counsel and mortgage lender, if any.

Title to the property will be taken in the following names:

Michael S. Leese
_____
Name

M
_____
Marital Status

Ashley A. Leese
_____
Name

M
_____
Marital Status

_____
Name

_____
Marital Status

_____
Name

_____
Marital Status

Title will be held in the following manner:

{  } Tenant in Severalty (one owner)

{  } Tenancy by the Entirety (married couple only)

{  } Tenancy in Common (two or more owners)

{X} Joint Tenants with the Right of Survivorship (two or more owners)

Note: If in doubt about the manner in which title will be held, it is suggested that buyer consult legal counsel.

Very truly yours,

_____
Signature of Buyer

_____
Signature of Buyer

cc: A. P. Orleans, Inc.



COMMUNITY: _Wexford_

LOT: _3_   BLOCK: _6808_

ADDRESS: _5 Victoria Ct_

DATE: _6/7/05_

_Michael + Ashley Leese_

**HOMEOWNERS**

Congratulations on the purchase of your new home. In order to assist you with your Orleans building process, we are providing you with a Homebuyer's Guide.

In addition, we offer our homebuyers an array of innovative quality products throughout your new home. Please review these warranties before selecting the options to be included in your new home. More product knowledge means greater consumer satisfaction, so we are providing you with sample warranties on many of the products offered at your community.

We are also providing you with a binder containing a sample of our limited warranty which provides pertinent information regarding our warranty program. We have also included information on home care after you have moved into your new home.

WE HEREBY ACKNOWLEDGE RECEIPT OF THE SAMPLE WARRANTY AND RELATED PRODUCT WARRANTIES BINDER OFFERED AT MY/OUR COMMUNITY.

I/WE HEREBY ACKNOWLEDGE RECEIPT OF THE HOMEBUYER'S GUIDE.

BUYER _M S Leese_

BUYER _f Leese_

One Greenwood Square, Suite 101, Bensalem, PA 19020 • (215) 245-7500 • Website: www.orleanshomes.com



COMMUNITY: _Wexford_

LOT: _3_    BLOCK: _6008_

ADDRESS: _5 Victorian Ct_

DATE: _10/7/05_

_Michael + Ashley Reise_

**HOMEOWNERS**

Congratulations on the purchase of your new home.  In order to assist you with your Orleans building process, we are providing you with a Homebuyer's Guide.

In addition, we offer our homebuyers an array of innovative quality products throughout your new home. Please review these warranties before selecting the options to be included in your new home.  More product knowledge means greater consumer satisfaction, so we are providing you with sample warranties on many of the products offered at your community.

We are also providing you with a binder containing a sample of our limited warranty which provides pertinent information regarding our warranty program.  We have also included information on home care after you have moved into your new home.

WE HEREBY ACKNOWLEDGE RECEIPT OF THE SAMPLE WARRANTY AND RELATED PRODUCT WARRANTIES BINDER OFFERED AT MY/OUR COMMUNITY.

I/WE HEREBY ACKNOWLEDGE RECEIPT OF THE HOMEBUYER'S GUIDE.

BUYER _____

BUYER _____

One Greenwood Square, Suite 101, Bensalem, PA 19020  •  (215) 245-7500  •  Website: www.orleanshomes.com

Block: 6008   Lot: 3
Bldg: _____  Qual: C-
Community: Wexfod

## AMENDMENT TO AGREEMENT OF SALE

Dated 6/7/03 _____ by and between

__Orleans_____ (Seller) and

Michael Leese + Ashley Leese _____ (Buyer(s)

FOR THE PROPERTY KNOWN AS S Victoria Ct _____

**THE PARTIES TO THIS AGREEMENT,** intending to be legally bound and for other good and valuable consideration, hereby agree to amend the Mortgage Contingency Rider or Paragraph to the Agreement of Sale described above as follows:

Provided Buyer is qualified and has made mortgage application to Seller's subsidiary, Alambry Funding, Inc., Buyer may elect to participate in any one of the following three special mortgage programs offered by Alambry Funding, Inc. exclusively to new home buyers of Orleans Homebuilders, Inc. and its subsidiaries:

(1)  **Orleans 3 Step Mortgage**

**Type of Loan** Provided Buyer has made mortgage application with Alambry Funding, Inc. for a Conventional Fixed Rate Mortgage with a term of note more than 30 years said mortgage will, if so elected by Buyer, contain the following provisions at no additional cost to Buyer:

**Note Rate:** The Buyer's Note Rate will be established and set in accordance with the Lender's lock-in or rate cap policy which will be explained at the time of mortgage application.

**Payment Rate:** The principal and interest portion of the first twenty-four monthly mortgage payments due the mortgage lender will be calculated based on a "payment" rate rather than the interest (note) rate in accordance with the following:

(a) The "payment" rate for the first twelve (12) payments due the mortgage lender will be the interest (note) rate less one and one-half percent (150 basis points).

(b) The "payment" rate for second 12 payments (payments 13 through 24) will be the interest (note) rate less one-half of one percent (50 basis points).

(c) The principal and interest portion of the month mortgage payment will be calculated on the full interest (note) rate for the balance of the loan term and will be computed based on the original principal balance of the mortgage loan.

**Points:** The Buyer will be responsible for origination and/or discount fees (points), if any, for the Note Rate as set by the Lender at the time the interest rate is locked-in in accordance with the Lender's policy. The Buyer will not be responsible for the applicable temporary buydown fees.

(2)  **Orleans Points Lite Mortgage**

**Type of Loan:** Provided Buyer has made mortgage application with Alambry Funding, Inc. for any Conventional mortgage, conforming or jumbo, fixed or adjustable rate, with a term of not more than 30 years, said mortgage will, if elected by Buyer, contain the following terms.

**Points:** When the final interest rate and points are locked in prior to settlement, the origination/discount points due from the Buyer will be reduced by one and one-half percent (1.5%) of the mortgage amount. Accordingly, at mortgage lock-in, if the Buyer opts for a rate with a total

of three points, the Buyer will be responsible for one and one-half (1.5) points. If the Buyer opts for a rate with one and one-half (1.5) points, the Buyer will not pay any points. In the event Buyer opts for a rate with less than one and one-half (1.5) points, the difference will be credited to Buyer's other eligible closing costs. This reduction in the points applied to market rate quotes and not to quotes which already include the Points Lite Discount.

