IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL LEESE, et al., | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | |
| v. | Civil Action No. 11-5091 (JBS/AMD) |
| LOCKHEED MARTIN CORP., | |
| Defendant. | **OPINION** |

APPEARANCES:

Julie A. LaVan, Esq.
Alaina A. Gregorio, Esq.
Drew Chigounic, Esq.
LAVAN LAW
11 East Maine Street, 2nd Floor
Moorestown NJ 08057
    Attorneys for Plaintiffs

Robert L. Ebby, Esq.
Steven T. Miano, Esq.
Robert A. Wiygul, Esq.
HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia PA 19103
    Attorneys for Defendant

**SIMANDLE, Chief Judge:**

**I. Introduction**

    Plaintiffs Michael and Ashley Leese and Jay and Racquel Winkler allege that years of environmental contamination attributable to Defendant Lockheed Martin Corp. has decreased the value of their residential properties in Moorestown, New

Jersey. The question for the Court is whether Plaintiffs' expert valuation report is admissible evidence of loss of value, and, if so, the remaining portion of Defendant's pending motion for partial summary judgment will be denied. [Docket Item 58.] Defendant moves to preclude the testimony of Plaintiffs' valuation expert, Jerome McHale [Docket Item 117], and seeks summary judgment on Counts V through VIII of the Second Amended Complaint, to the extent those tort claims derive from loss of value to the residential properties. If McHale's report and testimony are excluded, Plaintiffs will have adduced no admissible evidence on the loss of property values, and Defendant is entitled to partial summary judgment.

Defendant challenges both the reliability of McHale's methodology and the fitness of the report. Because the methodologies are based in part on arbitrary and unreliable decisions by McHale without support in scientific literature or practice, and because fitness problems may mislead or confuse a jury, the Court will exclude McHale's report from evidence and grant partial summary judgment in favor of Defendant.

## II. Background

The facts of this case were recited in the Court's previous Opinion and will not be repeated here. See Leese v. Lockheed Martin Corp., No. 11-5091, 2013 WL 5476415, at *1-*3 (D.N.J. Sept. 30, 2013).

Defendant moved for partial summary judgment on Plaintiffs' tort claims. The Court granted Defendant's motion as to personal injury claims for the Leese children but deferred judgment on Plaintiffs' claims for loss of property value. Id. at *9, *14. Pursuant to Fed. R. Civ. P. 56(e), the Court permitted Plaintiffs to supply an expert report quantifying the diminished property value for each residential property. Id. at *14. Plaintiffs timely filed an expert report for each property [Docket Item 111], the admissibility of which Defendant now challenges.

**A. McHale's reports**

Jerome J. McHale produced two valuation reports, one for the Leese property (5 Victoria Court) and one for the Winkler property (7 Victoria Court). The reports are nearly identical. McHale concluded that each property is worth $295,000 "as is," and would be worth $600,000 "if clean," meaning the loss in value at each property is $305,000. [Jerome J. McHale, Self-Contained Appraisal of Residential Dwelling (5 Victoria Court) at 2 (Oct. 11, 2013) (hereinafter "McHale Rept.").][1]

**1. "If clean" valuation**

McHale arrived at his "if clean" valuation using a "sales comparison" approach by averaging the sale prices of four

---

[1] The Court will cite to the Leese report only, as the reports are nearly identical.

comparable properties within the Plaintiffs' residential development. (Id. at 28-29.) The four properties, which sold between April 2012 and October 2013, fetched prices between $520,000 and $755,100. (Id. at 35.) McHale adjusted the sales price for each comparator based on variations among the properties (e.g., number of rooms, square footage, or other amenities) and weighted each of the sales equally to arrive at the "if clean" valuation of $600,000. (Id. at 36-37.)

### 2. "As is" valuation

McHale described the environmental issues on the properties that contributed to a loss in value:

> As a result of sampling showing levels above the State standard in addition to the presence of monitoring wells on the property, the known presence of a contaminated site located across the street, the fact that the subject is located hydrogeologically down gradient from this area, the property sits above the plume, the labeling of the subject being within the CEA, and having to allow access for future testing creates an inconvenience and stigma to the property.

(Id. at 38.) He then used three different techniques to estimate the "as is" value of the properties, and calculated the weighted average of the three valuations to arrive at the final "as is" figure of $295,000. These three techniques that form the methodology for his "as is" opinion of value are next described.

### a. Technique 1: "cost to cure"

A "cost-to-cure" estimate subtracts from the "if clean" valuation the amount of investment a homeowner would have to make to mitigate the effects of contamination. (Id. at 44.)