**(3)    Orleans Best Rate Mortgage**

**Type of Loan:** Provided Buyer has made mortgage application with Alambry Funding, Inc. for a Conventional Fixed Rate Mortgage with a term of not more than thirty years, said mortgage will, if elected by Buyer, contain the following provisions at no additional cost to Buyer:

**Cap Rate:** The Buyer will be permitted to set the maximum interest rate (Cap Rate) and points by executing a Rate Cap Addendum at any time after the Resale Contingency, if any, has been satisfied and construction on the property has started. The Cap Rate will be the interest rate and points quoted by the Lender for settlements taking place within sixty (60) days of the date on which the Rate Cap Addendum is executed for the mortgage program selected by Buyer. At the time the Rate Cap Addendum is executed, the Buyer will pay a fee equal to one percent (1%) of the mortgage amount as a rate guarantee fee. At settlement, this amount will be credited again the Buyers total points and, in the event Buyer opts for a zero point loan, the credit will be applied towards other eligible closing costs.

**Maximum Interest Rate:** Provided settlement takes place within nine months of the date on which the Rate Cap Addendum is executed by Buyer, the final interest rate and points will be no greater than the interest rate and points specified in the Rate Cap Addendum.

**Final Interest Rate:** Within fifteen (15) days prior to settlement, Buyer may set the final interest rate by executing a Rate Lock Agreement. Provided the rate cap period has not expired for reasons other than construction delay, the final interest rate and points will be those specified in the Rate Cap Addendum. If the interest rate and points quoted by the Lender for the mortgage program selected by Buyer are lower than the rate and points specified in the Rate Cap Addendum at the time of rate lock, Buyer may opt to take the lower rate and/or points by paying a re-lock fee of one-quarter of one percent (.25%) of the mortgage amount.

Buyer's selection of one of the above programs must be made within five (5) business days of a written or oral request for such selection by any representative of Alambry Funding, Inc. The execution of this Amendment does not in any way obligate Buyer to make mortgage application to Alambry Funding, Inc. and Buyer may use any reputable mortgage lender. In the event Buyer elects to apply with any other lender, the terms of this Amendment will be null and void.

DESPITE the provisions contained in this Amendment, any provisions contained in the original agreement of sale which is not inconsistent with this Amendment shall remain in full force and effect.

Date: 6/7/03

_____
WITNESS as to BUYER

_____
WITNESS as to BUYER

_____          _____
WITNESS/ATTEST                                        Michael S. Leese
                                                                 BUYER

                                                                 Ashley J. Leese
                                                                 BUYER

                                                                 SELLER
                                                                 By:_____
                                                                 AUTHORIZED SIGNATORY

# BUYER FINANCIAL INFORMATION

**ORLEANS** *Building Trust Since 1918*

Community: **Wexford**

Sale Price: $ **487,000**     Mortgage Amount: _____     Address: **5 Victoria Ct**     Settle: **6/30/03**

## PURCHASER #1

Name **Michael Leese**
Street Address **55 E. Greenwood Ave**
City **Lansdowne** State **PA** Zip **19050**
Soc. Sec. # **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**     Age **32**
☑Own ☐ Rent ☐ Live with Parents **4** # Years
**610-622-8848** (Home) **215-665-3960** (Work)
**610-457-7356** (Cell) E-mail: **mleese@taxwarriors.com**
Marital Status: ☑Married ☐ Unmarried ☐ Separated
Number of Persons in Household? **2**

## PURCHASER #2

Name **Ashley A. Leese**
Street Address **55 E. Greenwood Ave**
City **Lansdowne** State **PA** Zip **19050**
Soc. Sec. # **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**     Age **33**
☑Own ☐ Rent ☐ Live with Parents **4** # Years
**610-622-8848** (Home) _____ (Work)
**610-457-7856** (Cell) E-mail: **itsashleyle@yahoo.com**
Marital Status: ☑Married ☐ Unmarried ☐ Separated
Number of Persons in Household? _____

## INCOME DATA, calculated on a monthly basis.
Examples: if you're paid on a bi-weekly basis, multiply your gross paycheck income (before deductions) by 26 and divide the result by 12.   If paid weekly, multiply gross paycheck by 52 and divide by 12.

| | PURCHASER #1 | PURCHASER #2 |
|---|---|---|
| Gross monthly salary wages | $ 5833 | $ 3125 |
| Other income -- indicate source and amount if any: | $ | $ |
| Overtime, commission, or bonuses (2 year average) | $ 500 | $ |
| Part-time employment (2 year average) | $ | $ |
| Tips or gratuities, if tax declared (2 year average) | $ | $ |
| Retirement or disability pensions* | $ | $ |
| Dividends or interest* | $ | $ |
| Self-employment - net of business expenses* | $ | $ |
| Other (*must continue 3+ years) | $ | $ |
| TOTAL GROSS MONTHLY INCOME | $ 6383 | $ 3125 |

## EMPLOYMENT HISTORY - list all of your employers for the last 2 years, use a separate sheet if necessary.

| Purchaser #1 Employer | Position / Title | From | To | Self- Employed? |
|---|---|---|---|---|
| Drucker & Scaccetti | Tax lawyer | 3/02 | Present | Yes / No |
| Jackson Hewett | | 8/98 | Present | Yes / No |
| **Purchaser #2** | | | | |
| Owens Regional School district | Teacher | 8/01 | Present | Yes / No |
| | | | | Yes / No |

## SOURCE OF DOWN PAYMENT & CLOSING COSTS (enter the dollar value of liquid assets you're using toward the home purchase):

| | |
|---|---|
| Savings accounts, checking accounts, certificates of deposits, money market funds | $ |
| Stocks, bonds, mutual funds, cash value of life insurance (current market value) | $ 8000 |
| Sale of real estate (net equity available for reinvestment) | $ |
| Gifts from family members or close friends | $ |
| Withdrawals from IRA or 401K accounts, or sale of other assets (auto, antiques, etc) | $ 72000 |
| Other (describe) | $ |
| TOTAL ASSETS AVAILABLE FOR PURCHASE | $ 80000 |