McHale based his estimation of mitigation costs on a "Mitigation Work Plan and Budget Evaluation" created by Joel Rogers of Impact Environmental ("the Rogers letter"). (Id. at 43-44, A81-A82.) The Rogers letter provided an estimate of ongoing and one-time costs "required to mitigate effects of contaminated groundwater and soil vapor intrusion on the subject property at 5 Victoria Court in Moorestown, New Jersey." (Id. at A81.) Rogers wrote that his estimate was

> designed considering the scenario in which the upgradient source of contamination is not abated by LMC, and therefore the proposed measures are prophylactic as opposed to curative in nature. It is considered the minimum requirement to intercept and treat contaminated groundwater and soil vapor plumes migrating towards the subject house, as well as to provide protection within the house against soil vapor intrusion from residual vapors or in the event of failure of the extraction system.

(Id.) Rogers identified $272,799 in one-time costs, such as pilot testing, permitting, and the installation of wells, piping and treatment systems, among others. (Id. at 44, A82.) The letter also described annual recurring costs of approximately $51,100. (Id. at A82.) Plaintiffs did not qualify Rogers as an expert in this case.

McHale projected the ongoing costs over 10 years, and added that sum to the one-time costs. (Id. at 44.) He concluded that the present value of mitigation expenditures was $720,000, which, when subtracted from the $600,000 "if-clean" valuation, resulted in a negative valuation of $120,000. (Id. at 45.) McHale rounded up the cost-to-cure estimate to zero dollars for his "as is" value. (Id.)

### b. Technique 2: "paired sales analysis"

A paired sales analysis looks to sales of other stigmatized properties, estimates "if clean" valuations for those properties, and calculates a "percentage discount" for environmental stigma for each property. (Id. at 45.) The average percentage discount is applied to the "if clean" estimations of Plaintiffs' properties. (Id.)

McHale considered four other stigmatized properties that had "if clean" values of $155,000 (206 Emerald Avenue); $165,000 (800 Greenwood Avenue); $200,000 (618 Charles Street); and $285,000 (16 Greentree Way) -- each less than half of the "if clean" value of Plaintiffs' properties. These properties sold at "stigma" discounts of 35 percent, 50 percent, 15 percent and 43 percent, respectively. (Id. at 46.) Three of the properties sold within the last three years; the Charles Street property sold in 2005. (Id.) None of the properties were contaminated by trichloroethylene ("TCE") or tetrachloroethylene (also known as

6

perchloroethylene or "PCE"), the contaminants that had been detected on Plaintiffs' properties. Rather, three of the comparator properties were contaminated with oil, and the Emerald Avenue property had an unknown contaminant.[2] (Id. at A92, A94, A96, A98.)

In calculating a "weighted average diminution in value," McHale weighed the three highest stigma discounts equally, at 30 percent each, and the lowest discount at 10 percent. (McHale Rept. at 46.) McHale said he weighted the Charles Street discount the least because it came from the oldest sale, but he admitted that he did not consult any authority to calculate the weighted average discount; he described the process as "opinion based" derived from his "experience." (McHale dep. at 228:21-299:11.) He testified that "it's common practice to give your sales weight," and "[i]t's something I decided to do. And I believe you'll find most other appraisers do it as well." (Id. at 229:10-21.) This process yielded a weighted average diminution in value of 40 percent. (Id.)

McHale decided, however, that the discount applied to Plaintiffs' properties should be greater than 40 percent,

---

[2] McHale describes the "stigma" of the Emerald Avenue property as: "Underground contamination from off-site source, DEP mitigation system installed." (Id. at A96.) At his deposition, McHale could not recall the contaminant at issue on the property or the level of contamination. (McHale dep. at 217:16-24, 218:14-20.)

because three of the four comparators "primarily involve underground oil tanks and contaminated soils" and "can be remediated and will no longer suffer from a stigma, unlike the subject property." (Id. at 45-46; McHale Rept. at A92, A94, A96 & A98.) He concluded that an additional 10 percent discount was appropriate, resulting in a 50 percent stigma discount he applied to the Plaintiffs' properties. (Id. at 46.) McHale explained that he added 10 percent "based on the fact that we're located on a plume. We have continued contamination and mitigation that the majority of matched pairs did not have." (McHale dep. at 233:7-13.) He selected the figure of 10 percent because he "basically allocated 5 to the location on the plume and continued stigma for the market. There's something. It's there. . . . There is only a small portion of the market in my opinion that would even look at this property." (McHale dep. at 235:15-21.) However, McHale conceded at his deposition that one of the stigmatized comparators was subject to continued contamination and mitigation, and stigma attributable to ongoing contamination already was factored into the percentage discount for that property. (McHale dep. at 231:10-17.)