## RECURRING DEBTS & LIABILITIES - list all charge accounts, leases, mortgages, and loans with open/unpaid balances:

| | Monthly Payment | Current Balance Due |
|---|---|---|
| 1st Mort | $ 121,600 | $ |
| Home Eq | $ 46,000 | $ |
| Car loan | $ 9,500 | $ |
| | $ | $ |
| | $ | $ |
| Alimony and/or child support due or paid monthly: | $ 176,500 | $ |
| Monthly child care or special employment expenses: | $ | $ |
| Other monthly obligations (describe): | $ | $ |
| TOTAL MONTHLY OBLIGATIONS | $ 1,925 | $ |

## MISCELLANEOUS INFORMATION - please answer the following questions:

| | Purchaser #1 Yes No | Purchaser #2 Yes No |
|---|---|---|
| Are there any outstanding judgements or lawsuits pending against you? | ☐ ☑ | ☐ ☑ |
| In the last 7 years, have you filed bankruptcy or been foreclosed? | ☐ ☑ | ☐ ☑ |
| Are you currently delinquent on any government-backed debt or loan? | ☐ ☑ | ☐ ☑ |
| Have either of you co-signed a loan for someone else? | ☐ ☑ | ☐ ☑ |
| Are either of you obligated to pay any child support or alimony? | ☐ ☑ | ☐ ☑ |
| Have either of you owned a home within the past 3 years? | ☑ ☐ | ☐ ☑ |
| Is any part of the down payment borrowed or intended to be borrowed? | ☐ ☑ | ☐ ☑ |
| If any of above answers marked "yes", please explain: _____ | | |
| Are you a U.S. citizen? | ☑ ☐ | ☐ ☑ |
| Do you intend to occupy this new home as your primary residence? | ☑ ☐ | ☐ ☑ |
| If either answered "no", please explain: _____ | | |

## PURCHASER'S CERTIFICATION - the undersigned warrant the above information is all true, and understand the Seller and Lender will rely on this data to determine Purchaser's eligibility for mortgage financing if the purchase is subject to a mortgage contingency.  I/We give A.P. Orleans, Inc. and/or its assigns permission to use the above information to obtain credit reports to be used for mortgage purposes, and agree to hold Orleans' and its assigns/officers/directors harmless for any errors contained in said credit report.

Signed by: _____ (Purchaser #1)     Dated: **4/7/03**

Witnessed by: _____     _____ (Purchaser #2)     Dated: **6/7/03**



BORTONS LANE
(57.75 FEET WIDE)

S34°13'49"W

5' WIDE BIKE PATH
EASEMENT TO BENEFIT
MOORESTOWN TOWNSHIP

78X00
80X00

45.19'   76.66'
77.00
46.26'   6.27'
172.00

176.88'

72.80
75

(3)
AREA = 13,301 S.F.

73.00

20' WIDE LANDSCAPE BUFFER
EASEMENT TO BENEFIT
MOORESTOWN TOWNSHIP

72X15   72X75

71.65

BLOCK

(4)

15.4' ±   73X25   16.2' ±   72.00   6008

PROP. MILLFORD
(FARMHOUSE)
2-CAR L.H. F.E.
4' EXT. KITCHEN NOOK
4' EXT. FAMILY ROOM
*WALKOUT BSMNT.
T.O.B. = 74.56
B/F = 66.23

(2)

S61°40'37"E   70.50   71.00   N61°40'37"W

15.0' ±   30' DROP
72X05

16.6' ±

BUILDING SETBACK LINE

30'

PROP.
DRIVE

7.5%

31.0' ±

69.50   69.70   70.10   PROP. WALK

X69.29
G68.79   N30°34'51"E

76.31'

K69.85
GR69.18   PROP. CURB

VICTORIA COURT
(50.00 FEET WIDE)

NOTE:
1.) *BASEMENT HEIGHT INCREASED AS PER CLIENTS REQUEST.
2.) 30' DROP INDICATES ELEVATION CHANGE FROM TOP OF
BLOCK TO FRONT OF GARAGE.

TOP OF BLOCK ELEVATION = 74.56

PROPOSED TOP OF BLOCK REPRESENTS T.O.B.
ELEVATION FOR LOWEST LIVING SPACE OF
DWELLING. TOP OF BLOCK ELEVATION MAY
BE ADJUSTED TO MEET FIELD CONDITIONS, IF
APPROVED BY THE DEVELOPER'S ENGINEER.

N.J. PROFESSIONAL ENGINEER NO. 44765

**WILLIAM B. McANALLY**

**PERMIT PLAN**
WEXFORD
LOT 3 BLOCK 6008 SECTION 2B
MOORESTOWN TOWNSHIP
BURLINGTON COUNTY, NEW JERSEY

TAYLOR  •  WISEMAN  &  TAYLOR
CONSULTING  ENGINEERS • SURVEYORS
PLANNERS • LANDSCAPE  ARCHITECTS
124 GAITHER DRIVE, SUITE 150, MOUNT LAUREL, N.J. 08054

| DATE: | SCALE: | DRAWING NO. |
|---|---|---|
| 12-06-04 | 1" = 30' | 17684 |

Q:\CAD\17684\ORLEANS\BLOCK 6008\LOT03.DGN

NEW JERSEY STATE
PLANE COORDINATE SYSTEM





MILFORD MODEL
FARMHOUSE
FIRST FLOOR PLAN



MILFORD MODEL
FARMHOUSE
SECOND FLOOR PLAN

MILFORD MODEL
FARMHOUSE ELEVATION
W/ OPT. STUCCO & STONE

ORLEANS

5 Victoria Court
Moorestown, NJ
Block 6008/3

# Wexford

**ORLEANS** — Building Trust Since 1918

**Bradford Grand**
Model Information and Disclaimer
*Optional Features Shown*

## Foyer
- Circular Oak Stairs with bullnose and Volutes and Carpet Runner
- Ceramic Tile *(Hardwood is Standard)*
- Extended Hardwood in Foyer
- Stained Glass Inserts in Side Lights and Transom

### Rear Stairs
- 4 Foot Extension
- 2 Skylights
- Recessed Lights
- Trim Package, Chair Rail
- Upgraded Oak Treads and Platform and Carpet Runner

## Kitchen
- Hardwood Flooring *(Vinyl is Standard)*
- Upgraded Appliances *(Kitchen Aid®)*
- Optional Gourmet Kitchen
- Appliance Package
- Optional Concept Kitchen Design
- Refrigerator
- Upgraded Cabinets *(Windsor Natural®)* with Braided Trim
- Cabinet Knobs
- Soap Dispenser
- Granite Counter tops *(Laminate is Standard)*
- Upgraded Stainless Steel Under Mount Sink
- Upgraded Faucet
- Wet Bar and Additional Cabinets
- Ice Maker / Wine Cellar
- Ceramic Backsplash