The paired sales analysis yielded an "as is" valuation of $300,000, which is 50 percent of the "if clean" $600,000 valuation.

### c. Technique 3: "realtor and broker surveys"

McHale surveyed 11 area realtors to "ascertain what, if any, would be an appropriate discount to a property that was faced with a stigma . . . ." (Id. at 47.) McHale instructed interviewers to determine (1) how long each respondent had been a real estate agent, (2) whether the realtor had ever listed or sold a house with stigma, (3) whether the stigma had an effect on the sales price, and (4) whether the realtor was familiar with Wexford Estates, the Plaintiffs' development. (Def. Mot. Br. Ex. 14 [Docket Item 1117-16].) McHale then instructed the interviewers to ask: "If a home in Wexford Estates without any contamination issues was worth $600,000, what would you expect to sell the same model for that had a subsurface depressurized remediation system in the basement?"[3] (Id.)

Two of the 11 realtor respondents had never listed or sold homes with stigma or environmental issues. Three declined to

_____

[3] McHale's report notes that "ownership had a subsurface vapor mitigation system installed in the spring of 2013 in the basement." (McHale Rept. at 39.) However, for some reason, McHale's valuation assumed that the properties did not have these systems already installed. McHale's report states that "[i]t is a hypothetical condition of the appraisal that the owner installed vapor recovery system does not exist at this time." (McHale Rept. at 2.) McHale made this assumption "because the property owners incurred that cost on their own," and he didn't want the appraisal to be off by $1,500 or $2,000, which is the approximate cost of the system. (McHale dep. at 86:24-88:8.) He stated he did not believe that the vapor intrusion system actually addressed any environmental problem at the property. (Id.at 87:19-22.) He also stated his assumption would not have a material effect on the market valuation. (Id. at 89:10-12.)

offer an opinion as to a uniform percent discount that should be applied to stigmatized property, and one realtor stated she would not sell a home to any of her clients in a contaminated development. (McHale Rept. at 47.) Three realtors thought the stigma discount should be at least 10 percent, three thought the discount should be 15 percent, and one thought the discount should be 20 percent or more.[4] (Id.) Five of these respondents purported to suggest a percentage discount to the listing price, without stating what the expected sale discount should be. (Id.) McHale also surveyed nine mortgage professionals about issuing loans on an environmentally compromised property. (Id. at 48.)

McHale concluded that "[b]ased on the realtor survey, a discount on the listing price of the property is 20%." (Id. at 49.) McHale added another 5 percent because "non-stigmatized properties at Wexford Estates sold for 5% below their listing prices over the past two years." (Id.) He then added another 15 percent because of "additional marketing time and effort, the difficulty in obtaining financing, and a discount for a cash buyer," resulting in a final discount of 40 percent. (Id.) Forty percent of the $600,000 "if-clean" valuation yielded an "as is" survey valuation of $360,000. (Id.)

_____

[4] Two of the three realtors who suggested a 15 percent discount actually stated the discount should be at least "10% to 20%." (Id.) McHale quantified these responses, for purposes of his report, as 15 percent. (Id.)

10

### d. Reconciling the valuation estimates

In reconciling the three estimates, McHale gave the most weight to the "paired sales" valuation of $300,000 (50 percent weight), the second-highest weight to the survey valuation of $360,000 (40 percent weight) and the least weight to the cost-to-cure valuation of zero dollars (10 percent weight). (<u>Id.</u> at 50.)  He explained:

> the most weight has been given to Technique 2, the paired sales analysis, as this is the most reflective of the potential buyers' market and mindset. The least weight has been given to Technique 1 because it is unlikely that a prospective buyer would agree to an annual expense of more than $50,000.

(<u>Id.</u>) McHale calculated the "as is" valuation of the property to be $295,000. (<u>Id.</u>)

### 3. Loss of value

McHale subtracted the "as is" valuation of $295,000 from the "if clean" valuation of $600,000, and determined the loss in value was $305,000 for each property. (<u>Id.</u>)

## III. Standard of review

The admissibility of expert opinions is governed by Fed. R. Evid. 702 & 703, and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

11

understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert opinions may be based on

facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Daubert announced a nonexhaustive list of

factors that bear on the inquiry of reliability: (1) whether the

theory or technique can be and has been tested, (2) whether the

theory or technique has been subjected to peer review, (3) the

known or potential rate of error and the existence of and

maintenance of standards controlling the technique's operation,

and (4) general acceptance of the practice. Oddi v. Ford Motor

Co., 234 F.3d 136, 144-45 (3d Cir. 2000) (quoting Daubert, 509

U.S. at 593-97). "[A]ny step that renders the analysis

unreliable under the Daubert factors renders the expert's

testimony inadmissible. This is true whether the step completely

changes a reliable methodology or merely misapplies that

methodology." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 745
(3d Cir. 1994); see also In re TMI Litig., 193 F.3d 613, 695 (3d
Cir. 1999); In re Human Tissue Products Liab. Litig., 582 F.
Supp. 2d 644, 656 (D.N.J. 2008).