### Optional Grand
- Grand Island
- Extended Breakfast Bar
- Vacuum Pan Under Kitchen Sink
- Recycle Bins in Kitchen Cabinets
- Under Cabinet Lighting

### Morning Room
- Hardwood Flooring *(Vinyl is Standard)*
- Optional Cabinets
- Chandelier
- Recessed Lighting
- Transom Over Sliding Glass Door

## Laundry Room & Mud Room
- Optional Layout
- Exterior Door
- Hardwood with Carpet Inlay
- Pent Roof Over Exterior Door

### Optional Butler's Pantry
- Granite Top
- Upgraded Cabinets with Glass Doors and Wine Rack
- Mirror Backsplash

## Family Room
- Entertainment Center Above Fireplace and Stucco Chimney
- Full Chimney *(Direct Vent Shed Standard)*
- Upgraded Hardwood and Carpet

## Study
- French Doors, 2 Panel
- Interior Transom Over French Doors
- Classique are Standard
- Wainscoting®
- Crown Molding
- 2" Extension
- Angle Twin Bay Windows on Side Wall
- Ceiling Fan Pre-wire
- Recessed Lights
- Upgraded Hardwood

## Powder Room
- Wall Sconces
- Upgraded Ceramic Tile

## Living Room
- *(A Fixture Over Mirror is Standard)*
- Upgraded Marble
- Gas Fireplace with Mantle
- Full Chimney *(Direct Vent Shed is Standard on Optional Fireplace)*
- Upgraded Hardwood and Carpet

## Dining Room
- Upgraded Light Fixture
- Ceiling Fan Outlet
- Chair Rail
- Closet Shelving
- Chair Rail

## Bedroom #3
- Trim Package
- Ceiling Fan Outlet
- Whirlpool Jetted Tub
- Cabinet Hardware
- Beige Marble *(White is Standard)*
- Recessed Lighting
- Chair Rail

### Basement
- Extra Height
- Finished
- Additional Finished Area Under Morning Room and Extended Family Room
- Walk-up Exterior Stairs with Sliding Glass Doors with Stucco Facade
- Additional Basement Windows *(2 are Standard)*
- Powder Room in Basement with Optional Ceramic
- Decorative Column Around Support Column
- Extra Lights
- Upgraded Vanities
- 2 Extra Windows
- Expanded Closets Above

## Master Bedroom
- 3rd Car Garage
- Mirrored Closet Doors
- Mirrored Walls
- Fireplace with Mantle
- Built-in Cabinets - Book Shelves
- Wall Sconces
- Trim Package
- Tray Ceiling
- Ceiling Fan Outlet
- Recessed Lighting

## Master Bath
- Mirrors
- Box Window
- Upgraded Ceramic
- Recessed Lighting
- Upgraded Vanities with Drawers
- Clear Frameless Shower Door
- Corian® Vanity Tops

## Bedroom #4
- Optional Bathroom
- Monticello® Fixtures *(Chrome and Brass)*
- Upgraded Tile
- Ceramic Tile Installed on Angle
- Ceramic up to the Ceiling
- Upgraded Vanity with Knobs
- Beige Marble Sill *(White is Standard)*
- Trim Package
- Recessed Lighting
- Ceiling Fan Outlet



### Hall Bath
- Corian® Vanity Top
- Upgraded Tile and Installed to Ceiling

### Exterior
- 3 Car Garage
- Side Door with Roof
- Walk-up Stairs from Basement with Stucco Facade
- Stucco 3 Sides and to Grade
- Upgraded Stone Wainscoting®
- Front and 2 Sides
- Shutters on Side Windows
- Stucco Bands All
- Windows and Doors
- Arched Stucco Bands or Garage Doors and Morning Room
- Custom Walkway with Flagstone to Street and Front Porch
- Copper Roof on Porch and Box Window
- Andersen® Windows



## 2nd Floor Hallway
- Radius Balcony
- Railing in Lieu of Half Wall
- Upgraded Shelves in Linen Closet

## Throughout Home
- Alarm System
- Central Vacuum System
- Custom Audio System
- Recessed Lighting
- Upgraded Flooring *(Carpeting, Hardwood, and Ceramic Tile)*
- Bell Atlantic® "Ready Wire"



Subject to Errors and Omissions 02.05.03

*Decorator Features Not Available*

Lawn Sprinkler System and Landscaping, Chandelier with Medallion, Ceiling Fans, Custom Built-ins, Window Treatments, Custom Mirrors, Custom Stained Glass Windows in Front

4008/3

x _____ (signature)
x _____ (signature)

# *Quality Features*



/ 208 /3

## *The Community*

- Elegantly appointed executive single family homes in a variety of architectural styles situated on private lots
- Excellent Moorestown School District
- Professionally landscaped community entrance and tree lined streets

## *Elegant Lifestyle Features Included*

- Sodded front and side lawn
- Seeded rear lawns
- Professional landscape package
- Innovative 4 bedroom floor plans
- 2-1/2 baths including posh master bath suites
- Poured concrete basement
- Attached garages
- Central air-conditioning (*two zone in selected models)
- Grand 9' ceilings on first floor
- Elegant two-story entrance foyers
- Spacious family rooms with gas fireplace with wood mantle include marble surround and hearth
- First floor library/den
- Sitting room (*some models)
- Dramatic volume ceilings (*some models)
- Trim package including chair rail, crown molding, and shadow box (*per model plan)
- 5-1/4" baseboards
- 3-1/4" door and window casings

- Hardwood flooring in foyer
- Wall-to-wall carpeting in a choice of designer colors
- Vinyl sheet flooring in kitchen and utility room in a variety of styles and colors
- Open riser staircase with oak handrails
- Rear stairs (*some models)
- Abundant closet space with ventilated vinyl coated shelving
- Classique 2 panel interior doors
- Brass front entry handleset
- Laundry Tub
- Pre-wired for telephone and cable TV in two locations
- U.L approved smoke detectors
- Washer/Gas dryer hook-ups