     In general, the trial court has discretion to hold an
evidentiary hearing when a Daubert issue arises. See FEDERAL
JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 35-36 (3d ed.
2011). In the Third Circuit, a hearing is typically required
where the court excludes an expert report on the grounds that
the opinions are "insufficiently explained and the reasons and
foundations for them inadequately and perhaps confusingly
explicated." Player v. Motiva Enters. LLC, No. 02-3216, 2006 WL
166452, at *4 (D.N.J. Jan. 20, 2006), aff'd, 240 F. App'x 513
(3d Cir. 2007) (quoting Padillas v. Stork-Gamco, Inc., 186 F.3d
412 (3d Cir. 1999)). "Where the evidentiary record is
substantial, however, or the court has before it the information
necessary to determine that the expert lacks 'good grounds' for
his conclusions, an in limine hearing may be unnecessary." Id.;
see also Oddi, 234 F.3d at 151-55 (stating that a hearing is
necessary "to determine how the expert reached his opinion");
Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir. 2000) ("a
Daubert hearing would have permitted a fuller assessment of
Copemann's [the expert] analytical processes and thus was a
necessary predicate for a proper determination as to the

reliability of Copemann's methods"); <u>Furlan v. Schindler</u>
<u>Elevator Corp.</u>, 516 F. App'x 201, 205 (3d Cir. 2013) ("A hearing
may not be required in all circumstances, particularly where the
depositions, affidavits, or briefing before the court are
sufficient to perform a proper analysis.").

Pursuant to Fed. R. Civ. P. 56(a), the "court shall grant
summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."

**IV. Discussion**

Defendant challenges the reliability of the three
techniques McHale used, as applied, and the fitness of the
opinions.[5]

### A. Reliability and fitness of cost-to-cure analysis (Technique 1)

Defendant argues the cost-to-cure methodology is unreliable
because it is based on the opinions about remediation costs by
Rogers, who is "an undisclosed, non-testifying expert," and
therefore the opinion drawn from Technique 1 is inadmissible.

---

[5] The record of this case includes a 283-page transcript of Mr.
McHale's deposition, in which he was questioned at length about
his methodologies, his assumptions, and how he arrived at his
opinions. Because the record is sufficient to perform a proper
analysis, the Court did not hold an <u>in limine</u> hearing to take
additional testimony from McHale. No party requested the
opportunity to present live testimony or cross-examination of
Mr. McHale, so the <u>Daubert</u> hearing consisted of consideration of
the arguments of counsel and all proffered exhibits relevant to
this motion.

(Def. Mot. Br. at 23.) Defendant objects that Rogers's letter describes "proposed measures" to remediate the property that "are prophylactic as opposed to curative in nature." (Id. at 10-11; McHale Rept. at A81.) Defendant also observes that Plaintiffs did not designate Rogers as an expert and did not provide proper disclosures for Rogers's conclusions. (Def. Mot. Br. at 11, 12 n.6.) Defendant reiterates, and McHale admitted at his deposition, that the NJDEP does not require or recommend that any of Rogers's measures be implemented on Plaintiffs' properties. (Id. at 12; McHale Dep. [Docket Item 117-9] at 156:10-15, 205:20-24.) Defendant argues that there is no basis for Rogers's conclusion that $720,000 of remedial measures are "required" at each property. (Def. Mot. Br. at 24.) Because Rogers's conclusions are unsupported, Defendant argues that McHale's valuation using the cost-to-cure method is unreliable. (Id. at 25.)

Defendant further argues that experts may not parrot or act as a mouthpiece for other experts' opinions, without independent verification of those opinions. Muhsin v. Pac. Cycle, Inc., No. 2010-060, 2012 WL 2062396, at *4, *8 (D.V.I. June 8, 2012) (stating that experts may not rely "upon opinions developed by another expert without independent verification or validation of the underlying expert's work," because Fed. R. Evid. 703 "contemplates that a testifying expert can validate the facts,

data and opinions he relied upon . . . and be subject to cross-examination on them"); Dura Auto. Sys. of Ind., Inc. v. CTS Corp., 285 F.3d 609, 612–14 (7th Cir. 2002) (stating that an expert "is not permitted to be the mouthpiece of a scientist in a different specialty").