## *Modern Kitchen Designs*

- Self-cleaning gas range/oven
- Microwave
- Dishwasher
- In-sink food waste disposal system
- Stainless steel kitchen sink (Double bowl 1/3 - 2/3)
- 42" oak wood cabinets
- Laminate countertops in a choice of colors
- Center island counters and cabinets
- Oversized pantry storage area
- Cold water line for ice maker

x *[signature]*

x *[signature]* Ashley f. Leese



## Luxurious Baths

- Private master baths with separate steeping tubs and shower areas (*some models)
- Glass shower enclosures in master baths
- Cultured marble countertops in hall and master baths
- Ceramic floors and shower surrounds in hall and master baths
- Pedestal sink in powder room with chrome and brass designer faucet and ceramic floor

## Quality Construction Features

- Engineered floor and roof system
- Concrete service walks
- Private asphalt driveways
- 200-amp electric service
- Underground utilities
- Public water and sanitary sewer service
- Single hung vinyl insulated windows with screens
- Embossed insulated metal front doors
- Self-sealing fiberglass roof shingles with 25-year warranty
- Weatherproof ground fault protected exterior electrical outlet
- Maintenance-free vinyl siding
- Aluminum soffits, fascia, trim, gutters, and downspouts
- Exterior hose bibs

## Energy Saving Features

- Full thick insulation in walls and ceilings
- Moisture and air infiltration barrier
- Energy sealant system around all windows, doors, and exterior wall penetrations
- Efficient and economical gas heating and cooking
- Efficient 50-gallon gas hot water heater
- Automatic set-back thermostats

## Available Features

- Corian® countertops
- Granite countertops
- Finished basements
- Side entry garages on selected homesites
- Tray ceiling in master bedroom (*some models)
- Alternate appliance selections including washers, dryers, refrigerators, and microwave ovens
- Alternate flooring selections
- Additional quality kitchen cabinet choices
- Velux® skylights
- Water-jetted tubs
- Extensive pre-priced customization features to personalize your home

## Homeowner Services

- Exclusive Orleans Homebuyer Program using the easy-to-follow Orleans Homebuyer Guide which includes:
  - *Individual guide to purchasing an Orleans home*
  - *Step-by-step outline of the construction process for your home*
  - *Schedule Construction Confirmation meeting with buyer, community manager, and construction manager*
  - *Two scheduled homeowner orientations (pre-drywall and pre-settlement) utilizing our comprehensive quality assurance checklist*
  - *Complete warranty booklets for the quality products selected for your home*
- 83 years of Orleans homebuilding experience backed by a ten-year RWC warranty insurance program





♻ Printed on Recycled Paper

**Exhibit B**



January 12, 2009

Mr. and Mrs. Michael Leese
5 Victoria Court
Moorestown, NJ 08057

Dear Mr. and Mrs. Leese:

As promised, Lockheed Martin is providing you with results of the precautionary vapor testing that was performed in December 2008 on your property. As communicated in our November 2008 correspondence to you, we are working with the New Jersey Department of Environmental Protection (NJDEP) to investigate the potential for vapor intrusion associated with certain chemicals identified in the groundwater at and in the vicinity of the Moorestown facility.

The results for the sampling performed on your property are summarized in the tables below. The final laboratory reports containing your results are enclosed. We have also included an "example" laboratory report that includes explanations and definitions of terminology found in the report that might be helpful. For your reference, NJDEP does not recommend further action where the sampling results are below the NJDEP screening levels. Results that are above the screening levels do not necessarily indicate that vapor intrusion is occurring. Rather, such results indicate that further testing is recommended.

**NEAR SLAB SAMPLE RESULTS** (exterior soil gas samples taken within 10 feet from foundation)

*Sample Number: NSSG-VICTORIA-5N*

| Target Compound | Results (ppbv) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND[2] | 5 |
| Tetrachloroethylene (PCE) | 6.5 | 5 |
| 1,1-Dichloroethane | ND | 6300 |
| 1,1-Dichloroethylene | ND | 2800 |
| cis-1,2-Dichloroethylene | ND | 460 |
| trans-1,2-Dichloroethylene | ND | 920 |
| Vinyl Chloride | ND | 5 |

(1) ppbv – parts per billion by volume
(2) ND – Non Detect

*Sample Number: NSSG-VICTORIA-5S*

| Target Compound | Results (ppbv) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND | 5 |
| Tetrachloroethylene (PCE) | 1.4 (J)[3] | 5 |
| 1,1-Dichloroethane | ND | 6300 |
| 1,1-Dichloroethylene | ND | 2800 |
| cis-1,2-Dichloroethylene | ND | 460 |
| trans-1,2-Dichloroethylene | ND | 920 |
| Vinyl Chloride | ND | 5 |

(3) J value – indicates an estimated value from lab

## SUB SLAB SAMPLE RESULTS (samples taken from beneath basement foundation slab)

*Sample Number: SUBSLAB-VICTORIA-5*

| Target Compound | Results (ppbv[1]) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND[2] | 5 |
| Tetrachloroethylene (PCE) | 10.6 | 5 |
| 1,1-Dichloroethane | ND | 6300 |
| 1,1-Dichloroethylene | ND | 2800 |
| cis-1,2-Dichloroethylene | ND | 460 |
| trans-1,2-Dichloroethylene | ND | 920 |
| Vinyl Chloride | ND | 5 |

(1) ppbv – parts per billion by volume
(2) ND – Non Detect

The sampling results from your property were all non-detectable for the respective target compounds except tetrachloroethylene (PCE) which had a near slab result of 6.5 ppbv in sample NSSG-VICTORIA-5N and sub slab result of 10.6 ppbv in sample SUBSLAB-VICTORIA-5. Both of these results are above the NJDEP screening level of 5 ppbv. Sample NSSG-VICTORIA-5S had 1.4 ppb (J – estimated value) of tetrachloroethylene (PCE) which is below the NJDEP screening level of 5 ppbv.

## Recommendations or Further Actions

Based on the results of the sampling on your property, Lockheed Martin proposes to conduct additional indoor air sampling. We will be in contact with you soon to set up the sampling effort.

I would welcome the opportunity to sit down and discuss your results with you in the next few weeks. If you would like to do so, please contact Brad Heim at 856-722-4657 to schedule a time convenient to meet.

Lockheed Martin is firmly committed to maintaining an open line of communication with you and providing a safe and healthy environment for both our employees and our neighbors. Thank you for your participation in this study. Please contact me at 856-722-2578 if you have any questions or concerns regarding this matter.