Plaintiffs deny that the Rogers letter contains opinions; they insist that it presents "data." (Pl. Opp'n at 21) (emphasis in original). Plaintiffs also point to the "BNA Environmental Due Diligence Guide," which states that "[e]nvironmental engineers generally provide these [remediation] costs, often in the form of a competitive bid" to appraisers. (Id.) Plaintiffs contend that McHale was entitled to rely on Rogers's estimate of remediation costs.

The Rogers letter contains a mix of data (costs of various services or equipment) and subjective analysis (what "prophylactic" measures are "required"). While experts may not simply "parrot" ideas of other experts, they "are permitted to rely on materials used by other experts in developing their own opinions." I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants, No. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008). Experts "may use a mix of objective data and subjective analysis from another expert to . . . create an admissible report," and the testifying expert's knowledge regarding the underlying facts "go[es] to the weight accorded to

16

[that expert's] report and testimony, rather than its admissibility." Id. (quoting In re Wagner, No. 06-1026, 2007 WL 966010, at *4 (E.D. Pa. Mar. 29, 2007) (ellipsis and insertions in I.B.E.W.). Finally, experts may rely on facts or data that an expert "in the particular field would reasonably rely" upon, even if the underlying facts are inadmissible. Fed. R. Evid. 703; In re TMI Litig., 193 F.3d at 664. However, here, Rogers is not an expert, because Plaintiffs never so qualified him.

The most significant problem with McHale's cost-to-cure analysis is that he may not reasonably rely on Rogers's unsupported, subjective analysis of what remedial measures are "required" on the property. Rogers himself states that his estimate describes "measures [that] are prophylactic as opposed to curative in nature." (McHale Rept. at A81.) In other words, Rogers, by his own admission, does not intend his letter to address the cost to cure the contamination on Plaintiffs' properties. Rather, Rogers expresses opinions about what prophylactic measures are "required" without explaining the basis for such an opinion. He does not reference, for example, minimum state regulatory or other standards that the property must meet. Because Plaintiffs did not qualify Rogers as an expert, he would not be allowed to testify about how he reached his opinions and could not be cross-examined on these questions. Without an explanation for why these proposed costs would be

17

necessary to cure environmental problems, Rogers's opinions are not of a type reasonably relied upon by experts in McHale's field in forming their opinions. See In re TMI Litig., 193 F.3d at 664. This renders McHale's valuation opinion unreliable.

Technique 1 suffers from a fitness problem, as well. McHale describes the cost-to-cure analysis as estimating what steps would "further mitigate the effects of the contaminated groundwater and soil vapor intrusion to the indicated value of the subject property 'As If Clean.'" (McHale Rept. at 43) (emphasis added). However, Plaintiffs admit that, at the time of purchase, they knew the groundwater under their properties contained TCE. (See Def. Mot. for Partial Summary Judgment [Docket Item 87-7] Ex. 4 ¶¶ 6-7).) Remediating the property to "if clean" levels would improve the property beyond what Plaintiffs purchased, bestowing upon them an impermissible windfall. In that respect, Technique 1 does not fit the question of what loss of value the Plaintiffs allegedly suffered; the proper analysis must take into account what Plaintiffs knew of the condition of the properties at the time of purchase. As explained above, the Rogers letter does not purport to address what costs are required to improve the properties to the known condition they were in when Plaintiffs bought them. Therefore, Technique 1 does not address the relevant question, namely what

18

is the appropriate measure of Plaintiffs' diminished property value.

Because Technique 1 does not fulfil the reliability factors and does not fit the question before the Court, testimony about Technique 1 would not aid, and might confuse, a jury about the appropriate measure of damages. The Court will grant Defendant's motion and exclude those portions of McHale's report, as well as any testimony, about the cost-to-cure technique.

### B. Reliability and fitness of the "paired sales" analysis (Technique 2)

Defendant argues that the paired sales analysis is flawed because the "comparable" properties had "vastly different" environmental conditions, none of which included contamination by TCE or PCE. (Def. Mot. Br. at 12, 26, 31.) In addition, Defendant argues that two of the four comparators are inappropriate because the NJDEP required remediation on them, whereas the NJDEP did not require remediation on Plaintiffs' properties, and the cost of remediation on the two comparators was estimated to be tens of thousands of dollars, not hundreds of thousands as alleged for Plaintiffs' properties. (Id. at 13, 32.) Defendant contends that McHale did not compare "apples to apples," as required by appraisal literature, because the properties did not share conditions or severity of contamination or similar costs of remediation. (Id. at 27-30.) Defendant

19

disagrees with McHale's assumption that the market was not sophisticated enough to distinguish between different environmental conditions. (Id. at 29-30.)