Sincerely,

David A. Sutton

David A. Sutton
Manager – Environment, Safety and Health

Cc:
William Koba, Case Manager, NJDEP Office of Site Remediation
Bob Gogats, Health Officer BCHD

Accutest LabLink@10:31 18-Dec-2008

## Report of Analysis

Page 1 of 1

| Client Sample ID: | NSSG-VICTORIA-5N | | |
|---|---|---|---|
| Lab Sample ID: | JA6995-8 | | |
| Matrix: | AIR - Air | Summa ID: A431 | Date Sampled: 12/02/08 |
| Method: | TO-15 | | Date Received: 12/03/08 |
| Project: | | | Percent Solids: n/a |
| | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | W19137.D | 1 | 12/09/08 | YMH | n/a | n/a | VW817 |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 50.0 ml | |
| Run #2 | | |

**VOA Special List**

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 1.6 | 0.17 | ppbv | | ND | 6.5 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 1.6 | 0.32 | ppbv | | ND | 6.3 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 1.6 | 0.19 | ppbv | | ND | 6.3 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 1.6 | 0.22 | ppbv | | ND | 6.3 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | 6.5 | 1.6 | 0.21 | ppbv | | 44 | 11 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 1.6 | 0.23 | ppbv | | ND | 8.6 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 1.6 | 0.25 | ppbv | | ND | 4.1 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 97% | | 78-124% |

---

| | | |
|---|---|---|
| ND = Not detected    MDL - Method Detection Limit | J = Indicates an estimated value | |
| RL = Reporting Limit | B = Indicates analyte found in associated method blank | |
| E = Indicates value exceeds calibration range | N = Indicates presumptive evidence of a compound | |



14 of 31
ACCUTEST.
JA6995

Accutest LabLink@10:31 18-Dec-2008

## Report of Analysis

Page 1 of 1



| Client Sample ID: | NSSG-VICTORIA-5S | | |
|---|---|---|---|
| Lab Sample ID: | JA6995-9 | | |
| Matrix: | AIR - Air | Summa ID: A409 | Date Sampled: 12/02/08 |
| Method: | TO-15 | | Date Received: 12/03/08 |
| Project: | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | Percent Solids: n/a |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | W19138.D | 1 | 12/10/08 | YMH | n/a | n/a | VW817 |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 50.0 ml | |
| Run #2 | | |

### VOA Special List

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 1.6 | 0.17 | ppbv | | ND | 6.5 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 1.6 | 0.32 | ppbv | | ND | 6.3 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 1.6 | 0.19 | ppbv | | ND | 6.3 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 1.6 | 0.22 | ppbv | | ND | 6.3 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | 1.4 | 1.6 | 0.21 | ppbv | | ND | 9.5 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 1.6 | 0.23 | ppbv | J | ND | 11 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 1.6 | 0.25 | ppbv | | ND | 4.1 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 96% | | 78-124% |

---

ND = Not detected    MDL - Method Detection Limit
RL = Reporting Limit
E = Indicates value exceeds calibration range

J = Indicates an estimated value
B = Indicates analyte found in associated method blank
N = Indicates presumptive evidence of a compound



Accutest LabLink@15:24 30-Dec-2008

## Report of Analysis

Page 1 of 1

| Client Sample ID: | SUBSLAB-VICTORIA-5 | | | |
|---|---|---|---|---|
| Lab Sample ID: | JA8245-3 | | | |
| Matrix: | AIR - Air    Summa ID: A522 | | Date Sampled: | 12/17/08 |
| Method: | TO-15 | | Date Received: | 12/17/08 |
| Project: | | | Percent Solids: | n/a |
| | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | | |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | W19316.D | 1 | 12/19/08 | BR | n/a | n/a | VW824 |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 50.0 ml | |
| Run #2 | | |

**VOA Special List**

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 1.6 | 0.17 | ppbv | | ND | 6.5 | |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 1.6 | 0.32 | ppbv | | ND | 6.3 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 1.6 | 0.19 | ppbv | | ND | 6.3 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 1.6 | 0.22 | ppbv | | ND | 6.3 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | 10.6 | 1.6 | 0.21 | ppbv | | 71.9 | 11 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 1.6 | 0.23 | ppbv | | ND | 8.6 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 1.6 | 0.25 | ppbv | | ND | 4.1 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 102% | | 78-124% |

---

ND = Not detected     MDL - Method Detection Limit
RL = Reporting Limit
E = Indicates value exceeds calibration range

J = Indicates an estimated value
B = Indicates analyte found in associated method blank
N = Indicates presumptive evidence of a compound



JA8245

# SAMPLE

## Report of Analysis



Page 1 of 1

Client Sample ID:
Lab Sample ID:
Matrix:         AIR - Air        Summa ID:  A544        Date Sampled:
Method:         TO-15                                   Date Received:
Project:        Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ   Percent Solids:   n/a

| | File ID | | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | | 1 | | BR | Prep Date n/a | n/a | |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 50.0 ml | |
| Run #2 | | |

### VOA Special List

| | | Compound | | | | Units | Q | | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 1.6 | 0.17 | | ND | | 6.5 | |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 1.6 | 0.32 | ppbv | ND | | 6.3 | |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 1.6 | 0.19 | ppbv | ND | | 6.3 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 1.6 | 0.22 | ppbv | ND | | 6.3 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | ND | 1.6 | 0.21 | ppbv | ND | | 6.3 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 1.6 | 0.23 | ppbv | ND | | 11 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 1.6 | 0.25 | ppbv | ND | | 8.6 | ug/m3 |
| | | | | | | | | | 4.1 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 102% | | 78-124% |

Dilution Factor - In this case analysis required a 1:1 dilution

Chemical Abstract Services number is a unique identifier for chemical substances

Molecular Weight of the chemical substance

Results are reported with two different units of measure. Lockheed Martin is communicating your results as ppbv in the result tables of the cover letter.

Reporting Limit - This is typically the low calibration standard corrected for dilution and sample amounts. The lowest concentration at which an analyte (e.g. a chemical substance) can be detected and its concentration measured (reported) with a reasonable degree of accuracy and precision.

Method Detection Limit - The minimum concentration of a chemical substance that can be detected with 99% confidence, but the exact concentration cannot be reliably quantified.

urrogate Recoveries    Direct measures of how well the analytical method has worked on each individual sample. The percent recoveries indicate the accuracy of the analytical method.