Defendant also attacks McHale's method of calculating a percentage discount, arguing that he had no basis for according the least weight to the least discounted property, or adding an additional 10 percent to the weighted average discount. (Id. at 13-15.) At his deposition, McHale confirmed that he did not use any literature or source or authority to come up with his weighted average; rather, his weighted average was "opinion based" and could not be tested for validity or accuracy. (McHale dep. at 229:2-11.) McHale stated that "it's common practice to give your sales weight," and he believes "most other appraisers do it as well." (McHale dep. at 229:10-21.) McHale also admitted that he increased the percentage discount because Plaintiffs' properties sit on a plume and have "the continued stigma of ongoing contamination and mitigation, which you don't have in the matched pairs." (McHale dep. at 230:20-231:4.) He later conceded that one of the comparators also was subject to continued contamination and mitigation and those factors were already accounted for in the original percentage discount. (McHale dep. at 231:10-17.)

Defendant relies primarily on Player, supra. In Player, the district court found an expert valuation report unreliable

20

because the expert compared the property at issue with a site much more profoundly contaminated and which had caused cancer in "an inordinate number of children." Player, 2006 WL 116452, at *7. The expert did not select the comparator because of its similarity to the plaintiff's land, but because he did not know of any other cases with readily available data, which was improper. (Id.) The district court also faulted the expert for extrapolating a discount percentage after receiving responses to e-mailed questions from four financial lenders. (Id. at *8.) The expert improperly concluded from these responses that buyers would not be able to obtain loans and would have to buy in cash. (Id.) The e-mail also improperly suggested much greater contamination of the property than was actually present. (Id.) The Third Circuit affirmed, noting that the district court "certainly had the discretion to exclude 'opinion evidence that is connected to existing data only by the ipse dixit of the expert.'" Player, 240 F. App'x at 520 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). The Third Circuit ruled that "there was no basis for saying the [comparator] contamination site is similar to the properties involved in this litigation," and the method for determining that buyers could not receive financing was unreliable. Id. at 520-21. Defendant urges the same result here.

Plaintiffs counter that the comparators are similar enough to avoid being misleading and that the literature does not always require identical comparators. (Pl. Opp'n at 23.) Plaintiffs suggest that disagreements about McHale's assumptions go to weight, not admissibility. (Id. at 23-24.) Plaintiffs also reject the analogy to Player, arguing that Player did not involve paired sales analysis, and the expert in Player could not read relevant scientific charts. (Id. at 24.)

In reply, Defendant reiterates that the properties are not similar in condition or "if clean" value, and that McHale did not make adjustments to account for significant differences. (Def. Reply at 6.) At McHale's deposition, he testified that the differences in the comparators' percentage discounts were based on differences in markets, not environmental factors. (Id. at 7 n.2; McHale dep. 225:3-5 ("It depends on the market and it depends on the market participants.").) Assuming this is true, Defendant argues that McHale made no showing that the markets for the comparators were in any way analogous to the market for Plaintiffs' properties, rendering the opinion unreliable. (Def. Reply at 7 n.2.)

The comparators are not identical, but they are not nearly as arbitrary as the one in Player, which the expert selected only because he knew of no other options, and the difference in

contamination is not as severe as in <u>Player</u>. These differences alone do not render this report inadmissible.

However, McHale's report has irreparable flaws. McHale could not articulate a reliable basis for weighting the comparator percentages, and he did not consult any authority to arrive at his average. The Court may "exclude 'opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert.'" <u>Player</u>, 240 F. App'x at 520 (quoting <u>Gen. Elec. Co.</u>, 522 U.S. at 146).

More significantly, McHale had no reliable basis for adding 10 percent to the weighted average discount. Although McHale's report states that the need for ongoing contamination and mitigation is a factor unique and "specific to the subject property," McHale admitted that one of this four comparators, the Emerald Avenue property, also faced ongoing contamination and mitigation:

> Q. . . . At least one of these properties still has
> continued contamination and mitigation, right?
> A. Correct.
> Q. So, that's already factored into your weighted
> average, right?
> A. Correct.