Parts per billion by volume

Micrograms per cubic meter

ND = Not Detected
E = Indicates value exceeds calibration range
J = Indicates an estimated value

B = Indicates analyte found in associated method blank
N = Indicates presumptive evidence of a compound

# EXHIBIT C

SUPERIOR COURT
BURLINGTON COUNTY

LOCKHEED MARTIN

2011 JUL 26 PM 3:09

RECEIVED

March 10, 2009

Mr. and Mrs. Michael Leese
5 Victoria Court
Moorestown, NJ 08057

Dear Mr. and Mrs. Leese:

Lockheed Martin is providing you with results of the additional precautionary vapor testing that was performed in January 2009 on your property. As communicated to you near the end of 2008, we are working with the New Jersey Department of Environmental Protection (NJDEP) to investigate the potential for vapor intrusion associated with certain chemicals identified in the groundwater at and in the vicinity of the Moorestown facility.

The results for the indoor sampling performed on your property are summarized in the tables below. The final laboratory reports containing your results are enclosed. We have also included an "example" laboratory report that includes explanations and definitions of terminology found in the report that might be helpful. For your reference, NJDEP does not recommend further action where the sampling results are below the NJDEP screening levels.

## Indoor Air Sample Results

*Sample Number: IA-VICTORIA-5-BASEMENT*

| Target Compound | Results (ppbv[1]) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND[2] | 0.5 |
| Tetrachloroethylene (PCE) | 0.78 | 0.5 |
| 1,1-Dichloroethane | ND | 130 |
| 1,1-Dichloroethylene | ND | 55 |
| cis-1,2-Dichloroethylene | ND | 9 |
| trans-1,2-Dichloroethylene | ND | 18 |
| Vinyl Chloride | ND | 0.5 |

(1) ppbv – parts per billion by volume
(2) ND – Non Detect

*Sample Number: IA-VICTORIA-5-FIRST FLOOR*

| Target Compound | Results (ppbv) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND | 0.5 |
| Tetrachloroethylene (PCE) | 0.24 | 0.5 |
| 1,1-Dichloroethane | ND | 130 |
| 1,1-Dichloroethylene | ND | 55 |
| cis-1,2-Dichloroethylene | ND | 9 |
| trans-1,2-Dichloroethylene | ND | 18 |
| Vinyl Chloride | ND | 0.5 |

*Sample Number: IA-VICTORIA-5-AMBIENT*  (sample taken outside house)

| Target Compound | Results (ppbv[1]) | NJDEP Screening level (ppbv) |
|---|---|---|
| Trichloroethylene (TCE) | ND | 0.5 |
| Tetrachloroethylene (PCE) | ND | 0.5 |
| 1,1-Dichloroethane | ND | 130 |
| 1,1-Dichloroethylene | ND | 55 |
| cis-1,2-Dichloroethylene | ND | 9 |
| trans-1,2-Dichloroethylene | ND | 18 |
| Vinyl Chloride | ND | 0.5 |

The sampling results from your property were all non-detectable for the respective target compounds except tetrachloroethylene (PCE).  The basement sample result was 0.78 ppbv and the first floor sample result was 0.24 ppbv. The basement result was above the NJDEP screening level of 0.5 ppbv and the first floor result was below the NJDEP screening level of 0.5 ppbv.

## Recommendations for Further Actions

Lockheed Martin has collected numerous groundwater samples from monitoring wells both in the area generally and around the Wexford development, and has not encountered any PCE detections in the groundwater results.  This leads us to believe the presence of PCE is not coming from the groundwater and is unrelated to the trichloroethylene (TCE) that has been the focus of Lockheed Martin's investigations. Rather, we believe that the PCE is coming from another source. PCE is a common ingredient in certain cleaning products and is the main chemical used in dry cleaning.  Despite Lockheed Martin's belief that the PCE is unrelated to the TCE, Lockheed Martin offers to conduct additional indoor air sampling and follow up sub-slab sampling in order to assist you in better understanding this issue.  We will be in contact with you soon to discuss this sampling and to set up the sampling effort.

I would welcome the opportunity to sit down and discuss your results with you in the next few weeks.  If you would like to do so, please contact Brad Heim at 856-722-4657 to schedule a time convenient to meet.

Lockheed Martin is firmly committed to maintaining an open line of communication with you and providing a safe and healthy environment for both our employees and our neighbors. Thank you for your participation in this study.  Please contact me at 856-722-2578 if you have any questions or concerns regarding this matter.

Sincerely,

David A. Sutton

David A. Sutton
Manager - Environment, Safety and Health

Cc:
William Koba, Case Manager, NJDEP Office of Site Remediation
Robert Gogats, Health Officer, Burlington County Health Department

Raw Data: 2W21886.D

Accutest Laboratories

# Report of Analysis

Page 1 of 1

| Client Sample ID: | IA-VICTORIA-5-BASEMENT | | |
|---|---|---|---|
| Lab Sample ID: | JA10853-1 | | |
| Matrix: | AIR - Air | Summa ID:  A848 | Date Sampled:  01/29/09 |
| Method: | TO-15 | | Date Received:  01/29/09 |
| Project: | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | Percent Solids:  n/a |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | 2W21886.D | 1.53 | 02/02/09 | YMH | n/a | n/a | V2W940 |
| Run #2 | | | | | | | |

| | Initial Volume | | |
|---|---|---|---|
| Run #1 | 612 ml | | |
| Run #2 | | | |

VOA Special List

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 0.20 | 0.021 | ppbv | | ND | 0.81 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 0.20 | 0.040 | ppbv | | ND | 0.79 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 0.20 | 0.023 | ppbv | | ND | 0.79 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 0.20 | 0.023 | ppbv | | ND | 0.79 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | ND | 0.20 | 0.028 | ppbv | | ND | 0.79 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | 0.78 | 0.20 | 0.027 | ppbv | | 5.3 | 1.4 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 0.20 | 0.029 | ppbv | | ND | 1.1 | ug/m3 |
| | | | | | 0.031 | ppbv | | ND | 0.51 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 80% | | 78-124% |

---

ND = Not detected     MDL - Method Detection Limit
RL = Reporting Limit
E = Indicates value exceeds calibration range

J = Indicates an estimated value
B = Indicates analyte found in associated method blank
N = Indicates presumptive evidence of a compound