(McHale dep. at 231:12-17.) When pressed, McHale said the extra 10 percent derived from "a market based opinion from me." (<u>Id.</u> at 236:12.) He referred to gathering opinions from unspecified "other people in the market." (<u>Id.</u> at 235:15-16, 236:4-5.) He

also attempts to justify the figure by reiterating his observations that the property is on a plume and subject to ongoing contamination and mitigation. But these statements do not constitute an explanation for selecting the figure of 10 percent. McHale does not provide a basis for finding that the specific methodology he used in this case is reliable, verifiable or common practice. He appears to have selected it out of thin air.

By adding 10 percent to the weighted average discount, McHale is saying, effectively, that the conditions on Plaintiffs' properties are less desired by the marketplace than the comparators, necessitating an upward adjustment in the discount percentage. However, Defendants are correct that McHale does not discuss the marketplaces and, more importantly, McHale admitted that he does not know the level of contamination on Plaintiffs' properties or whether the levels are above NJDEP screening levels. (McHale dep. at 210:12-17.) This admission casts doubt on McHale's ability to reliably select and adjust comparators for the paired sales analysis.

McHale denies that he double counts the discount for ongoing contamination and mitigation when adding 10 percent to the weighted average because "only one comparable had that, not all four," and he accounted for that fact "[i]n my weighting." (Id. at 231:22-23, 232:3.) But again, McHale cannot sufficiently

24

explain his weighting. McHale does not explain why the property that had ongoing contamination was not weighted more heavily than those that did not, or how the 10 percent figure appropriately accounts for the similarities of the Emerald Avenue property and the differences of the other comparators with Plaintiffs' properties.

The addition of an unjustifiable 10 percent discount improperly inflates the loss of value estimate, rendering the opinion unreliable. McHale's paired sales analysis is inadmissible.

The paired sales analysis also suffers from a problem of fit, as the cost-to-cure analysis did. The measure of Plaintiffs' damages is the loss of value they sustained, which must take into account, in some fashion, the condition of the property Plaintiffs purchased, what knowledge they had of the conditions at the time, and what appreciation or depreciation occurred during the period of ownership. This figure is not necessarily the same as the pure difference between the property "as is" and "if clean," as of the date McHale performed his analysis. But McHale begins his report with a statement of purpose, which is "to provide a market value estimate for the fee simple interest of the property 'As Is' and 'As If Clean.'" (McHale Rept. at 1.) McHale's report makes no reference to the purchase price or knowledge Plaintiffs had of the property at

25

the time of purchase, which necessarily affects the injury.
McHale ignores the fact that Plaintiffs were advised, at the
time of purchase of these homes, of the fact that contamination
had been detected in groundwater. Plaintiffs admitted that they
were aware of the presence of TCE in the groundwater under their
properties before they purchased their homes. (Pl.'s Resp. to
Def.'s Requests for Admission [Docket Item 87-7] ¶¶ 6-7[6]; see
also Def. Ex. 2 [Docket Item 87-5] at 12 & Def. Ex. 3 [Docket
Item 87-6] at 15 (Agreements of Sale disclosing TCE ground water
contamination in the "southeastern quarter of the Wexford at
Moorestown site," the portion of the residential development
where Plaintiffs own property).) The Agreements of Sale also
alerted Plaintiffs to the fact that that the Lockheed Martin
facility across the street was contaminated and being
remediated. [Docket Items 87-5 at 12 & 87-6 at 15.] Despite

---

[6] The admissions read:

> 6. Admit that Michael and Ashley Leese were aware by
> no later than June 7, 2003, that the groundwater at 5
> Victoria Court, Moorestown, New Jersey, contained TCE.
>     ANSWER
>         Admit.

> 7. Admit that Jay and Raquel Winkler were aware by no
> later than November 24, 2003, that the groundwater at
> 7 Victoria Court, Moorestown, New Jersey, contained
> TCE.
>     ANSWER
>         Admit.

[Docket Item 87-7 ¶¶ 6-7.]

Plaintiffs' awareness of these facts at the time of purchase, McHale considered these environmental factors as contributing to the "as is" discount in his calculations. In short, McHale ignores that these properties were not "clean" when purchased and that the prices paid by the Leeses and Winklers necessarily would have reflected some discount for the stigma of being down-gradient from the Lockheed Martin facility. The methodology thus creates a misleading result, because it does not purport to measure the damages actually sustained by Plaintiffs. Because the report would not necessarily help a jury determine the loss of value Plaintiffs allegedly suffered, the paired sales portion of the report is inadmissible.