6 of 375
ACCUTEST
JA10853

Raw Data: 2W21868.D

Accutest Laboratories

## Report of Analysis

Page 1 of 1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Client Sample ID: | IA-VICTORIA-5-FIRST FLOOR | | | | | | |
| Lab Sample ID: | JA10853-2 | | | | Date Sampled: | 01/29/09 | |
| Matrix: | AIR - Air | Summa ID: | A309 | | Date Received: | 01/29/09 | |
| Method: | TO-15 | | | | Percent Solids: | n/a | |
| Project: | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | | | | | |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | 2W21868.D | 1 | 01/31/09 | YMH | n/a | n/a | V2W939 |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 400 ml | |
| Run #2 | | |

### VOA Special List

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 0.20 | 0.021 | ppbv | | ND | 0.81 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 0.20 | 0.040 | ppbv | | ND | 0.79 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 0.20 | 0.023 | ppbv | | ND | 0.79 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 0.20 | 0.028 | ppbv | | ND | 0.79 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | 0.24 | 0.20 | 0.027 | ppbv | | 1.6 | 1.4 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 0.20 | 0.029 | ppbv | | ND | 1.1 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 0.20 | 0.031 | ppbv | | ND | 0.51 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 90% | | 78-124% |

---

ND = Not detected   MDL - Method Detection Limit
RL = Reporting Limit
E = Indicates value exceeds calibration range

J = Indicates an estimated value
B = Indicates analyte found in associated method blank
N = Indicates presumptive evidence of a compound



7 of 375
ACCUTEST
JA10853

Raw Data: 2W21869.D

Accutest Laboratories

## Report of Analysis

Page 1 of 1

| Client Sample ID: | IA-VICTORIA-5-AMBIENT | | |
|---|---|---|---|
| Lab Sample ID: | JA10853-3 | | Date Sampled: 01/29/09 |
| Matrix: | AIR - Air | Summa ID: A093 | Date Received: 01/29/09 |
| Method: | TO-15 | | Percent Solids: n/a |
| Project: | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | |

| | File ID | DF | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | 2W21869.D | 1 | 01/31/09 | YMH | n/a | n/a | V2W939 |
| Run #2 | | | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 400 ml | |
| Run #2 | | |

### VOA Special List

| CAS No. | MW | Compound | Result | RL | MDL | Units | Q | Result | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 0.20 | 0.021 | ppbv | | ND | 0.81 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 0.20 | 0.040 | ppbv | | ND | 0.79 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 0.20 | 0.023 | ppbv | | ND | 0.79 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 0.20 | 0.028 | ppbv | | ND | 0.79 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | ND | 0.20 | 0.027 | ppbv | | ND | 1.4 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 0.20 | 0.029 | ppbv | | ND | 1.1 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 0.20 | 0.031 | ppbv | | ND | 0.51 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 84% | | 78-124% |

---

ND = Not detected     MDL - Method Detection Limit     J = Indicates an estimated value
RL = Reporting Limit     B = Indicates analyte found in associated method blank
E = Indicates value exceeds calibration range     N = Indicates presumptive evidence of a compound



8 of 375
ACCUTEST
JA10853  Laboratories



# SAMPLE

## Report of Analysis

Page 1 of 1                                                                3.2

| Client Sample ID: | | | | | | |
|---|---|---|---|---|---|---|
| Lab Sample ID: | | | | | | |
| Matrix: | AIR - Air | Summa ID:  A544 | | Date Sampled: | | |
| Method: | TO-15 | | | Date Received: | | |
| Project: | | | | Percent Solids:  n/a | | |
| | Lockheed Martin (Off-Site), 199 Borton Landing Road, Moorestown, NJ | | | | | |

| | File ID | | Analyzed | By | Prep Date | Prep Batch | Analytical Batch |
|---|---|---|---|---|---|---|---|
| Run #1 | | | | BR | n/a | n/a | |
| Run #2 | | 1 | | | | | |

| | Initial Volume | |
|---|---|---|
| Run #1 | 50.0 ml | |
| Run #2 | | |

**VOA Special List**

| | | Compound | | | MDL | Units | Q | | RL | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| 75-34-3 | 98.96 | 1,1-Dichloroethane | ND | 1.6 | 0.17 | ppbv | ND | | 6.5 | ug/m3 |
| 75-35-4 | 96.94 | 1,1-Dichloroethylene | ND | 1.6 | 0.32 | ppbv | ND | | 6.3 | ug/m3 |
| 156-60-5 | 96.94 | trans-1,2-Dichloroethylene | ND | 1.6 | 0.19 | ppbv | ND | | 6.3 | ug/m3 |
| 156-59-2 | 96.94 | cis-1,2-Dichloroethylene | ND | 1.6 | 0.22 | ppbv | ND | | 6.3 | ug/m3 |
| 127-18-4 | 165.8 | Tetrachloroethylene | ND | 1.6 | 0.21 | ppbv | ND | | 11 | ug/m3 |
| 79-01-6 | 131.4 | Trichloroethylene | ND | 1.6 | 0.23 | ppbv | ND | | 8.6 | ug/m3 |
| 75-01-4 | 62.5 | Vinyl chloride | ND | 1.6 | 0.25 | ppbv | ND | | 4.1 | ug/m3 |

| CAS No. | Surrogate Recoveries | Run# 1 | Run# 2 | Limits |
|---|---|---|---|---|
| 460-00-4 | 4-Bromofluorobenzene | 102% | | 78-124% |

Dilution Factor - In this case analysis required a 1:1 dilution

Chemical Abstract Services number is a unique identifier for chemical substances

Molecular Weight of the chemical substance

Results are reported with two different units of measure. Lockheed Martin is communicating your results as ppbv in the result tables of the cover letter.

Reporting Limit - This is typically the low calibration standard corrected for dilution and sample amounts. The lowest concentration at which an analyte (e.g. a chemical substance) can be detected and its concentration measured (reported) with a reasonable degree of accuracy and precision.

MDL  Method Detection Limit - The minimum concentration of a chemical substance that can be detected with 99% confidence, but the exact concentration cannot be reliably quantified.

urrogate Recoveries   Direct measures of how well the analytical method has worked on each individual sample. The percent recoveries indicate the accuracy of the analytical method.

Parts per billion by volume

Micrograms per cubic meter

ND = Not Detected
E = Indicates value exceeds calibration range          B = Indicates analyte found in associated method blank
J = Indicates an estimated value                                N = Indicates presumptive evidence of a compound