### C. Reliability of interviews/surveys

Defendant contends that McHale's survey method is unreliable because the interviewers did not follow "proper, reliable survey" methods, which Defendant draws from trademark law. (Def. Mot. Br. at 35-37) (citing J&J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 369 (D.N.J. 2002).) Defendant further argues that the discount value derived is arbitrary. (Id. at 38.) Only one of seven realtors who offered an opinion on the percent discount said the discount should be 20 percent or more (others mentioned the listing price should be discounted "at least by 10% to 20%"), but McHale concluded that the discount is at least 20 percent. (Id.) Then McHale doubled

the discount to 40 percent for "additional marketing time and effort, the difficulty in obtaining financing, and a discount for a cash buyer," without explaining why the realtors did not take those factors into account when giving their answers. (Id.) Presumably, the discount of the selling price already includes these very considerations and they should not be counted twice.

Plaintiffs respond that the standards of trademark surveys do not apply here and that methodological deficiencies go to weight of the survey, not the admissibility. (Pl. Opp'n at 25–26) (quoting J&J Snack Foods, 220 F. Supp. 2d at 369).) Plaintiff also argues that the most important quality of a survey is that it fits the issue and that the findings do not inject confusion into the record. (Id. at 26.) Plaintiffs assert that Defendant has not challenged the fit of the survey. (Id. at 26.)

Defendant replies that it does challenge the fit and that McHale's method, in any event, was unreliable. Defendant further quotes J&J Snack Foods, which stated: "[W]hen the deficiencies are so substantial that they render the survey's conclusions untrustworthy, the court should exclude the survey from evidence." (Def. Reply at 11; J&J Snack Foods, 220 F. Supp. 3d at 369.) Defendant observes that Plaintiffs did not attempt to defend the flaws in the methodology, or argue that the survey is nonetheless reliable. (Def. Reply at 11-12.)

McHale's survey technique is similar to that rejected in Player. In Player, the expert received survey responses from only four financial lenders, and the process was unreliable for three reasons: (1) the number of responses (four) was small; (2) lenders were given the impression by the questions that the property had much greater contamination that it actually did, and (3) it was unclear how the expert calculated his final percentage discount. Player, 2006 WL 166452, at *8.

Similarly here, McHale based his discount on only seven or eight responses from realtors (seven offered a percentage discount, one said that she would not sell a home in that development). (McHale Rept. at 47.) Next, those realtors were not informed of the kind or level of contamination on Plaintiffs' properties, or whether that the contamination exceeded regulatory screening levels. (McHale dep. at 151:16-19, 240:1-10, 261:12-17, 262:1-4.) Realtors were asked for how much they would "expect to sell" a house with a subsurface remediation system. (Def. Mot. Br. Ex. 14.) But, while the realtors were asked to assume that the house had a subsurface mitigation system, McHale's report, counterfactually, assumed Plaintiffs did not have these systems in their homes. McHale does not reconcile these inconsistencies. Finally, it is unclear how McHale arrived at his final percentage discount. First, he determined that "a discount on the listing price of the property

is at least 20%," (McHale Rept. at 49), without explaining how, mathematically, his average discount could be equal the highest discount offered by one respondent. Then McHale doubled that figure to arrive at an estimated sale price. The doubling included a 5 percent discount for the fact that properties in the development sold for that amount below the listing price, and 15 percent for "additional marketing time and effort, the difficulty in obtaining financing, and a discount for a cash buyer . . . ." (Id.) McHale could not explain why these "additional" factors were not adequately considered by the realtors when they suggested discounts to the listing price.

Although some methodological flaws go to weight, here the methodology is unreliable at each step: fact gathering, percentage averaging, percentage doubling. The entire formulation of the survey seems to invite unreliability, asking the realtors for their listing price (rather than at what price, in their experience, a property like this might sell), and then adding additional discounts without any basis to support such a figure. Like the report in Player, McHale's survey valuation must be excluded as unreliable.

**D. Summary judgment**

Because each of McHale's methodologies is unreliable, the entirety of his report must be excluded. The methodologies contain arbitrary or unreliable factors that inflate the loss of

value and might mislead a jury. As a result, Plaintiffs have not adduced any admissible evidence of diminished property value in opposing Defendant's summary judgment motion. Therefore, the Court will grant the remaining portion of Defendant's motion for partial summary judgment on Plaintiff's tort claims.

**V. Conclusion**

For the reasons explained above, the Court will exclude Plaintiffs' expert valuation report and expert testimony as it is unreliable and suffers from fitness problems. Defendant is entitled to partial summary judgment on Plaintiffs' diminished property value claims.


**March 17, 2014**                              **s/ Jerome B. Simandle**
DATE                                            JEROME B. SIMANDLE
                                                Chief U.S. District Judge